No. 21-1786

# United States Court of Appeals
## for the Sixth Circuit

——— ı ———

**Timothy King, et al.**,

*Plaintiffs*

v.

**Gretchen Whitmer, in her official capacity as Governor of the State of Michigan, et al.**,

*Defendants-Appellees.*

——— ı ———

Appeal from the United States District Court
Eastern District of Michigan
No. 2:20-cv-13134
Honorable Linda V. Parker, District Judge, Presiding

**Opening Brief of Appellants
Sidney Powell, Howard Kleinhendler, Gregory Rohl, Julia Z.
Haller, Brandon Johnson, and Scott Hagerstrom**

Howard Kleinhendler, Esq.
369 Lexington Avenue, 12th Floor
New York, NY 10017
Ph: 917-793-1188
E-Mail: howard@kleinhendler.com

Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Local Rule 26.1, Appellants certify that as natural persons they have no parent corporation and no publicly held corporation owns 10% or more of any stock.


Date: February 7, 2022 　　　　/s/ Sidney Powell
　　　　　　　　　　　　　　 Sidney Powell, Esq.
　　　　　　　　　　　　　　 2911 Turtle Creek Blvd, Ste 300
　　　　　　　　　　　　　　 Dallas, TX 75219
　　　　　　　　　　　　　　 Ph: 214-707-1775
　　　　　　　　　　　　　　 Email: sidney@federalappeals.com
　　　　　　　　　　　　　　 *Counsel for Appellants*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ............................................................ii

TABLE OF AUTHORITIES ......................................................iv

STATEMENT REGARDING ORAL ARGUMENT ...............................1

STATEMENT OF JURISDICTION ............................................2

SUMMARY OF THE ARGUMENT ...........................................3

STATEMENT OF THE ISSUES.............................................10

STATEMENT OF THE CASE ..............................................11

STANDARD OF REVIEW...................................................16

ARGUMENT ...................................................................17

  I.   The District Court abused its discretion in awarding sanctions to punish an argument it dislikes. ..........................................17

    A.   Appellants made non-frivolous factual assertions based on sworn statements and under the emergency circumstances that triggered this litigation. ..................................................19

      1.   Attorneys cannot be sanctioned for relying on affidavits they did not know to be untrue, particularly in a fast-paced election case. ..............................................................19

      2.   Appellants' reliance on reams of sworn testimony to bring suit was reasonable. ..................................................21

      3.   The District Court reached a contrary conclusion only through an invidious rewriting of the record. ................37

    B.   Appellants brought non-frivolous claims based on a reasonable interpretation of the law and plausible arguments to extend the law. ..................................................................52

    C.   The District Court abused its discretion in awarding Detroit, a permissive intervenor, nearly 700% of the fees awarded to the actual Defendants. ........................................................58

  II.   The District Court erred as a matter of law by violating the First Amendment rights of Appellants and their clients. ...........................60

III.   The District Court erred as a matter of law by issuing a sanctions order with no effort to tie specific findings of sanctionable conduct to a specific standard and specific remedy............................ 64

    A.   The various, and varied, sources of sanctions authority.......... 66

    B.   The hash made of the standards. ............................................. 68

    C.   At least remand for clarification is necessary. ........................ 75

IV.   The District Court erred as a matter of law by imposing sanctions collectively against all attorneys without explaining its individualized consideration of their relative responsibility for any misconduct. ................................................................................. 76

V.   The District Court erred as a matter of law by flouting Rule 11's substantive protections and using inapplicable supplemental sources of sanctions authority to fill the gap. .................................................... 81

CONCLUSION ....................................................................................... 83

CERTIFICATE OF COMPLIANCE........................................................ 86

CERTIFICATE OF SERVICE................................................................. 87

DESIGATION OF RELEVANT LOWER COURT DOCUMENTS ........ 88

# TABLE OF AUTHORITIES

## Cases

*Abrams v. United States*, 250 U.S. 616 (1919)....................................6-7

*Advanced Video Techs. LLC v. HTC Corp.*, No. 1:11 CIV. 06604 (CM),
2015 WL 7621483 (S.D.N.Y. Aug. 28, 2015) .......................................20

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*,
45 F.3d 1144 (7th Cir. 1995) ...............................................................60

*Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 191
(9th Cir. 1989) ......................................................................................85

*Bell Atlantic Corp. v. Twombly*, 549 U.S. 1018 (2006) ..........................30

*Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109
(6th Cir. 1989) ......................................................................................81

*Bodenhamer Bldg. Corp. v. Architectural Rsch. Corp.*, 989 F.2d 213
(6th Cir. 1993) ......................................................................................79

*Bowyer v. Ducey*, No. 2:20-cv-02331 (D. Ariz. 2021)...............................6

*Brubaker v. City of Richmond*, 943 F.2d 1363 (4th Cir. 1991)...............51

*Bush v. Gore*, 531 U.S. 98 (2000) ...................................................*passim*

*Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n*,
434 U.S. 412 (1978) .............................................................................28

*Cicero v. Borg-Warner Automotive, Inc.*, 163 F. Supp. 2d 743
(E.D. Mich. 2001)..................................................................................33

*Coffey v. Healthtrust, Inc.*, 955 F.2d 1388 (10th Cir. 1992)....................74

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,  370 U.S. 690 (1962)
.....................................................................................................37, 50

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990) .............16-17

*Costantino v. Detroit*, 950 N.W.2d 707 (Mich. 2020) ........................23-24

*Costantino v. Detroit*, No. 20-014780-AW (Wayne Cty. Cir. Ct. 2020)...23

*Curling v. Raffensperger*, 397 F. Supp. 3d 1334 (N.D. Ga. 2019) ....25, 44

*Danvers v. Danvers*, 959 F.2d 601 (6th Cir. 1992)..................................66

*Davis v. City of Detroit*, No. 347931, 2020 WL 1488661 (Mich. Ct. App.
March 24, 2020)....................................................................................13

*Eagon ex rel. Eagon v. City of Elk City, Okl.*, 72 F.3d 1480
(10th Cir. 1996) ....................................................................................60

*Eclipse Res.-Ohio, LLC v. Madzia*, No. 2:15-CV-00177, 2017 WL 274732
(S.D. Ohio Jan. 20, 2017) ....................................................................36

*Garner v. Cuyahoga Cty. Juv. Ct.*, 554 F.3d 624 (6th Cir. 2009) .....65, 69

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) ...................... 60, 64

*Goldstein v. Cox*, 396 U.S. 471 (1970) ...................................................... 17

*Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017). 59, 67, 72

*Healey v. Chelsea Res., Ltd.*, 947 F.2d 611 (2d Cir.1991) ....................... 21

*In re Amodeo*, No. 8:17-BK-07965-RCT, 2019 WL 10734046 (Bankr. M.D. Fla. July 30, 2019) .......................................................................... 20

*In re Big Rapids Mall Associates*, 98 F.3d 926 (6th Cir.1996) .............. 21

*In re Blasingame*, 709 F. App'x 363 (6th Cir. 2018) ............................... 70

*In re Corrinet,* 645 F.3d 1141 (9th Cir. 2011) ........................................ 73

*In re Murchison*, 349 U.S. 133 (1955) ..................................................... 64

*In re Primus*, 436 U.S. 412 (1978) ........................................................... 61

*In re Ruben*, 825 F.2d 977 (6th Cir. 1987) ................ 65, 68, 72, 76-77, 84

*In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90 (3d Cir. 2008) .............. 70

*INVST Fin. Grp., Inc. v. Chem-Nuclear Sys.*, Inc., 815 F.2d 391 (6th Cir. 1987) ...................................................................................... 30

*Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224 (6th Cir. 1989)............................................................. 55, 58, 66, 80

*Jeffreys v. Rossi*, 275 F. Supp. 2d 463 (S.D.N.Y. 2003) ........................... 21

*Jones v. Cont'l Corp.*, 789 F.2d 1225 (6th Cir. 1986)............................... 65

*Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350 (3d Cir. 1990)......... 69, 75

*Katz v. Household Int'l, Inc.*, 36 F.3d 670 (7th Cir. 1994)...................... 79

*King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020)....................... 53

*King v. Whitmer*, No. 20-02205 (6th Cir. 2020) ...................................... 14

*Kleinmark v. St. Catherine's Care Ctr.*, 585 F. Supp. 2d 961 (N.D. Ohio 2008).................................................................................... 34

*LaSalle Nat'l Bank v. First. Conn. Holding Grp.*, 287 F.3d 279 (3d Cir. 2002) ....................................................................................... 74

*Lawrence Univ. Bicentennial Comm'n v. City of Appleton, Wisc.*, 409 F. Supp. 1319 (E.D. Wis. 1976) ................................................................. 60

*Leahy v. Orion Twp.*, 711 N.W.2d 438 (Mich. Ct. App. 2006) ............... 23

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)............................. 61

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ...................................................................................................... 54

*Lucas v. Jos. A. Bank Clothiers, Inc.*, 217 F. Supp. 3d 1200 (S.D. Cal. 2016) ...................................................................................................... 20

*Macort v. Prem, Inc.*, 208 F. App'x 781 (11th Cir. 2006) ....................... 70

*Matter of Yagman*, 796 F.2d 1165 (9th Cir. 1986)................................... 70

*McLinko v. Commw. of Penn., Dep't of State*, No. 244 M.D. 2021, 2022 WL 257659 (Pa. Commw. Ct. Jan. 28, 2022) ....................................... 26

*McNeill v. Wayne Cty.*, No. 05-72885, 2005 WL 1981292 (E.D. Mich. Aug. 10, 2005) ...................................................................................... 34

*Mezibov v. Allen*, 411 F.3d 712 (6th Cir. 2005) ................................. 61, 64

*NAACP v. Button*, 371 U.S. 415 (1963) .................................................. 61

*National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ...................................................................................... 61, 64

*New York News, Inc. v. Kheel*, 972 F.2d 482 (2d Cir. 1992) ................... 59

*Nieves v. City of Cleveland*, 52 F. App'x 635, 637 (6th Cir. 2002) .......... 80

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986) ............................... 76

*Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992) ....... 79

*Page v. Oath Inc.*, No. 69,2021, 2022 WL 162965 (Del. Jan. 19, 2022) .............................................................. 3, 22, 30

*Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989) ........................................................................................................ 78, 80

*Peacock v. Thomas*, 516 U.S. 349 (1996) ................................................ 17

*Pearson v. Gov. of Georgia*, No. 20-cv-04809 (N.D. Ga. 2021) ................. 6

*Pravic v. U.S. Indus.-Clearing*, 109 F.R.D. 620 (E.D. Mich. 1986) ........ 36

*Pub. Interest L. Found. v. Benson*, 1:21-cv-00929 (W.D. Mich. filed Nov. 3, 2021) ................................................................................................ 18

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006) .................................................................................. 67

*Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389 (6th Cir. 2009) ..... 68

*Republican Party of Penn. v. Degraffenreid,* 141 S. Ct. 732 (2021) ........ 24

*Riddle v. Egensperger*, 266 F.3d 542 (6th Cir. 2001) ............................. 62

*Roadway Exp., Inc. v. Piper*, 447 U.S. 752 (1980) ..................... 17, 67, 83

*Royal v. Netherland*, 4 F. Supp. 2d 540 (E.D. Va. 1998) ....................... 20

*Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368 (6th Cir. 1996) ......................................................................................... 17

*Schottenstein v. Schottenstein*, 230 F.R.D. 355 (S.D.N.Y. 2005) ........... 36

*Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941) ................... 17

*Smith v. Psych. Sols., Inc.*, 864 F. Supp. 2d 1241 (N.D. Fla. 2012) ....... 70

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ............................ 54

*Trump v. Wisconsin Elections Comm'n*, No. 20-cv-1785-BHL (E.D. Wisc. Dec. 6, 2021) ..................................................................................... 6, 22

*United States v. Allmendinger*, No. 3:10CR248, 2017 WL 455553 (E.D. Va. Feb. 1, 2017) ................................................................................... 20

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................64

*United States v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen &*
  *Helpers of Am.*, 948 F.2d 1338 (2d Cir. 1991) ...............................75, 80

*United States v. Ross*, 535 F.2d 346 (6th Cir. 1976) ......................17, 74

*Vild v. Visconsi*, 956 F.2d 560 (6th Cir. 1992) ...................................81

*Xcentric Ventures, L.L.C. v. Borodkin*, 908 F. Supp. 2d 1040
  (D. Ariz. 2012) ...................................................................................20

*Zuk v. Eastern Pa. Psychiatric Inst. of the Med. Coll.*, 103 F.3d 294
  (3d Cir. 1996) .....................................................................................70

## Statutes

3 U.S.C. § 1 .................................................................................................57

3 U.S.C. § 2 .................................................................................................57

3 U.S.C. § 5 .................................................................................................57

28 U.S.C. § 1291 ..........................................................................................2

28 U.S.C. § 1253 ........................................................................................17

28 U.S.C. § 1331 ..........................................................................................2

28 U.S.C. § 1343 ..........................................................................................2

28 U.S.C. § 1367 ..........................................................................................2

28 U.S.C. § 1927 ................................................................................*passim*

28 U.S.C. § 2201 ..........................................................................................2

28 U.S.C. § 2202 ..........................................................................................2

Mich. Comp. Laws § 168.769(1) .............................................................29

## Rules

Delaware Rule of Professional Conduct 3.1............................................30

Federal Rule of Appellate Procedure 4(a)(1)(A)......................................2

Federal Rule of Civil Procedure 11 ................................................*passim*

Federal Rule of Civil Procedure 41(a)....................................................17

Michigan Rule of Professional Conduct 3.1 ..........................................73

Michigan Rule of Professional Conduct 3.3............................................73

# Treatises

Joshua A. Douglas, *The Procedure of Election Law in Federal Courts*, 2011 UTAH L. REV. 443 ............................................................58

Lawrence Tribe, *eroG .v hsuB and its Disguises: Freeing* Bush v. Gore *from its Hall of Mirrors*, 115 HARV. L. REV. 170 (2001)......................55

WRIGHT & MILLER, 5A FED. PRAC. & PROC. CIV. § 1339 *Verification* (4th ed. West 2022) ..........................................................................19

# Other Authorities

Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, N.Y. TIMES (Oct 6, 2012)................................................................25

Brad Brooks et al., *Why Republican voters say there's 'no way in hell' Trump lost*, REUTERS (Nov. 20, 2020) ..................................18

Ga. Sec. State Press Office, *Secretary Raffensperger Calls on J. Alex Halderman To Agree To Release "Secret Report" and Pre-Election Testimony* (Jan. 27, 2022) ........................................................25

Geoff Earle, *Majority of Americans believe US democracy is at risk of extinction and just 54% think Biden won the presidential election, new poll shows*, DAILY MAIL (Jan. 17, 2022) ..............................18

Henry Olsen, *Reforming the Electoral Count Act is crucial to our democracy*, WASH. POST (Jan. 25, 2022)................................18

J.B. Hopkins, *The First Thing We Do, Let's Get Shakespeare Right!*, 72 Fla. B.J. 9, 9 (Apr. 1998) ....................................................84

Lane Cuthbert, *Do Republicans really believe Trump won the 2020 election? Our research suggests that they do*, WASH. POST (Jan. 7, 2022) ..................................................................................64

Larry Diamond, *Democrats, Want to Defend Democracy? Embrace What Is Possible*, N.Y. TIMES (Jan. 25, 2022) .........................18, 57

Lois Beckett, *Millions of Americans think the election was stolen*, THE GUARDIAN (Apr. 16, 2021)....................................................18

Monmouth U. Polling Inst., *Doubt in American System Increases* (Nov. 15, 2021), *available at* https://tinyurl.com/y6zyuvfu ...........................18

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents novel questions of both fact and law concerning the ability of public officials exercising election-related functions under the Constitution to secure legal representation. These questions arise in an unusually important context—disputes concerning a presidential election—and, inasmuch as the District Court's order directly threatens their livelihoods and reputations, Appellants have more than an ordinary party's stake in the outcome. Given the novelty of the issues and the extent of the record below, it is impossible for Appellants to anticipate all possible questions concerning issues not yet refined by the common-law process. Further, Appellants' unusually weighty personal interests in these proceedings, as well as the public interest in matters surrounding the 2020 Presidential Election, counsel allowing the fullest panoply of procedural protections. The decisional process and the public interest in transparent, and full and fair proceedings, would thus be aided significantly by oral argument.

## STATEMENT OF JURISDICTION

Plaintiffs properly invoked the jurisdiction of the District Court under 28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.  RE 6, Page ID # 881.  Appellants are subject to a final judgment of the District Court, entered December 2, 2021.  RE 180, Page ID # 7169-70.  They filed a timely notice of appeal on December 3, 2021, properly invoking this Court's jurisdiction under 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4(a)(1)(A).  RE 182.

## SUMMARY OF THE ARGUMENT

Appellants Sidney Powell, Howard Kleinhendler, Gregory Rohl, Julia Z. Haller, Brandon Johnson, and Scott Hagerstrom have been sanctioned by the District Court for serving as attorneys to Plaintiffs challenging the 2020 Presidential Election. For the offense of representing Michigan Republican Presidential Electors and the Republican Party officials with a role in selecting them, the District Court imposed on Appellants the maximum possible sanctions, with the clear purpose of depriving them of their livelihoods.

This sanctions order is extraordinary, and not just among sanctions decisions as a whole but among directly comparable cases surrounding the 2020 Presidential Election. Other courts have been unwilling to sanction attorneys who bring claims on behalf of public officials, based in sworn testimony, on the compressed timeline applicable to election litigation, that are then dismissed within a reasonable time.[1]

---

[1] The only other court to sanction one of the attorneys in this case for involvement in litigation challenging the 2020 Presidential Election—a state trial court's involuntary revocation of Lin Wood's *pro hac vice* status—was sternly reversed by the Delaware Supreme Court. *Page v. Oath Inc.*, No. 69,2021, 2022 WL 162965 (Del. Jan. 19, 2022).

The bulk of the District Court's order is devoted to Monday morning quarterbacking the sworn testimony on which Appellants relied as part of their representation of Plaintiffs. Yet the American legal system relies every day on sworn testimony no different than the dozens of eyewitnesses and expert affidavits that Appellants submitted, even though Appellants were under no obligation to possess sworn *anything* before filing a complaint. Men sit on death row based on the testimony of a single witness—legions less than Appellants were handed as evidentiary support. Nation-wide injunctions issue against important government programs based on sworn statements as to entirely unknowable mental processes. Every day, billions of dollars change hands, licenses and permits running the gamut from barbering to nuclear reactor construction are granted and denied, and personal freedom is gained and lost, all on nothing more than a single person's sworn say-so. Most complaints in federal court are not even verified, far less accompanied by affidavits. The right of attorneys to file a complaint seeking redress of grievances on behalf of public official clients without fear of judicial reprisal applies no matter the ultimate

truth or falsity, good or bad faith, of a client's statements, so long as *the attorneys* do not suborn the statements.

Plaintiffs are not merely random citizens questioning votes. They are public officials of a constitutionally special sort—presidential electors and officials from a party organization charged by state law with selecting those electors—who sought Appellants' counsel and representation because they suspected they were being denied the constitutional right to fulfill their duties. These public officials did so based on information they received from citizens who, in statements made under penalty of perjury, alleged first-hand knowledge of deeply troubling election misconduct, and on expert reports corroborating those suspicions. If a sworn statement is sufficient to entitle someone to vote without identification, as is true in Michigan, a sworn statement should be sufficient for calling into question the propriety of that vote.

Appellants had a legitimate basis for alleging serious election-law violations justifying relief under *Bush v. Gore*, 531 U.S. 98 (2000). They had a legitimate argument for the extension of law—and, indeed, for application of *settled* law. (For example, the District Court's Eleventh Amendment, standing, abstention, and laches rulings were themselves

5

dubious.  *See infra* n.57.)  That is perhaps why other courts handling cases identical in all relevant respects have either refused sanctions, *Trump v. Wisconsin Elections Comm'n*, No. 20-cv-1785-BHL (E.D. Wisc. Dec. 6, 2021) (ECF 178), or have never been asked to impose sanctions in the first place, *Bowyer v. Ducey*, No. 2:20-cv-02331 (D. Ariz. 2021); *Pearson v. Gov. of Georgia*, No. 20-cv-04809 (N.D. Ga. 2021).  Indeed, more than half of the Defendants and Intervenors in *this* case either did not seek or were refused sanctions.

The District Court makes it sound like everything submitted by Plaintiffs was a fraud, but prior and subsequent lawsuits have pointed to very similar problems.  And dozens of laws have been enacted by state legislatures in response to concerns similar to those raised in the complaint.  Millions of Americans believe the central contentions of the complaint to be true, and perhaps they are.

"If," as seems true of the District Court, "you have no doubt of your premises or your power and want a certain result with all your heart you naturally express your wishes in law and sweep away all opposition."  *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, dissenting).  "But when men have realized that time has upset

6

many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas." *Id.* Punishing Appellants for "spread[ing] the narrative that our election processes are rigged and our democratic institutions cannot be trusted," RE 172, Page ID # 6992-93, cannot be reconciled with the First Amendment's clear command that "[t]he best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams,* 250 U.S. at 630. In an era when election disputes are common, perhaps even routine, imposing sanctions on lawyers for bringing such challenges because they cannot prove their case before even filing the complaint cuts at the heart of our democratic process.

The District Court arrived at its deeply flawed result through a deeply flawed process. Contemplating the order's prolixity, one might think it must at least check all the requisite procedural boxes. Yet, despite lavish outrage (including blaming Appellants for the events of January 6, 2021) and voluble (if partisan) paeans to "America's civil litigation system," the order contains not a single word tying specific conduct to a specific standard or specific finding, as required under the

heightened standards applicable to sanctions proceedings. Despite widely varying levels of involvement, each sanctioned attorney is also treated exactly the same in the ultimate sanctions ordered, with no explanation how the sanctions were tailored against any individual. These procedural defects are legal errors that require, at a minimum, vacatur and remand.

The Court need not remand, however, because the District Court commits another species of legal error, separate and apart from ignoring proper procedure or the fact the complaint was adequately grounded in fact and law: The District Court disregarded Rule 11's safe-harbor provision by sanctioning Appellants for dismissing their complaint seven business days late, ignoring its own orders extending relevant times to act and the pendency of an appeal in this and related cases. Then, in an effort to ground the order somewhere else, the District Court disregarded both the text of 28 U.S.C. § 1927 and a crystal clear admonition from the Supreme Court on inherent-authority sanctions. Appellants' substantial compliance with Rule 11's safe-harbor provision, coupled with their dismissal of the complaint during

the pendency of appellate review, foreclosed sanctions on another basis as a matter of law.

For all the District Court's fulminations, Appellants thoroughly litigated serious issues regarding a presidential election, all in about a month and a half.  In whose interest would it have been to have this and all similar matters proceed pro se?  Or, worse yet, for the public to watch such allegations suppressed rather than refuted because no lawyer could be found to present Plaintiffs' grievances to the courts?

Appellants respectfully request that this Court reverse, or in the alternative vacate and remand to a different district judge, the judgment and order sanctioning them.

## STATEMENT OF THE ISSUES

I.    The District Court lacked jurisdiction to award inherent-authority and 28 U.S.C. § 1927 sanctions to Defendants based on a post-dismissal motion.

II.    The District Court abused its discretion in awarding the maximum possible sanctions to punish an argument it dislikes.

A.    Appellants made non-frivolous factual assertions based on sworn statements and under the emergency circumstances that triggered this litigation.

B.    Appellants brought non-frivolous legal claims based on a reasonable interpretation of the law and plausible arguments to extend the law.

C.    The District Court abused its discretion by awarding to Detroit, a permissive intervenor, nearly 700% of the sanctions awarded to the actual Defendants.

III.    The District Court erred as a matter of law by violating the First Amendment rights of Appellants and their clients.

IV.   The District Court erred as a matter of law by issuing a sanctions order with no effort to tie specific findings of sanctionable conduct to a specific standard and specific remedy

V.    The District Court erred as a matter of law by imposing sanctions collectively against all attorneys without explaining its individualized consideration of their relative responsibility for any misconduct.

VI.   The District Court erred as a matter of law by ignoring Rule 11's safe-harbor provision and using inapplicable supplemental sources of sanctions authority to fill the gap.

## STATEMENT OF THE CASE

Plaintiffs are three registered Michigan voters nominated to serve as Republican Presidential Electors on behalf of the State of Michigan and three others who served as the chairpersons of their respective counties' chapters of the Republican Party, which is charged under state law with selecting electors.  RE 6, Page ID # 882-83.  Plaintiffs sued Defendant Gretchen Whitmer in her official capacity as Governor of Michigan, Jocelyn Benson in her official capacity as Michigan

Secretary of State, and the Michigan Board of State Canvassers.[2]  *Id.*
During the first week of litigation, the City of Detroit (RE 5), the
Democratic National Committee and Michigan Democratic Party (RE
14), and a gadfly serial litigant (RE 12) each moved for leave to
intervene.  Each was granted leave, though without a specification
whether leave was as of right or permissive, except as to the serial
litigant, who was granted permissive leave.  RE 28, Page ID # 2147.
Thus, all but Governor Whitmer and Secretary Benson were volunteer
defendants, so far as anyone can tell merely permissively joined.  *Id.*

The operative complaint alleged four counts.  FAC, RE 6, Page ID
# 937-54.  Count One alleged liability for the Governor, Secretary
Benson, and others, under 42 U.S.C. § 1983, for engaging in an on-going
violation of the Elections and Electors Clauses of the Constitution, U.S.
CONST. art. II., § 1, cls. 2-3.  *Id.* at 937-39.  Counts Two through Four
made further allegations that Michigan was violating the equal
protection and due process rights of its citizens by failing to enforce its
own state election laws.  *Id.* at 939-52.

---

[2] The Board of Canvassers expressly declined to join the motion for
sanctions and thus will be ignored as a defendant for purposes of this
appeal.  RE 105, Page ID # 4336 n.1.

This is the unfortunate case where dates do matter, and so Appellants are compelled to include them, even though they never make a brief more readable. Five days after adding the Intervenors, on December 7, 2020, the District Court denied Plaintiffs' motion for injunctive relief. RE 62, Page ID # 3296. Plaintiffs then sought appellate review and certiorari, the latter filed on December 11.[3]

Meanwhile, Detroit served a Rule 11 safe-harbor letter on Plaintiffs on December 15, 2020. RE 95, Page ID # 4118-19. On December 22, the gadfly litigant—who, according to the District Court, did "more to interfere with than assist the advancement of this litigation"[4]—moved for sanctions under the District Court's inherent authority and 28 U.S.C. § 1927. RE 69. The same day, all Intervenors and Defendants other than the gadfly moved to dismiss. RE 69, 70, 72, 73. Detroit's motion to dismiss included four paragraphs requesting

---

[3] RE 68. The Supreme Court would not deny this petition until February 22, 2021. RE 114.

[4] This should not have surprised the District Court, as this vexatious litigant has himself been repeatedly sanctioned. *E.g., Davis v. City of Detroit*, No. 347931, 2020 WL 1488661 (Mich. Ct. App. March 24, 2020) (affirming sanctions against Davis).

sanctions under Section 1927 and the District Court's inherent authority. RE 73, Page ID # 3576-78.

Rule 11's safe-harbor provision gave Plaintiffs until January 5, 2021, to respond to Detroit's December 15, 2020, letter, Fed. R. Civ. P. 11(c)(2). RE 172, Page ID # 6900. Plaintiffs timely moved for an extension to respond to the sanctions motion, which the District Court granted until January 19, 2021. *Id.* Plaintiffs also successfully moved for more time, until January 19, 2021, to respond to the motions to dismiss. *Id.* at 6901.

On January 14, just six weeks after the case started, Plaintiffs voluntarily dismissed as to both Defendants and all Intervenors except the gadfly, who was voluntarily dismissed a few days later. RE 172, Page ID # 6901. On January 26, the parties stipulated to dismissal of the then-pending appeal, *King v. Whitmer*, No. 20-02205 (6th Cir. 2020). *Id.* Sanctions were neither requested nor imposed on Appellants in connection with that appeal or the petition for certiorari.

But that expeditious end to this matter was not in fact the end. Back on the day that Plaintiffs were due to respond to the gadfly's sanctions motions, and after Plaintiffs had moved for and received more

time to respond, Detroit filed a Rule 11 motion for sanctions requesting, among other things, "Disbarment Referral." *Id.* Defendants—the Governor and Secretary of State—then moved for sanctions under Section 1927, but not until January 28, 2021, or two weeks after being voluntarily dismissed. *Id.*

At the beginning of June 2021, the District Court scheduled a hearing on the sanctions motions for the next month. *Id.* On July 12, 2021, it held a six-hour hearing wherein it deemed each Appellant responsible for the answer of any other Appellant unless an objection was made. *Id.* at 6902. At the conclusion of the hearing, the District Court invited supplemental briefing and the submission of affidavits by Appellants. *Id.* It entered the substantive ruling now appealed on August 25, 2021. *Id.* at 6999.

Intervenors Democratic National Committee and Michigan Democratic Party did not request sanctions, and the District Court denied sanctions to the gadfly Intervenor. *Id.* at 6996, 6998. Otherwise, the District Court granted what was within Defendants' power to seek—indeed, it granted more. In addition to awarding monetary sanctions, the District Court ordered Appellants to

participate in twelve hours of "non-partisan" continuing legal education on pleadings standards and election law. *Id.* 6998-99. It also ordered the Clerk of the District Court to send a copy of its opinion to the Michigan Attorney Grievance Commission and the disciplinary authority of each jurisdiction to which Appellants are admitted "for investigation and possible suspension or disbarment." *Id.* at 6999.

The order did not resolve the amount of the monetary awards. After subsequent practice, the District Court held Appellants to be jointly and severally liable for $21,964.75 to the Governor and Secretary of State and $153,285.62 to Detroit. RE 179, Page ID # 7168. The District Court stayed payment of those amounts (but not the non-monetary sanctions) until the disposition of the appeal. *Id.*

## STANDARD OF REVIEW

The Supreme Court has held that "all aspects of a district court's Rule 11 determination" should be reviewed for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990). But the Court added an important caveat: "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law ...." *Id.* at 405. The same standard applies to sanctions orders under

Section 1927 and a district court's inherent authority, subject to the same caveat concerning errors of law. *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996)).

## ARGUMENT[5]

### I.  The District Court abused its discretion in awarding sanctions to punish an argument it dislikes.

---

[5] While *Cooter & Gell* supports jurisdiction to entertain a post-dismissal Rule 11 sanctions motion, the Supreme Court's reasoning in that case—which focused on "Rule 11's language and purposes"—has no application to inherent-authority or Section 1927 sanctions. 496 U.S. at 394-95. Because the authority to impose sanctions is penal in nature, it must be strictly construed. *E.g.*, *United States v. Ross*, 535 F.2d 346, 350 (6th Cir. 1976). This is particularly true of inherent-authority sanctions, which are "shielded from direct democratic controls, [and] must be exercised with restraint and discretion." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). The rule is that jurisdiction to wield strictly-construed powers must be construed narrowly. *See Goldstein v. Cox*, 396 U.S. 471, 477–478 (1970) (28 U.S.C. § 1253 jurisdiction); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941) (removal jurisdiction). Thus, in the absence of a specific textual authority granting jurisdiction to entertain a motion for sanctions filed after a case is over, as happened here the moment Plaintiffs filed notices of voluntary dismissal, Fed. R. Civ. P. 41(a)(1)(A)(i), the district court has no jurisdiction to decide it. *Peacock v. Thomas*, 516 U.S. 349, 355 (1996) ("[O]nce judgment was entered in the original ERISA suit, the ability to resolve simultaneously factually intertwined issues vanished."). The District Court erred by failing to dismiss the Governor and Secretary of State's motion for Section 1927 and inherent-authority sanctions for want of jurisdiction.

17

The District Court evidently does not think much of the millions of Americans,[6] hundreds of legislators,[7] and dozens of affiants in this case who share Plaintiffs' concerns about election integrity.  If that were the end of it, Appellants would have no cause to complain.  But the District Court gave its personal opinions the weight of punitive government sanction.  Its discussions are one-sided—citing only those who agree with its preferences, and wholly ignoring huge parts of the record that

---

[6] *See* Geoff Earle, *Majority of Americans believe US democracy is at risk of extinction and just 54% think Biden won the presidential election, new poll shows*, DAILY MAIL (Jan. 17, 2022); Lois Beckett, *Millions of Americans think the election was stolen*, THE GUARDIAN (Apr. 16, 2021); Brad Brooks et al., *Why Republican voters say there's 'no way in hell' Trump lost*, REUTERS (Nov. 20, 2020).  Polls show 30% of the electorate reports the lowest possible confidence in our elections.  *E.g.*, Monmouth U. Polling Inst., *Doubt in American System Increases* (Nov. 15, 2021), *available at* https://tinyurl.com/y6zyuvfu.

[7] Nineteen states have passed nearly 90 bills responding to election security concerns raised after the 2020 Presidential Election.  *See* Chart of Election Law Changes *available at* https://tinyl.io/5e1p.   Federal legislators apparently have similar concerns.  *See* Larry Diamond, *Democrats, Want to Defend Democracy? Embrace What Is Possible*, N.Y. TIMES (Jan. 25, 2022) (describing congressional efforts to reform the Electoral Count Act because of the many ambiguities it creates); *see also* Henry Olsen, *Reforming the Electoral Count Act is crucial to our democracy*, WASH. POST (Jan. 25, 2022) (same).  And new evidence of voting irregularities in Michigan are the subject of a new lawsuit.  *Pub. Interest L. Found. v. Benson*, 1:21-cv-00929 (W.D. Mich. filed Nov. 3, 2021).

contradict its conclusions.  Its analysis mixes standards and relies on inapplicable authorities.  Its order deploys a censorious, accusatory tone, contriving misconduct where there was clearly none.  *E.g., infra* n.56.  The District Court's sanctions order is an outlier for a reason:  It is an abuse of discretion.

### A. Appellants made non-frivolous factual assertions based on sworn statements and under the emergency circumstances that triggered this litigation.

#### 1. Attorneys cannot be sanctioned for relying on affidavits they did not know to be untrue, particularly in a fast-paced election case.

Attorneys—like Michigan elections officials, Mich. Comp. L. §§ 168.523(2), 168.558(2)—are entitled to rely on the sworn affidavits of witnesses.  Attorneys are also entitled to rely on their clients, who in this case were persons experienced in Michigan elections, namely, Michigan state party officials and the presidential electors they selected.  Indeed, given that "[v]erification is the exception rather than the rule in federal civil practice," attorneys are not required to have *any* evidence—sworn or otherwise—beyond a client's say-so before bringing suit.  WRIGHT & MILLER, 5A FED. PRAC. & PROC. CIV. § 1339 *Verification* (4th ed. West 2022).

Addressing a motion for sanctions, Judge McMahon wrote: "I was once a practicing lawyer, and if my client came to me and told me he owned a patent, and showed me that the patent was registered to him at the PTO, I doubt very much whether I would have undertaken an extensive title search; lawyers are entitled to rely on their clients in such matters." *Advanced Video Techs. LLC v. HTC Corp.*, No. 1:11 CIV. 06604 (CM), 2015 WL 7621483, at *10 (S.D.N.Y. Aug. 28, 2015), *aff'd*, 677 F. App'x 684 (Fed. Cir. 2017). That is the consensus view of experienced federal judges. *E.g.*, *Lucas v. Jos. A. Bank Clothiers, Inc.*, 217 F. Supp. 3d 1200, 1205-06 (S.D. Cal. 2016) ("[A]n attorney is entitled to rely on his client's sworn testimony, as outlandish as the twelve-suit story sounded ....").[8] It is also the law of this Circuit. *In re*

---

[8] *In re Amodeo*, No. 8:17-BK-07965-RCT, 2019 WL 10734046 (Bankr. M.D. Fla. July 30, 2019) (bankruptcy trustee entitled to rely on debtor's statement); *United States v. Allmendinger*, No. 3:10CR248, 2017 WL 455553 (E.D. Va. Feb. 1, 2017), *vacated on other grounds*, 894 F.3d 121 (4th Cir. 2018) ("[A] lawyer is entitled to rely on what his client tells him unless, of course, the lawyer has *proof* to the contrary." (emphasis added)); *Royal v. Netherland*, 4 F. Supp. 2d 540, 556 (E.D. Va. 1998); *Xcentric Ventures, L.L.C. v. Borodkin*, 908 F. Supp. 2d 1040, 1048-49 (D. Ariz. 2012), *aff'd*, 798 F.3d 1201 (9th Cir. 2015) ("In general, a lawyer is entitled to rely on information provided by the client. ... Without *knowledge* that her client has made *specific false statements*, an attorney may, without being guilty of malicious prosecution, vigorously

*Big Rapids Mall Associates*, 98 F.3d 926, 932 (6th Cir.1996) ("The lack of credibility of the Debtor's principals, while a basis for sanctions against the principals cannot, without more, serve as a basis for an award of sanctions against [their lawyers].").

### 2. Appellants' reliance on reams of sworn testimony to bring suit was reasonable.

Rule 11's touchstone is reasonableness, and "what constitutes a reasonable inquiry may depend on such factors as *how much time for investigation was available to the signer*; whether he *had to rely on a client for information as to the facts underlying the pleading*, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; *or whether he depended on forwarding counsel or another member of the bar*." Fed. R. Civ. P. 11 (advisory committee notes) (emphases added).

---

pursue litigation in which she is unsure of whether her client or the client's adversary is truthful, so long as that issue is genuinely in doubt." (emphasis added) (cleaned up)); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 481 (S.D.N.Y. 2003), *aff'd*, 426 F.3d 549 (2d Cir. 2005) ("[P]laintiff's counsel is entitled to rely on the representations of their client, without having to assess his credibility; 'credibility is solely within the province of the finder of fact.'" (quoting *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir.1991)).

Each of these factors has particular salience in an election-law case litigated under the draconian time-limits of the certification process. Constrained by the ticking clock, Appellants were required in large part to rely on others in asserting these claims. But the District Court does not simply refuse Appellants the benefit of the doubt; it undertakes an aggressive misreading of the record. From conflating absurd third-party Twitter comments with Appellants' legal position (RE 172, Page ID # 6945-46 & n.31), to asserting that the mere fact other courts rejected similar claims makes Appellants' claims frivolous (*id.* at 6496),[9] to insinuating Appellants are responsible for the events of January 6, 2021 (*id.* at 6989-90),[10] the District Court does everything possible to make Appellants seem overwrought, dangerous lunatics. Under the surface is a different story.

---

[9] By that specious reasoning, the rejection of sanctions in *Trump v. Wisconsin Elections Comm'n*, No. 20-cv-1785-BHL (E.D. Wisc. Dec. 6, 2021) (ECF 178), would render the District Court's own opinion frivolous.

[10] The Delaware Supreme Court recently castigated a trial court for the same baseless insinuation against Lin Wood. *Page v. Oath*, No. 69,2021, 2022 WL 162965, at *3 (Del. Jan. 19, 2022).

For example, the District Court repeatedly cites *Costantino v. Detroit*, No. 20-014780-AW (Wayne Cty. Cir. Ct. 2020), as rejecting Appellants' legal arguments and factual submissions.  But the ruling in *Costantino*—the trial court's November 13 order concluding certain affidavits before it were too speculative to support relief—was not final; the Michigan Court of Appeals would not close out its file on just the interlocutory appeal until January 22, 2021, eight days after Appellants dismissed this complaint. *Leahy v. Orion Twp.*, 711 N.W.2d 438, 441 (Mich. Ct. App. 2006) ("A decision is final when all appeals have been exhausted or when the time available for an appeal has passed.").  Thus, *Costantino* had not conclusively resolved any of the issues when Plaintiffs filed their complaint; Appellants could reasonably hope that the trial court's ruling would be reversed.

Not just reasonably but quite plausibly.  Two Michigan Supreme Court justices, including the then-chief justice, concurring in a denial of interlocutory relief, wrote that there were still avenues for those plaintiffs to pursue.  *Costantino v. Detroit*, 950 N.W.2d 707, 707 (Mich. 2020) (Zahra, J., joined by Markman, C.J., concurring).  The District

Court does not mention those additional avenues and does not acknowledge this passage from Justice Zahra's concurrence:

> Nothing said is to diminish **the troubling and serious allegations of fraud and irregularities** asserted by the affiants offered by plaintiffs, among whom is Ruth Johnson, Michigan's immediate past Secretary of State, who testified that, given the "very concerning" "allegations and issues raised by Plaintiffs," she "believe[s] that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of th[e] election."

*Id.* at 708 (emphasis added). Neither does the District Court mention Justice Viviano's dissent in *Costantino*, bringing to three (out of seven) the number of Michigan Supreme Court justices who saw merit in the case. *Id.* at 710. Or the fact that "two members of the board [of canvassers for Wayne County] sought to rescind their votes for certification." *Id.* at 708.

The District Court knew of these opinions, because it cited the Michigan Supreme Court's denial. RE 172, Page ID # 6946 n.33. Doubtless the District Court also knew of (but also did not mention) Justice Thomas's expressed concern on claims substantially similar to those brought by Appellants. *Republican Party of Penn. v. Degraffenreid,* 141 S. Ct. 732 (2021) (Thomas, J., dissenting from the

denial of certiorari).  These concerns are shared by the dean of Yale Law School.  Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, N.Y. TIMES (Oct 6, 2012) ("'You could steal some absentee ballots or stuff a ballot box or bribe an election administrator or fiddle with an electronic voting machine,' [Heather Gerken] said.  That explains, she said, 'why all the evidence of stolen elections involves absentee ballots and the like.'").  District Judge Totenberg noted Georgia's elections systems suffer from many of the same vulnerabilities advanced by Appellants and thought those vulnerabilities sufficiently serious to justify granting a preliminary injunction.  *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1347 (N.D. Ga. 2019).[11]

Reading the District Court's order, however, one would think no sane person—far less state and federal judges and justices—has ever expressed concerns about the voting systems in place during the 2020

---

[11] The Georgia Secretary of State recently joined the plaintiffs in that case in calling for release of a secret report on vulnerabilities in voting machines made by the same manufacturer as used in Michigan.  Ga. Sec. State Press Office, *Secretary Raffensperger Calls on J. Alex Halderman To Agree To Release "Secret Report" and Pre-Election Testimony* (Jan. 27, 2022), *available at* https://tinyurl.com/bder999d.

Presidential Election.[12]  Reading its order one would also think that there were final judicial findings from other courts to which Plaintiffs owed absolute deference.

The District Court went on to scorn the serious chain-of-custody issues and other irregularities that Appellants pointed out, reasoning that, since none of the acts violated Michigan law, it was sanctionable to rely on them.  RE 172, Page ID # 6947.  But Plaintiffs' allegations concerning vote miscounting and manipulation unquestionably stated a claim for violation of Michigan and federal law, and the District Court did not consider whether, *e.g.*, evidence of chain-of-custody issues, "has *any* tendency to make" vote miscounting or manipulation "more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a) (emphasis added); RE 172, Page ID # 6947-48.  Even the District Court's preferred source, *Costantino*, contained testimony from an adverse witness that "[t]o an untrained observer[,] it may appear that

---

[12] Less than two weeks ago, the Pennsylvania Commonwealth Court struck down that state's legislatively adopted expansion of eligibility to vote by mail.  *McLinko v. Commw. of Penn., Dep't of State*, No. 244 M.D. 2021, 2022 WL 257659 (Pa. Commw. Ct. Jan. 28, 2022).  Abuses of the vote-by-mail process were among the many irregularities documented by Plaintiffs' evidence in this case.  *See infra* pp. 34-36, 42-43.

the ballot is being counted twice." *Id.* at 6950 n.41. Yet Appellants get no leeway for complaining about something that even an adverse expert describes as a plausible view of events.

Bulldozing over these nuances, the District Court concluded: "What the City claims and the Court agrees is sanctionable as a violation of the rule is the filing of pleadings claiming violations of the Michigan Election Code, Equal Protection Clause, Due Process Clause, and Electors and Elections Clauses where the factual contentions asserted to support those claims lack evidentiary support." *Id.* at 6954. But that "claims lack evidentiary support" is not, without more, sanctionable under Rule 11 when they are alleged on information and belief. *E.g.*, RE 6, Page ID # 933 ("Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol."). The standard in that instance is "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P.

11(b)(3). "Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n*, 434 U.S. 412, 422 (1978).

The District Court knocks down a few of Plaintiffs' affidavits like so many bowling pins because it finds them unpersuasive, but that is not the standard applicable to the imposition of sanctions. For example, the court faulted Appellants for presenting the affidavit of Jessy Jacob, an employee of the City of Detroit who "was assigned to work in the Elections Department for the 2020 election." RE 6-4, Page ID # 1263. Jacob swore under oath that she "observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot." RE 172, Page ID # 6957-58. And, as the District Court acknowledged, Jacob also attested that "those individuals voted without returning the mailed absentee ballot or signing an affidavit that the ballot had been lost," as required by Michigan law, which the District Court also cited. *Id.* at 6958 n.50

(quoting Mich. Comp. Laws § 168.769(1)).[13]  Jacob thus swore that she observed voters voting in violation of Michigan law.  This, Plaintiffs suggested, was evidence of double voting.  Plaintiffs did not claim that this was conclusive proof—nor need it have been at the pleading stage. It was enough that the affiant had observed violations of voting laws designed to avoid double voting.

The District Court would have none of it.  According the court, any inference that these voters cast illegal double ballots was not "reasonable," but "speculation or conjecture."  *Id.* at 6959.  According to the District Court, "Jacob does not state that these individuals voted in person and absentee. As such, her affidavit in fact does not plausibly support 'illegal double voting.'"  But Jacob clearly stated that the individuals in question did not comply with state law designed to prevent double voting.  Surely, one plausible inference from this unlawful conduct is that they did not comply because they double

---

[13]  "An absent voter may vote in person within his or her precinct at an election, notwithstanding that he or she applies for an absent voter ballot and the ballot is mailed or otherwise delivered to the absent voter by the clerk" if, "[b]efore voting in person," "the absent voter [] return[s] the absent voter ballot."  RE 172, Page ID # 6958-59.

voted.[14]  This may not be enough to persuade the court to issue a preliminary injunction.  Perhaps it would not be enough to survive summary judgment if, after discovery, no further evidence is produced.[15]  But the District Court's categorical claim that double voting cannot possibly be inferred from observed conduct that violates laws designed to prevent double voting, and that offering an affidavit disclosing these facts is frivolous, is wishful thinking, not fact.

While the District Court focuses on a single paragraph of the Jacob affidavit (¶10), it ignores other parts, where this election worker states under oath that she observed multiple irregularities and illegal

---

[14] *See also* RE 6-3, Page ID # 1058 (Zaplinty ¶ 11).

[15] The District Court cites *Twombly's* plausibility standard, RE 172, Page ID # 6965 n.60, but *Bell Atlantic Corp. v. Twombly*, 549 U.S. 1018 (2006), concerned sufficiency of pleadings, not sanctions.  That a case is dismissed under *Twombly* does not mean it was sanctionable to bring it in the first place, else every *Twombly* dismissal would be followed by sanctions—recall that Rule 11 *requires* sanctions whenever its standards are violated.  *INVST Fin. Grp., Inc. v. Chem-Nuclear Sys.*, Inc., 815 F.2d 391 (6th Cir. 1987).  The Delaware Supreme Court made exactly this point when reversing the vacatur of Wood's *pro hac vice* admission.  *Page v. Oath Inc.*, No. 69,2021, 2022 WL 162965, at *3 (Del. Jan. 19, 2022) ("To the contrary, our own ethical rules, by prohibiting a lawyer from asserting claims 'unless there is a basis in law for doing so that is not frivolous,' implicitly recognize that a claim ultimately found to lack a basis in law and fact can nonetheless be non-frivolous." (quoting Del. R. Prof. C. 3.1)).

practices, *e.g.*, RE 6-4, Page ID # 1264, ¶6 ("I was instructed by my supervisor to adjust the mailing date of these absentee ballot packages to be dated earlier than they were actually sent."); *id.* ¶8 ("I directly observed, on a daily basis, City of Detroit election workers and employees coaching and trying to coach voters to vote for Joe Biden and the Democrat party.... I witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote.");[16] *id.* ¶9 ("I was specifically instructed by my supervisor not to ask for a driver's license or any photo I.D. when a person was trying to vote."); *id.* at 1265, ¶14 ("I was instructed not to validate any ballots and not to look for any deficiencies in the ballots."); *id.* ¶15 ("While I was at the TCF center, I was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file."); *id.* ¶17 ("On November 5, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020.  I was told to alter the information in the QVF to

---

[16] *See also* RE 6-3, Page ID # 1057 (Zaplinty ¶ 5).

falsely show that the absentee ballots had been received in time to be valid.  I estimate that this was done to thousands of ballots.").[17]

Even if Paragraph 10 of Jacob's affidavit, standing alone, does not support the double-voting claim—a proposition Appellants vehemently dispute, as explained above—Jacob's observations of widespread irregularities and illegalities at the voting center where she worked support the inference that allowing voters to vote in person without returning their absentee ballots, or swearing that the ballot had been lost, as required by Michigan law, was part-and-parcel of a state-sponsored scheme to facilitate illegal voting and tabulation.

The District Court takes the same antagonistic approach to Plaintiffs' other affidavits.  For example, it faults Appellants for the affidavit of Articia Bomer, a Republican poll-watcher, who attested to repeated acts of partisanship by election workers and widespread

---

[17] The allegation that poll workers were ordered to illegally backdate absentee ballots is confirmed by the affidavit of another eyewitness, Jessica Connarn, who observed an election worker in tears because she was coerced to illegally back-date a ballot as having been received on time.  RE 6-6, Page ID # 2699.  Connarn provided a note, surreptitiously received from the election worker, stating "entered receive date as 11/2/20 on 11/4/20."

disdain of Republicans,[18] particularly Black Republicans, like herself.

RE 6-3, Page ID # 1009.  She also reported on what she believed were

suspicious activities by these partisan election workers.  Among them is

the following allegation, on which the District Court focused:

> I observed a station where election workers were
> working on scanned ballots that had issues that needed to be
> manually corrected. I *believe* some of these workers were
> changing votes that had been cast for Donald Trump and
> other Republican candidates.

RE 172, Page ID # 6966 (quoting and adding emphasis to RE 6-3, Page

ID # 1009).  The District Court sanctions Appellants for having failed to

cross-examine Ms. Bomer as to the grounds for her belief and whether

she had actually observed any ballots being changed.  *Id.* at 6966-67.

This is unheard-of.  Lawyers often file complaints based on

perceptions of witnesses—victims of discrimination, for example—

where that which is perceived by the senses hints at a more sinister

reality that can only be exposed by discovery.[19]  Fairly and fully read,

---

[18] *See also* RE 6-3, Page ID # 1058 (Zaplinty ¶ 20).

[19]  Courts in this Circuit routinely refuse sanctions on such facts.  *E.g.*,
*Cicero v. Borg-Warner Automotive, Inc.*, 163 F. Supp. 2d 743, 746 (E.D.
Mich. 2001) ("Attorneys are often presented with clients who possess a
view of the situation that is (understandably) biased, and little else.
Not until a complaint is filed will an attorney have the mechanisms of

Mr. Bomer's affidavit discloses a vote-counting environment where staff workers wore clothing with partisan messages, cheered Democratic successes and jeered Republicans in general and herself as a Black Republican. In the midst of this hostile environment, the witness observed two poll workers manually correcting ballots and believed they were doctoring the ballots to change Trump votes to Biden.

In any other context, this kind of an allegation from a victim would be enough to survive a motion to dismiss, perhaps even summary judgment, but for this judge in this case it is sanctionable. By that

---

compulsory discovery available to him that might permit more complete view of the case and an informed evaluation of his client's claims. Moreover, a statute of limitations may create urgency to file a complaint so that an attorney may protect the viability of his client's claims before he has had a full opportunity to evaluate their merits."); *Kleinmark v. St. Catherine's Care Ctr.*, 585 F. Supp. 2d 961, 965 (N.D. Ohio 2008) ("Kleinmark's [erroneous] belief that St. Catherine singled her out for termination when it normally allowed employees to continue their employment after exhausting FMLA leave did not enable her to prevail against defendant's motion for summary judgment. It did, however, provide a non-frivolous basis on which to proceed with the lawsuit."); *see also McNeill v. Wayne Cty.*, No. 05-72885, 2005 WL 1981292, at *1 (E.D. Mich. Aug. 10, 2005) ("[T]he courts are understandably reluctant to undertake the fact-intensive assessment that would be necessary to make a threshold determination of the likelihood of success on the merits of a Title VII or ADA claim of discrimination or retaliation, based only upon a plaintiff's allegations and largely speculative beliefs advanced before the parties have engaged in any sort of discovery.").

standard, any complaint that does not contain the kind of smoking-gun evidence normally unearthed only through discovery would be sanctionable. This is not and never has been the law.

Space does not permit a full deconstruction of all the District Court's disdainful and one-sided criticisms of Plaintiffs' other affidavits. What the District Court wrote at RE 172, Page ID # 6959-6967 speaks for itself; what the District Court did not write—a discussion of the literally dozens of additional affidavits supporting those cited above—speaks even louder. *See infra* nn.20-53.

When Appellants pointed out that they expected to find additional facts through discovery, the District Court demurred: "Plaintiffs are not entitled to rely on the discovery process to mine for evidence that never existed in the first instance." *Id.* at 6965. This is circular reasoning. No one knows whether the evidence exists until discovery is conducted. If Plaintiffs offer proof plausibly suggesting such evidence might exist, they can bring suit and try to discover it. The key is plausibility judged by an objective observer, not by someone who is independently convinced that the case is frivolous.

The District Court piles on by faulting Appellants for using affidavits "recycled" from other election cases raising similar issues in other jurisdictions. But there is no ethical standard that precludes counsel from using affidavits that have also been used in other cases—the practice is not uncommon. *See, e.g.*, *Eclipse Res.-Ohio, LLC v. Madzia*, No. 2:15-CV-00177, 2017 WL 274732, at *7 (S.D. Ohio Jan. 20, 2017), *aff'd*, 717 F. App'x 586 (6th Cir. 2017) (finding agency's practice of accepting "recycled affidavits" so well-established as to require court to refuse deference to new agency position rejecting recycled affidavits).

The District Court did cite two cases standing for the proposition that lawyers may not rely on the legal analysis of lawyers in another case. *Id.* at 6970 (citing *Schottenstein v. Schottenstein*, 230 F.R.D. 355, 361-62 (S.D.N.Y. 2005); *Pravic v. U.S. Indus.-Clearing*, 109 F.R.D. 620, 622 (E.D. Mich. 1986)). Those cases do indeed stand for *that* proposition: Lawyers must confirm that the *legal* arguments they present are supported by existing law or a good faith extension—and must research whether the arguments are supported by authority. The same is not true of sworn declarations, which can't be confirmed on *Lexis-Nexis*. Indeed, the Advisory Notes to Rule 11 contemplate that

reliance on the work of other counsel should be considered in determining whether, and to what extent, conduct is sanctionable. *See supra* p. 25.   If the declarant states facts under oath, and the declaration is otherwise sufficient to support the claim—as Appellants believed and still believe they are—they have no obligation to cross-examine the witnesses.   The standard is not ultimate truth—or even plausibility.   Were it otherwise, every plaintiff who loses a motion to dismiss, motion for summary judgment, or even at trial would be sanctioned for having brought the case to begin with.

> **3.    The District Court reached a contrary conclusion only through an invidious rewriting of the record.**

But the district court's sanctions order suffers from a more fundamental flaw, namely nit-picking specific allegations, and pieces of allegations, Plaintiffs made in support of their claims.   This doesn't fly under a directed-verdict standard, far less when assessing sanctions at the complaint stage.   *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components ....").

As will be recalled, Plaintiffs claim that Michigan and its officials and employees violated state law and the federal constitution by manipulating the collection and tabulation of votes. They did this, Plaintiffs claim, to throw the election to candidate Biden as opposed to candidate Trump by misapplying, disregarding, or violating state law in a variety of ways, thereby denying Plaintiffs (and millions of others) equal protection and due process. We know that such a claim is viable because the Supreme Court held in *Bush v. Gore* that state authorities' violation of state law can amount to a federal constitutional violation.

Plaintiffs suggested numerous ways in which this may have occurred in Michigan during the 2020 Presidential Election, among them widespread illegal double voting and massive dumps of illegal ballots. But these were not the only objectionable procedures that Plaintiffs documented. Plaintiffs also alleged, and presented substantial proof of, other systemic irregularities: election officials instructing poll workers to violate the law by back-dating the receipt date on absentee ballots;[20] a concerted and seemingly coordinated effort

---

[20] RE 6-4, Page ID # 1265 (Jacob ¶ 10); RE 6-6, Page ID # 2699-2700 (Connarn ¶¶ 1-4).

to prevent Republican poll-watchers from observing the vote counting and otherwise interfere with their ability to perform their functions;[21] overt partisanship by election workers favoring Democratic poll-watchers, including apparent "collaboration between the democratic poll challengers and the City of Detroit poll workers";[22] intimidation and threats of assault against Republican poll-watchers;[23] treating Democratic poll-watchers far more permissively than their Republican counterparts;[24] failure of election workers to wear identification tags, as

---

[21] RE 6-3, Page ID # 1028 (Brunell ¶¶ 10-12, 14, 18); RE 6-3, Page ID # 1007 (Pennala ¶ 4); RE 6-3, Page ID # 1016-19 (Giacobazzi ¶¶ 3, 8, 11-12); RE 6-3, Page ID # 1023 (Schornak ¶4); RE 6-3, Page ID # 1058 (Zaplinty ¶¶ 15, 18); RE 6-3, Page ID # 1013 (Ballew ¶ 8); RE 6-3, Page ID # 1005 (Miller ¶¶ 4-9); RE 6-3, Page ID # 1011-12 (Tyson ¶¶ 11-13, 16); RE 6-3, Page ID # 999-1001 (Helminen ¶¶ 4, 5).

[22] RE 6-3, Page ID # 1007 (Pennala ¶ 5); RE 6-3, Page ID # 1016-17 (Giacobazzi ¶¶ 5, 7); RE 1-5, Page ID # 425 (Carone ¶ 12); RE 6-3, Page ID # 1028 (Schornak ¶4); RE 6-3, Page ID # 1034 (Piontek ¶ 11); RE 6-3, Page ID # 1058 (Zaplinty ¶ 20); RE 6-3, Page ID # 1013 (Ballew ¶ 9); RE 6-3, Page ID # 995 (Seely ¶ 6); RE 6-3, Page ID # 1009 (Bomer ¶¶ 6, 8).

[23] RE 6-3, Page ID # 1016, 1019 (Giacobazzi ¶¶ 3, 13, 14); RE 6-6, Page ID # 2389 (Connarn ¶ 2); RE 6-3, Page ID # 1034 (Piontek ¶ 11); RE 6-3, Page ID # 1013 (Ballew ¶ 7); RE 6-3, Page ID # 996 (Seely ¶ 12).

[24] RE 6-3, Page ID # 1018-19 (Giacobazzi ¶ 12); RE 6-3, Page ID # 1028 (Schornak ¶4); RE 6-3, Page ID # 1058 (Zaplinty ¶ 14); RE 6-3, Page ID # 1006 (Miller ¶¶ 14 (incorrectly numbered 2)); RE 6-3, Page ID # 995 (Seely ¶ 6).

required by Michigan law, and refusal to identify themselves to enable reporting of misconduct;[25] exclusion of all poll-watchers for certain periods;[26] unjustified forcible removal and exclusion of Republican poll-watchers;[27] scanning of ballots that appeared to be lacking proper signatures or where information was covered up by tape;[28] failure to verify ballot numbers;[29] ballots bearing numbers that did not match the number on the envelope, and election workers manually changing the number on the envelope to match that on the ballot;[30] counting ballots with "ballot numbers not matching, lack of signatures, unregistered voters";[31] re-scanning of previously scanned ballots without first

---

[25] RE 6-3, Page ID # 1028 (Schornak ¶ 9); RE 6-3, Page ID # 1019 (Giacobazzi ¶ 13).

[26] RE 6-3, Page ID # 995 (Seely ¶ 7).

[27] RE 6-3, Page ID # 1016 (Giacobazzi ¶ 6).

[28] RE 6-3, Page ID # 1030 (Brunell ¶ 19); RE 6-3, Page ID # 1028 (Schornak ¶4).

[29] RE 6-3, Page ID # 1053-54 (Spalding ¶¶ 8, 13); RE 6-3, Page ID # 1058 (Zaplinty ¶ 19).

[30] RE 6-3, Page ID # 1053-54 (Spalding ¶ 11); RE 6-3, Page ID # 1024 (Schornak ¶¶ 16, 17); RE 6-3, Page ID # 1034 (Piontek ¶ 10); RE 6-3, Page ID # 1058 (Ballew ¶ 5); RE 6-3, Page ID # 996-97 (Seely ¶15).

[31] RE 6-3, Page ID # 1029-30 (Brunell ¶¶ 15, 17); RE 6-3, Page ID # 1018 (Giacobazzi ¶10); RE 6-3, Page ID # 1000-01 (Helminen ¶ 5).

discarding the original scan;[32] manually filling out or correcting ballots by election workers and illegally signing the voters' names to the ballots;[33] failure to match signature on ballots to those on ballot applications;[34] ballot adjudication or duplication of questionable ballots with Democrats but no Republicans present;[35] "[A] pattern of intimidation, secrecy and hostility by the poll workers. Poll workers would cheer, jeer and clap when poll challengers were escorted out of the TCF Center …. ";[36] refusing to accept challenges from Republican poll-watchers;[37] failure to segregate challenged ballots so the challenges

---

[32] RE 1-5, Page ID #424 (Carone ¶¶ 3-4).

[33] RE 1-5, Page ID #424 (Carone ¶ 9); RE 6-3, Page ID # 1058 (Zaplinty ¶ 13); RE 6-3, Page ID # 1012 (Tyson ¶ 17); RE 6-3, Page ID # 996-97 (Seely ¶ 15).

[34] RE 6-3, Page ID # 1001 (Helminen ¶ 6).

[35] RE 1-5, Page ID #424 (Carone ¶ 5); RE 6-3, Page ID # 1024 (Schornak ¶ 18).

[36] RE 6-3, Page ID # 1058 (Ballew ¶ 9); RE 6-3, Page ID # 1002 (Helminen ¶ 9).

[37] RE 6-3, Page ID # 1018 (Giacobazzi ¶ 10); RE 6-3, Page ID # 1023 (Schornak ¶¶ 6-9); RE 6-3, Page ID # 1034 (Piontek ¶ 5); RE 6-3, Page ID # 1005 (Miller ¶¶ 11); RE 6-3, Page ID # 995-97 (Seely ¶¶ 4-5, 15-16).

could be adjudicated;[38] the failure to reject *any* ballots;[39] duplication of ballots;[40] election workers correcting ballots that did not match information on the computer database by entering names, addresses, and false birthdates into the database;[41] accepting unverified ballots and failure to verify certain ballots before scanning;[42] failure to reject ballots with identified irregularities;[43] counting two ballots for the same voter;[44] refusing Republican challengers access to the names and ballot numbers of ballots they wished to challenge;[45] open ballots stored in an insecure location;[46] failure to record ballots that could not be matched

---

[38] RE 6-3, Page ID # 1030 (Brunell ¶ 19); RE 6-3, Page ID # 1034 (Piontek ¶ 5).

[39] RE 6-3, Page ID # 1030 (Brunell ¶ 20).

[40] RE 6-3, Page ID # 1005 (Miller ¶¶ 4-9); RE 6-3, Page ID # 999-1000 (Helminen ¶ 4).

[41] RE 6-3, Page ID # 1018 (Giacobazzi ¶ 10); RE 6-3, Page ID # 1024 (Schornak ¶¶ 11, 13).

[42] RE 6-3, Page ID # 1030 (Brunell ¶ 21).

[43] RE 6-3, Page ID # 1030-31 (Brunell ¶22); RE 6-3, Page ID # 1023 (Schornak ¶¶ 6-8).

[44] RE 6-3, Page ID # 998 (Seely ¶ 21).

[45] RE 6-3, Page ID # 1024 (Schornak ¶ 15); RE 6-3, Page ID # 1033 (Piontek ¶¶ 5-6); RE 6-3, Page ID # 1005 (Miller ¶ 8).

[46] RE 6-3, Page ID # 1054 (Spalding ¶ 15).

on E-poll;[47] failure to follow established staffing procedures for ballot tabulation;[48] ballots with hand-written cursive notations but no ballot codes;[49] manual adjustment of ballots at locations and under circumstances where poll-watchers were unable to observe or verify the legitimacy of the adjustment;[50] admission of Democratic poll challengers without credentials;[51] several computers all synchronized to the same incorrect time.[52]

While these eyewitness accounts are typical, they represent fewer than a quarter of the sworn affidavits Appellants filed with their complaint. Yet the District Court's sanctions order mentions only the Jacob and Bomer affidavits when discussing allegations of misconduct by officials within the election center. With or without Jacob and Bomer, these additional affidavits paint an alarming picture of

---

[47] RE 6-3, Page ID # 1054 (Spalding ¶ 14).

[48] RE 6-3, Page ID # 1054-55 (Spalding ¶¶ 17-18).

[49] RE 6-3, Page ID # 1009 (Bomer ¶ 10).

[50] RE 6-3, Page ID # 1054 (Bomer ¶ 9).

[51] RE 6-3, Page ID # 1054 (Spalding ¶ 12).

[52] RE 6-3, Page ID # 1006 (Miller ¶ 15 (incorrectly numbered 3)).

43

organized illegality by Michigan election officials charged with tabulating votes in the 2020 Presidential Election.

Plaintiffs also presented numerous expert reports suggesting statistical anomalies in the 2020 presidential vote[53] and vulnerabilities in the Dominion voting system used to collect and tabulate the vote in Michigan.[54] The District Court discussed exactly two of these reports, the first being by Russel Ramsland. His report concluded "to a reasonable degree of professional certainty" that "the vote count in Michigan, and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes." RE 6-24, Page ID # 1577. The District Court pointed out (correctly) that some of the figures

---

[53] Dr. Quinnell concluded there were tens of thousands of suspicious votes in Wayne and Oakland counties, a conclusion to which he adhered in a rebuttal report. RE 6-29, Page ID # 1778; RE 49-2, Page ID # 3106. Dr. Briggs concluded there were suspicious anomalies in absentee voting in Michigan, which he also confirmed in a rebuttal report. RE 6-21, Page # ID 1543-44; RE 49-1, Page ID # 3101. Dr. Bouchard, in both his original and rebuttal reports, concluded there were anomalies substantially similar to those identified by Ramsland. RE 6-29, Page ID # 1796.

[54] RE 49-3, Page ID # 3112, 3117 (Ramsland); RE 6-30, Page ID # 1828 (Merritt); RE 49-3, Page ID # 3125 (same); RE 49-4, Page ID # 3143 (same); *see also Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1385-86 (N.D. Ga. 2019) (citing affidavits detailing numerous problems with Dominion machines).

Ramsland relied on were wrong but, as the District Court also recognized, Plaintiffs submitted an amended report on December 3, when they filed their reply in support of a temporary restraining order. The rebuttal report specifically engaged with criticisms of the original and adhered to its basic conclusion: Michigan probably counted tens of thousands of illegal ballots. RE 49-3, Page ID # 3122-24.

This was insufficient for the District Court, which faulted Appellants for "never drawing attention to this modification in the reply brief to which Ramsland's updated report was attached." Opinion, RE 172, Page ID # 6975. According to the District Court, Appellants engaged in sanctionable conduct for failing to highlight the corrections to an expert report that they filed with the court and served on opposing counsel. Counsel is unaware of any authority—and the District Court cites none—for the proposition that failing to highlight amendments to an expert report violates professional standards. In any event, the District Court is mistaken. Plaintiffs' reply *did* mention Ramsland's rebuttal report in their reply. Twice. RE 49, Page ID # 3074, 3092.

The District Court also levelled three substantive criticisms regarding the original Ramsland affidavit (but not the rebuttal). First,

the court deemed the vote figures on which Ramsland based his conclusion to be so out-of-kilter that counsel should have questioned the report before filing it in the first place. But Ramsland is an expert and counsel is unaware of a rule of professional conduct that calls for lawyers to cite-check expert reports. This is particularly true in a case involving dozens of affidavits and hundreds of pages of pleadings, operating on a highly compressed schedule where events could soon preclude effective relief. Errors in expert reports are normally winnowed out through the adversary process—as happened in this case.

The District Court also criticized Ramsland's figures for not lining up with those officially released by Michigan. RE 172, Page ID # 6973. But that, once again, is a bootstrap. Plaintiffs' very point was that the official Michigan figures were wrong, or at least unreliable. A discrimination plaintiff need not accept as true the employer's official figures showing non-discrimination. Similarly, Plaintiffs here were not bound by the state's figures, which they claimed were generated by a corrupt process.

Finally, the District Court found Ramsland's report objectionable because he relied on information from the Carone Affidavit, which was

among the handful of factual affidavits the District Court found sanctionable as based on "conjecture." RE 172, Page ID # 6964. But the Carone affidavit was no more conjectural than the Bomer affidavit discussed above. Carone was a Dominion employee who was present at the TCF Center, Detroit's ballot-counting center, the day of the election and witnessed a number of suspicious practices. *See supra* nn.32-33, 35. Among them were two vans pulling up to the center, purportedly to deliver food, but she "never saw any food coming out of these vans" and the center did not have enough food for "even 1/3 of the workers." Then, "not even two hours after the vans left," "it was announced on the news that Michigan had discovered over 100,000 more ballots ...." RE 1-5, Page ID # 424.

This was not particularly strong evidence, and even combined with other evidence it might not be sufficient to support a preliminary injunction or survive a motion for summary judgment, but holding that it is *sanctionable* to include conjectural allegations—or expert reports based on conjectural allegations—would significantly narrow the kind of cases that can be brought in federal court. Price-fixers do not upload their illegal agreements to the internet; discriminatory employers no

longer post "Irish need not apply" signs in their store windows; car manufacturers do not put notices in the glove compartment advising buyers that they disabled their emissions control systems. Lawsuits challenging such practices, and countless others, must rely to some extent on conjecture—to be confirmed or refuted by discovery. The District Court's blunderbuss opinion, sanctioning lawyers for building a case on scant evidence augmented by intuition, will be a stern warning to lawyers that the federal courthouse door cannot be unlocked unless their opponents hand them the key.[55]

The only other expert report the District Court mentioned—and then only to sternly criticize it—is that of Joshua Merritt, whom counsel identified as "a former electronic intelligence analyst with 305th Military Intelligence" and a "US Military Intelligence expert." RE 172, Page ID 6986. This turns out to have been untrue, as disclosed in a January 5, 2021, exposé in the Washington Post. The District Court did not find that Appellants were aware of the deceit, nor could it as there *was* no such evidence. Rather, the court faulted counsel for failing to

---

[55] The same analysis applies to the District Court's treatment of the Ciantar Affidavit. RE 172, Page ID # 6959-61.

disclose the discrepancy in the seven business days between the Post's publication of the story and Plaintiffs' voluntary dismissal on January 14. *Id.* at 6986-87. But there was no pleading due during that period; counsel would have had to file a special notice advising the District Court of information that was already national news. Why counsel were under a professional obligation to do so, when the possibility of getting effective relief was rendered essentially null the following day after Congress affirmed the Electoral College count and counsel was contemplating dismissing the case altogether, the District Court does not explain. This is another one-sided effort to paint Appellants as scoundrels bent on deceiving the court.[56]

---

[56] The District Court tries to bolster its finding by misconstruing counsel's statements at the sanctions hearing:

> Kleinhendler appears to concede that this argument is a poor one because he nonetheless admits that "[h]ad [he] known in advance [of the January 14 dismissal] that [Merritt] had transferred out, [he] would have made [it] clear." (*Id.* at Pg ID 5375, 5384-85, 5387.) **But this is yet another misrepresentation.** As detailed above, by January 5, Kleinhendler knew Merritt never completed the training that formed the basis of his purported expertise. Yet, Kleinhendler did not "make it clear."

ECF 172, Page ID # 6989 (emphasis added).

Using a magnifier to find what it believes are the weakest points of a massive submission, the court zeros in on particular affidavits—even just isolated paragraphs within affidavits—and accuses counsel of not doing enough to confirm that the affiants really saw and believed what they swore they saw and believed. This divide-and-conquer strategy is entirely novel in the federal courts. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Even ignoring the specific evidence the District Court believed (wrongly, in Appellants' view) to be unsupported, there was copious eyewitness and expert evidence that state officials misapplied or violated state law, giving rise to a claim under *Bush v. Gore*. In

---

It is the District Court here that engages in misrepresentation by putting words in counsel's mouth. Kleinhendler said that "had he known in advance" of Meritt's status, he would have made it clear. The District Court inserted "[of the January 14 dismissal]" into the quote to make it seem like counsel is lying. And the court also omitted counsel's sentence following the quoted language: "I had no reason to doubt." Fairly reading the two sentences together, it is perfectly clear that counsel is referring to the time he submitted the Merritt affidavit, not the time he dismissed the case. His final (omitted) sentence would make no sense if counsel were referring to the dismissal date. Distorting counsel's words in order to call him and his co-counsel liars ("Co-counsel for Plaintiffs also had reason to question Merritt's expertise by no later than January 5. Yet, they remained silent too.") is incompatible with the fairness expected of a federal judge.

adjudicating the adequacy of pleadings, and certainly in imposing sanctions, a court must look at the pleading as a whole to determine whether, based on everything the party submitted, the pleading states a claim.  Finding what it perceives to be individual weaknesses in a few sentences—weaknesses that one could expect to shore up through discovery—and imposing catastrophic sanctions on the lawyers for bringing the case is wholly unprecedented.

The Fourth Circuit made precisely this point in reversing sanctions for what the district court there believed to be unsubstantiated allegations:

> We conclude that plaintiffs did have a sufficient factual basis under Rule 11 for implicating Smith in the scheme. Many of the facts do not support the allegation that Smith was involved in the scheme. A factual basis for the allegation does exist, however.... For Rule 11 purposes, the allegation merely must be supported by *some* evidence. Because we are unable to say that plaintiffs had *no* factual basis for their allegation, we cannot conclude that plaintiffs violated Rule 11's factual inquiry requirement. The district court abused its discretion by awarding sanctions to Smith as a result of the RICO count.

*Brubaker v. City of Richmond*, 943 F.2d 1363, 1377-78 (4th Cir. 1991) (emphases in original).  Counsel has found no case where a federal court has imposed sanctions for failing to vet individual pieces of evidence in

51

support of a claim that is otherwise plausibly supported. This is consistent with the purpose of Rule 11, which is to prevent the filing of frivolous *claims*, not the presentation of a few pieces of evidence that turn out to be unsubstantiated, among other evidence. If the pleading as a whole is supported by non-frivolous evidence, then filing the pleading is not frivolous and therefore not sanctionable.

Even if the portions of the affidavits the District Court found objectionable were removed, there is copious evidence of election misconduct well supported by the sworn affidavits of eyewitnesses and experts. Whether Plaintiffs could have succeeded, had time not run out, we will never know. But the complaint as a whole—and each of its claims for relief—was supported by eyewitness and expert evidence, and arguments based on existing law or a plausible extension of existing law. The District Court's myopic focus on particular allegations is a gross misapplication of its sanctions authority. It is a vengeful effort to find fault with lawyers who presented a case the judge finds abhorrent.

**B. Appellants brought non-frivolous claims based on a reasonable interpretation of the law and plausible arguments to extend the law.**

The District Court elected not to revisit or even restate its analysis of the legal merits of the complaint, even though merely dismissing a complaint (or, more precisely, denying a preliminary injunction based on the court's view that a complaint suffers from flaws likely to preclude success) does not mean the complaint was frivolous. RE 172, Page ID # 6942 n.28. That self-evident rule applies all the more so here, where (as explained in the footnote below) every federal ground invoked by the District Court—the Eleventh Amendment, standing, laches, and abstention—could have been invoked in dismissing *Bush v. Gore*, 531 U.S. 98 (2000).[57] Given the track forged

---

[57] Indeed, when it comes to standing, persons charged with performing one-half of the constitutionally-required process to select the President and Vice-President—casting votes in the Electoral College, which Congress then counts—are in a stronger position than a candidate, who has an interest only in the outcome rather than an interest plus a duty to act. The District Court's Eleventh Amendment analysis, which amounted to the tautology "that *Ex parte Young* does not apply" because the Plaintiffs' claims failed on the merits, would earn a poor grade on a federal courts exam. *King v. Whitmer*, 505 F. Supp. 3d 720, 729 (E.D. Mich. 2020). Its laches analysis opens with a 1941 circuit case applying *Michigan state* law and a Supreme Court case that was about *exhaustion*, not laches, neither of which have anything to do with elections. *Id.* at 731. The idea that *Colorado River* abstention would apply here when it did not in *Bush v. Gore* is risible, particularly given that every Supreme Court citation to *Colorado River* since *Bush v. Gore* has stood for the proposition that federal courts should *not* abstain,

by *Bush v. Gore,* counsel would have been derelict in their duty of zealous advocacy to allow the impediments that did not prove fatal—or even relevant—there to block the path here.

At best, the District Court attempts to distinguish the two cases by noting that in *Bush v. Gore* the Supreme Court stopped a recount, whereas here Appellants represented parties asking for a recount. This amounts to saying *Bush v. Gore* arose in Florida whereas this case arose in Michigan. The constitutional violation found in *Bush v. Gore* was a state supreme court ordering recounts in violation of state law. The constitutional violation alleged here was state elections officials failing to do a proper count in the first place, also in violation of state law. So, of course, Appellants requested a different remedy; they were alleging a different harm. *But the harm was of the same constitutional kind— misapplication of state election laws to deprive Plaintiffs of their due process and equal protection rights.*

---

whether by the majority, *e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks omitted), or in dissent, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2216 (2021) (Thomas, J., dissenting).

Rejecting Plaintiffs' claims as frivolous cannot be reconciled with *Bush v. Gore* or the surprise that accompanied that ruling. *See, e.g.*, Lawrence Tribe, *eroG .v hsuB and its Disguises: Freeing* Bush v. Gore *from its Hall of Mirrors*, 115 HARV. L. REV. 170 (2001). The District Court's frivolousness holding is itself frivolous.

The only even arguably relevant difference between the two cases, though hardly significant enough to support sanctions, is mootness. The case was not moot when Plaintiffs filed the complaint which, of course, is the operative date under Rule 11. *Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989) ("Rule 11 does not create a continuing obligation ….") At that time Appellants did believe the case would become moot by December 8, 2020. RE 172, Page ID # 6937. Then, as explained at the sanctions hearing, the judge assigned to the Wisconsin case brought by Appellants expressed the view that the case would not become moot until December 14. *Id*. The District Court then faults Appellants for not dismissing before the Defendants and Detroit chose to file lengthy

motions to dismiss on December 22. *Id.*[58]   But, as explained below, under settled law, the case did not become moot even on December 14. When an alternative slate of electors for Michigan was advanced in early January, new life came into the case, *id.* 6937-38, and Appellants had a duty to their clients to keep fighting so long as there was a plausible argument that the case was not moot.

Justice Stevens illustrated why when he recounted a similar anecdote from our country's history. *Bush v. Gore.* 531 U.S. at 123, 127 n.5 (Stevens, J. dissenting).   Explaining that the deadlines set forth in Title 3 of the U.S. Code regarding presidential electors do not bar individual states from taking extra time to resolve election disputes, Justice Stevens noted that, in 1960, Hawaii appointed both a Republican and a Democratic slate of electors, and the governor did not certify a slate until January 4, 1961. *Id.* Congress did not receive the certified slate until January 6, 1961, the very day the electoral votes

_____

[58] That such motions were necessary is doubtful.  Plaintiffs' only chance to get relief hinged on a favorable ruling on appeal from denial of the preliminary injunction.   Any defendant spending its own money—rather than sending taxpayer dollars to a law firm of prominent local Democrats, as Detroit was doing—would never have wasted the billables when it could have simply run out the clock.

were counted.  Yet "Congress chose to count the [electors] appointed on January 4, 1961, well after the Title 3 deadlines."[59]  *Id.*

Thus, this case was not moot until Congress resolved any dispute between the rival slates of electors.  *Id.*  Under even *settled* mootness law, therefore, the case was not moot until January 6, 2021, six business days before Plaintiff dismissed the case on January 14.  Such a short delay, one that imposed no additional filing requirements on Defendants or Detroit, and no burden on the District Court, hardly supports sanctions.

Nor is it entirely clear that even January 6 was the drop-dead date.  Had Michigan been ordered to withdraw its certification after that date, Congress could have reconsidered its vote.  These are uncharted waters.  As *Bush v. Gore* proves, much election law is made on the spot, with flexible remedies adapted to the exigencies of the moment.  *See, e.g.*, 3 U.S.C. § 1 (no cases annotations between 1944 and 2020); *id.* § 2 (no cases before 2021); *id.* § 5 (no cases till *Bush v. Gore*

---

[59] The ambiguities under present law, combined with the recognition that postelection litigation is often necessary and requires adequate time, have led to proposed amendments to the Electoral Count Act. Larry Diamond, *Democrats, Want to Defend Democracy? Embrace What Is Possible*, N.Y. Times (Jan. 25, 2022).

litigation). There are special procedures for deciding election cases precisely because they often present novel claims on an expedited schedule. *See generally* Joshua A. Douglas, *The Procedure of Election Law in Federal Courts*, 2011 UTAH L. REV. 443. While the District Court makes much of supposed mootness at various points, the reality is that nobody knows—and it would appear had scarcely thought about the question prior to 2021—*when* a dispute over the selection of electors or counting of electoral college votes becomes moot. Even if this case did become moot, however, a difference of six business days is hardly vexatious or otherwise sanctionable. In fact, under Rule 11—the only potential source of authority for the non-monetary sanctions, *see infra* pp. 70-72—it *cannot* be sanctionable as a matter of law. *Jackson*, 875 F.2d at 1229.

## C. The District Court abused its discretion in awarding Detroit, a permissive intervenor, nearly 700% of the fees awarded to the actual Defendants.

Because the District Court did not expressly grant Detroit leave to intervene as of right, it was a party to the litigation permissively and—though this Court does not appear to have resolved the issue—Appellants will assume Detroit has technical standing to request

sanctions in some amount. *Cf. New York News, Inc. v. Kheel*, 972 F.2d 482 (2d Cir. 1992). Technical standing to request *some* sanctions does not, however, give a district court *carte blanche* to reward a permissive intervenor with largess nearly 700% of that available to the persons actually sued.

The District Court's dramatically disproportionate award creates perverse incentives. If this litigation was the nuisance Detroit apparently thinks it was, Detroit came to the nuisance. It volunteered to incur the fees it now requests from Appellants; it filed a humongous, unnecessary motion to dismiss. Today it is a city in an election case being showered in fees, but tomorrow—after seeing the potential to submit huge bills, with collection backed by the plenary powers of a federal court—it will be bounty hunting lawyers in all manner of litigation. If actual defendants can defend a supposedly frivolous case for x dollars, interlopers simply cannot reasonably assert that the loss they suffered "solely because of the misconduct" is 700% of x. *Cf. Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017). Mercenaries should be limited to, at most, the recovery available to the truly "innocent party." *Id.*

## II. The District Court erred as a matter of law by violating the First Amendment rights of Appellants and their clients.[60]

In *Gentile v. State Bar of Nevada*, the Supreme Court wrote: "It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." 501 U.S. 1030, 1071 (1991). It is thus understandable for this Court to have written "that courts have thus far been reluctant to allow the First Amendment to intrude into the courtroom," where it described "the First Amendment rights of everyone (attorneys

---

[60] The requirement that Appellants participate in "non-partisan" continuing legal education is at least a content-based restriction imposed with no discussion, *see, e.g.*, *Eagon ex rel. Eagon v. City of Elk City, Okl.*, 72 F.3d 1480, 1487 (10th Cir. 1996), and probably viewpoint discrimination, *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1462 (7th Cir. 1995) (Flaum, J., concurring) ("[T]he very terms 'political' or 'nonpartisan' are themselves insusceptible of principled application. Far too frequently the mantle of nonpartisanship is thrown over the shoulders of those who have been successful in obtaining political and economic power in our society, while the pejorative of 'political' is reserved for those who have been less successful in those same endeavors. More obliquely (although no less perniciously), the appellation of nonpartisan is often affixed to ideas and values whose very emptiness of political content may itself be considered an expression of political position." (quoting *Lawrence Univ. Bicentennial Comm'n v. City of Appleton, Wisc.*, 409 F. Supp. 1319, 1325 (E.D. Wis. 1976))). Could Appellants comply by taking CLE courses from the Federalist Society? Would they dare?

included)" as "at their constitutional nadir." *Mezibov v. Allen*, 411 F.3d 712, 717, 720-21 (6th Cir. 2005).

But the law has changed since *Mezibov*. *See National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2370 (2018). Defendants in *Becerra* argued that regulations on "professional speech" should be subject to lower scrutiny than under normal First Amendment doctrines. 138 S. Ct. 2361, 2370 (2018). The Court disagreed, explaining that its precedents had "not recognized 'professional speech' as a separate category of speech" subject to lower scrutiny. *Id.* at 2371. As such, the Court employed the "ordinary First Amendment principles" that govern content-based regulations. *Id.* at 2375. *Becerra* dealt with speech in the medical profession, but it relied on cases dealing with attorneys' First Amendment rights. *Id.* at 2372-74; *see In re Primus*, 436 U.S. 412, 428 (1978); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001); *NAACP v. Button*, 371 U.S. 415, 438 (1963).

Even before *Becerra,* this Court cautioned that imposing sanctions for political speech "would create a disincentive to the enforcement of civil rights laws and would have a chilling effect on a plaintiff who

seeks to enforce his/her civil rights, especially against a government official." *Riddle v. Egensperger*, 266 F.3d 542, 551 (6th Cir. 2001). This is especially true where, as in *Riddle* and here, the dispute concerns core political speech. Election challenges are an important component of the democratic process; in 2000 such a challenge determined who became President. Of necessity, such challenges must be brought in haste, often based on fragmentary and developing information, and subject to substantial uncertainty. Sanctioning lawyers for bringing such cases because they have not crossed every "t" and dotted every "i", at the time they file the complaint will deter future lawyers from bringing such cases, casting a chilling pall over such advocacy. No compelling, or even substantial, state interest is served by discouraging lawsuits that seek to ensure that our electoral process is conducted fairly and lawfully.

The First Amendment implications here are particularly weighty because the District Court's order is designed to prevent Appellants and their clients from speaking *expressly* because the District Court disapproves of their message:

> Sanctions are required to deter the filing of future frivolous lawsuits designed primarily **to spread the narrative that**

**our election processes are rigged and our democratic institutions cannot be trusted.**  Notably, many people have latched on to this narrative, citing as proof counsel's submissions in this case.  The narrative may have originated or been repeated by Former President Trump and it may be one that "many Americans" share (*see* ECF No. 161 at Pg ID 5817); however, that neither renders it true nor justifies counsel's exploitation of the courts to further spread it.

RE 172, Page ID # 6992-93 (emphasis added).

While this is the most explicit statement of the District Court's disagreement with the views of Appellants and their clients, it is not the only one.  *See, e.g.*, RE 172, Page ID # 6978 ("What is most important, however, and what very clearly reflects bad faith is that Plaintiffs' attorneys are trying to use the judicial process to frame a public 'narrative.'").  The opinion, in fact, bristles with disdainful and often partisan comments about Appellants' view that the 2020 Presidential Election was rigged.

Public interest litigation generally involves both a case and a cause.  Entities bringing such cases routinely use litigation as a way of publicizing their message.  There is nothing improper or unethical about this.  What the District Court found objectionable is that the litigation was used to advance *this* message—with which the District Court fervently disagrees.  The District Court used its punitive power to

suppress a point of view it disagrees with.    This is viewpoint

discrimination, pure and simple.    But judges, like other government

actors, are bound by the First Amendment; they may not punish speech

simply because they believe it's untrue.    *See United States v. Alvarez*,

567 U.S. 709, 729 (2012).    Even under the old *Gentile/Mezibov*

standard, and especially after *Bercerra*, punishing lawyers because the

District Judge detests their message is impermissible.[61]

### III.    The District Court erred as a matter of law by issuing a sanctions order with no effort to tie specific findings of sanctionable conduct to a specific standard and specific remedy.

---

[61] The ethics complaints seeking disbarment and filed by the Governor, Secretary of State, and Attorney General against Plaintiffs' Michigan-admitted lawyers only heighten the speech stakes in this case.    *E.g.*, Ethics Complaint Against Junttila *available at* https://tinyl.io/5e8k (last accessed Feb. 1, 2022).    A Democrat Governor, a Democrat Secretary of State, and a Democrat Attorney General have joined a Democrat-appointed, Democrats-confirmed judge to ask a disciplinary body appointed and superintended by a Democrat-controlled state entity to kill the careers of Republican lawyers for advancing what is a mainstream Republican position on the 2020 Presidential Election. Lane Cuthbert, *Do Republicans really believe Trump won the 2020 election? Our research suggests that they do*, WASH. POST (Jan. 7, 2022). At a bare minimum, the optics here are terrible.    "[J]ustice must satisfy the appearance of justice."    *In re Murchison*, 349 U.S. 133, 136 (1955) (internal quotation marks omitted).

"Careful analysis and discrete findings are required" before imposing sanctions, "no matter how exasperating the case." *In re Ruben*, 825 F.2d 977, 991 (6th Cir. 1987). Thus, district court orders that fail to make appropriately individualized findings under a specific standard, applied to a discrete act, must be vacated and remanded. *E.g.*, *id.* at 990 ("Discrete acts of vexatious conduct should be identified and a determination made whether" they meet a specific standard); *id.* ("Because the district judge did not analyze the impact upon defendants of discrete acts of claimed misconduct, remand is necessary to allow the district judge to make such a determination."); *see Garner v. Cuyahoga Cty. Juv. Ct.*, 554 F.3d 624, 646 (6th Cir. 2009) ("We therefore remand with instructions to consider ... the appropriate amount of sanctions against [counsel] vis-a-vis her clients."); *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986) (remanding for examination of specific act—failure to sign pretrial order—in isolation).

The order appealed from fails to specify which sanctions authority it uses to impose which sanctions against which Appellant. The District Court's "all of them, under each of them, against everybody, for everything" approach flies squarely in the teeth of controlling authority

65

and, because of the materially different outcomes under the different sources of authority, deprives Appellants of their right to meaningful review by this Court.

## A. The various, and varied, sources of sanctions authority.

Not all sanctions and sources of sanction authority are the same. After the 1983 amendments, Rule 11 has no willfulness or bad faith requirement, but its remedial scope—broad though it is to include both monetary and non-monetary sanctions—is limited to that necessary to deter future misconduct.   Fed. R. Civ. P. 11(c)(4); *id.* (advisory committee notes); *Jackson*, 875 F.2d at 1229-30 ("There is agreement among the circuits ... that because deterrence, not compensation, is the principal goal of Rule 11, courts should impose the least severe sanction that is likely to deter ...."); *see Danvers v. Danvers*, 959 F.2d 601, 605 (6th Cir. 1992) ("The idea is not to bankrupt an attorney ... but to deter him from repeating the conduct prohibited by Rule 11."). "The rule relates to papers filed in court by an attorney, not to questionable attorney conduct in general." *Jackson*, 875 F.2d at 1229. "The focus of Rule 11, then, is narrow; it relates to a specific act—the signing, and to

a specific time—the time of signing" and "does not create a continuing obligation like that imposed by § 1927." *Id.*

Inherent-authority sanctions are narrower in the sense that they require a showing of bad faith, *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 647 (6th Cir. 2006), but wider in that they need not be tethered to a specific pleading at a specific time, as under Rule 11, *see Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766-67 (1980). Although the law used to be the contrary, *see Sater*, 465 F.3d at 647 (describing purpose as "punitive"), the Supreme Court has now made clear that inherent-authority sanctions must be "compensatory rather than punitive in nature" and so are "limited to the fees the innocent party incurred solely because of the misconduct." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1182, 1186 (2017).

In contrast to those two sources of authority, Section 1927 sanctions are available against only an "attorney or other person admitted to conduct cases," and only for the "excess costs, expenses, and attorneys' fees reasonably incurred" because the proceedings were "multipli[ed]" in an "unreasonabl[e] and vexatious[]" manner. 28 U.S.C. § 1927. Falling somewhere between the *mens rea* standard under Rule

11 and that for inherent-authority sanctions, Section 1927 requires a showing of "something less than subjective bad faith, but something more than negligence or incompetence." *In re Ruben*, 825 F.2d at 987.

There are thus three very different sanctions standards in play.

## B. The hash made of the standards.

The District Court failed to perceive those important distinctions among sanctions standards. Consider, for example, what the District Court wrote under "Sanctions Imposed":

> If Plaintiffs' attorneys are not ordered to reimburse the State Defendants and the City for the reasonable costs incurred to defend this action, counsel will not be deterred from continuing to abuse the judicial system to publicize their narrative. Moreover, this Court has found that Plaintiffs' counsel initiated this litigation for an improper purpose, rendering this the "unusual circumstance" in which awarding attorneys' fees is warranted.

RE 172, Page ID # 6996-97.

This, as the District Court appears to have recognized in its abstract discussion of the law, looks like the standard applied for forcing one party to pay the legal expenses of another party, rather than a fine to the court's general fund, under Rule 11. *Id.* 6912 (citing Rule 11 and quoting *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009)). So too is the primary focus on deterrence from Rule 11.

*Yet the Governor and Secretary of State never moved for sanctions under Rule 11.*

As an initial matter, therefore, the District Court awarded sanctions to Defendants (as opposed to intervenor Detroit) under the more lenient standard of a rule they never invoked. Application of the standard under Section 1927 cannot save the award either. The District Court faults Appellants for "initiat[ing]" this litigation, which is conduct that Section 1927 does not cover. Then, looking backwards to its Section 1927 discussion, the District Court faults Appellants for failing to dismiss *after the case became moot*, which could not justify fees from the beginning (when the case clearly was not moot) even if they were theoretically available under Section 1927.

"Rule 11 and § 1927, while probably duplicative to some extent, cover different actions in a lawsuit and require the application of disparate standards of proof." *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1358 (3d Cir. 1990); *see Garner v. Cuyahoga Cty. Juv. Ct.*, 554 F.3d 624, 645 (6th Cir. 2009) (pointing out inadequacy of invoking one to justify the other). Obviously one cannot "multipl[y]" proceedings in a

"case" until after that case is filed.[62]   This is why other forms of litigation misconduct such as "failure to make a reasonably adequate inquiry into the facts and law before filing the lawsuit," *i.e.*, fault in *initiating* a suit, are excluded from Section 1927's reach.  *Zuk v. Eastern Pa. Psychiatric Inst. of the Med. Coll.*, 103 F.3d 294, 297-99 (3d Cir. 1996). *Cf. In re Blasingame*, 709 F. App'x 363, 371 (6th Cir. 2018) (sanctions under Section 1927 inappropriate where offending motions are traceable to defective initiation of proceedings).

Even the District Court seemed to recognize this, framing the opening question of its Section 1927 discussion as "whether Plaintiffs' counsel unreasonably and vexatiously multiplied proceedings by *failing to dismiss this case when even they acknowledged it became moot*."  RE 172, Page ID # 6936 (emphasis added).   Putting aside substantive

---

[62] *See also In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008) ("[T]he proceedings in a case cannot be multiplied until there is a case."); *Matter of Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986) ("Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed."); *Smith v. Psychiatric Sols., Inc.*, 864 F. Supp. 2d 1241, 1269 (N.D. Fla. 2012), *aff'd*, 750 F.3d 1253 (11th Cir. 2014) ("[B]ased on its plain language, § 1927 applies only to filings after the lawsuit has begun." (citing *Macort v. Prem, Inc.*, 208 F. App'x 781, 786 (11th Cir. 2006))).

problems with the resulting holding till later, *see infra* pp. 85-88, at face value these sanctions must be limited to legal expenses Defendants incurred after December 14. *Id.* # 6936-37. Yet then, when fashioning the remedy, the District Court held Appellants liable for *all* of the Governor and Secretary of State's (and Detroit's) legal expenses. RE 179, Page ID # 7168.

But assume, contrary to all the above, that Section 1927 applies and the District Court made the appropriate findings. Neither Section 1927 nor the Court's inherent authority could support the sanctions of requiring continuing legal education or referral for bar discipline.[63]

---

[63] Neither are there individualized findings of bad faith as to any Appellant. The majority of Appellants' names are not even mentioned again after the District Court opines they are subject to its jurisdiction. Indeed, this is the entirety of the District Court's bad faith ruling:

> And, for the reasons discussed above, Plaintiffs' counsel knew or should have known that these claims and legal contentions were not well-grounded in law or fact. Moreover, for the reasons also discussed above, the Court finds that Plaintiffs and their counsel filed this lawsuit for improper purposes.

RE 172, Page ID # 8991. But what is discussed above that paragraph is simply a recitation of the acts, unaccompanied by any discussion of an *individual's* action, failure to act, or even duty to act, that the District Court found improper. *Id.* Moreover, "knew or should have known" is an almost ostentatiously wrong recitation of the standard for a bad

Section 1927's terms are limited to a monetary award, capped at the expense caused by the vexatious multiplication of proceedings and, after *Haeger*, inherent-authority sanctions are also limited to legal expenses caused by the misconduct. 137 S. Ct. at 1186.

Was Appellants' conduct as to the Intervenors, the only party to move for Rule 11 sanctions, as opposed to the Defendants, sufficient—standing alone—to justify those non-monetary sanctions? One cannot tell. Can the District Court's conclusion that Appellants "initiated" suit for an improper purpose be supported when the Intervenors had nothing "initiated" against them by Appellants? The opinion is too opaque to see. Do the non-monetary sanctions survive excision of the District Court's consideration of "the number of failed election-challenge lawsuits that Plaintiffs' attorneys have filed," which could be relevant under inherent authority's plenary scope, except that such sanctions are now limited to monetary compensation, but cannot be relevant under Rule 11's "specific pleading, specific time" limitation from this Court's

---

faith finding, which is subjective ("knew") rather than objective ("should have known"). *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987) (noting that "knows *or reasonably should know*" standard is "entirely different from determinations under the bad faith rule" (emphasis in original)).

*Jackson* opinion?  875 F.2d at 1229.  Maybe not.  Is the District Court not-so-veiled reference to Appellants having caused the events of January 6th, RE 172, Page ID # 6989-90—the very kind of reference the Delaware Supreme Court found execrable—part of its calculus?  No doubt.

"Lastly," as the District Court put it, where on Earth did its *disciplinary* findings come from?  In an appositional phrase, the District Court purported to make a finding that "the conduct of Plaintiffs' counsel, which also constituted violations of the Michigan Rules of Professional Conduct, *see, e.g.*, MRPC 3.1 and 3.3, calls into question their fitness to practice law."  RE 172, Page ID # 6997.  The District Court has an entire procedure for making such findings.  *See* E.D. Mich. L. R. 83.22.[64]  This kind of unnoticed, armchair afterthought is

---

[64] Detroit asked the District Court to invoke this rule.  The District Court chose not to do so.  Instead it made its own finding of misconduct, and imposed its own punishment, bypassing the procedural protections of Local Rule 83.22.  This itself is reversible error.  *In re Corrinet,* 645 F.3d 1141, 1146 (9th Cir. 2011) ("[T]he district judge failed to adhere to the District of Oregon's rules regarding the discipline of attorneys. District judges must adhere to their court's local rules, which have the force of federal law.... 'Courts enforce the requirement of procedural regularity on others, and must follow those requirements themselves.'" (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 184 (2010) (per curiam))).

inappropriate in a disciplinary proceeding—or a sanctions one. *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1394 (10th Cir. 1992) (vacating and remanding where "[t]he Rule 11 proceeding was in effect transformed into a disciplinary action" because court was "unable to determine whether the sanction issued was the result of a violation of Rule 11 or the court's finding on [the attorney's] truthfulness").

Section 1927 and Rule 11 have each been construed as penal in nature and this Court "believes that [they] should be strictly construed." *United States v. Ross*, 535 F.2d 346, 350 (6th Cir. 1976). Any other attitude "stifle[s] the enthusiasm or chill[s] the creativity that is the very lifeblood of the law." *LaSalle Nat'l Bank v. First. Conn. Holding Grp.*, 287 F.3d 279, 289 (3d Cir. 2002); *see* Fed. R. Civ. P. 11 (advisory committee notes) ("The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.").

Strict construction requires strict analysis and strict findings. The District Court's order falls far short in both respects, even though the District Court took more than four-and-a-half times the period the underlying lawsuit was pending, and nearly half again as many pages as the complaint, to decide it. Indeed, one wonders how the District

Court's written work product would fare under its own unblinking glare. *See, e,g*, *supra* n.56.

## C. At least remand for clarification is necessary.

Appellants are not nit-picking. Do they have discretion to pass along the monetary sanctions to their clients? Is there even a plausible legal basis for the non-monetary sanctions? Under what standards were ethics violations found? How is "non-partisan" defined? RE 172, Page ID # 6999. Confusion like that resulting from the District Court's opinion requires remand. *Jones*, 899 F.2d at 1358 ("Because the district court did not differentiate between Rule 11 and [Section 1927] in imposing sanctions, we are not in a position even to know whether the district court applied the correct standard insofar as Rule 11 is concerned. In consequence, the entire order imposing sanctions on appellant must be vacated."); *United States v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 948 F.2d 1338, 1347 (2d Cir. 1991) (requiring separate analyses of Rule 11, Section 1927, and inherent-authority sanctions).

"Careful analysis and discrete findings are required" before imposing sanctions, "no matter how exasperating the case." *In re*

*Ruben*, 825 F.2d at 991.  In a Second Circuit case cited thirteen times by this Court, *Oliveri v. Thompson*, the panel concluded "the findings of the district court speak in terms too general to meet the 'high degree of specificity' that we have required to support an award made pursuant to § 1927."  803 F.2d 1265, 1277 (2d Cir. 1986).  The findings in *Oliveri* look like the movement of a Swiss chronograph compared to those here.

## IV. The District Court erred as a matter of law by imposing sanctions collectively against all attorneys without explaining its individualized consideration of their relative responsibility for any misconduct.

"A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4).  Further, "[a]n order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction."  *Id.* R. 11(c)(6).  Both Section 1927, which is limited to expenses attributable to conduct after a complaint is filed, and inherent-authority sanctions have their own tailoring requirements.  Yet the District Court treats every single Appellant exactly the same, despite widely varying levels of involvement.  No consideration is given to the role played by Appellants' clients and any affiants who may have lied.  *See, e.g. supra* pp. 42-51.

Kleinhendler, Haller, and Johnson did not sign the complaint. RE 172, Page ID # 6915. They were merely listed as "Of Counsel"—and Junttila was not even listed as that on the complaint.[65]  *Id.*; *In re Ruben*, 825 F.2d 977, 987 (6th Cir. 1987) ("Since Rathbun's case was instituted and prosecuted by several attorneys before Ruben entered an appearance, he cannot be sanctioned for 'bad faith in bringing an action or causing an action to be brought.'"). Johnson's name is not mentioned, except to identify him as joining filings in connection with the sanctions motions rather than some act in the underlying litigation, after the Court notes without further elaboration he was listed as "Of Counsel." *Id.* at 6895. The only mention of Hagerstrom, other than for identification purposes, is to say he signed the complaint. Haller is mentioned substantively but twice, once for an anodyne statement (*id.* at 6968) and once for answering "no" to a question at the sanctions hearing (*id.* at 6987). Newman had "a limited role," and Rohl was just a filing vehicle. *Id.* at 6924-25.

---

[65] The paper identified by the District Court as the basis for concluding Junttila nevertheless "advocated for" the complaint *was Appellants' response to the motion for sanctions where they also advised they were dismissing the case*! RE 172, Page ID # 6915 n.13 (citing RE 85). More egregious bootstrapping is hard to imagine.

Yet each of the above is treated exactly the same as Wood, the man the District Court spent page after page excoriating and calling a liar. *Id.* at 6914-23. And, at least on the District Court's account of his extrajudicial statements, an unrepentant one. *Id.* at 6922, 6977.

Accepting for the purposes of argument the District Court's conclusion that, for example, the very limited involvement of Junttila, Newman, Rohl, Johnson, Hagerstrom, and Haller may be sufficient to justify *some* award of sanctions—which, inasmuch as it imposes liability for any document one of them did not sign, runs directly contrary to *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 124 (1989), and inasmuch as it imposes liability for out-of-court acts (like failing to consent to a motion), cannot support non-monetary sanctions—that in no way justifies why those actions are equivalent to those of someone the District Court clearly believed to be the proud, unbowed architect. Neither does the opinion explain how Powell and Kleinhendler are Wood's equal in culpability. No individualized consideration of the varying financial conditions of Appellants appears either. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 420 (6th Cir. 1992).

Even if somehow this "one size fits all" Procrustean approach to sanctions could—under some reasoning mysterious to Appellants—be justified, the District Court's order certainly does not *explain* that reasoning.  The District Court's circumvention of the requirements to tailor and explain not only prejudices Appellants perhaps entitled to a different allocation, but it precludes this Court's meaningful review. *Katz v. Household Int'l, Inc.*, 36 F.3d 670, 676 (7th Cir. 1994) ("Because the district court did not clearly explain its award of sanctions, adequate review of its decision has proven impossible.").

This Court has vacated and remanded for precisely this kind of judicial lassitude.  *Bodenhamer Bldg. Corp. v. Architectural Rsch. Corp.*, 989 F.2d 213, 218 (6th Cir. 1993) (faulting district court for failure to "analyze the impact upon [the moving party] of discrete acts of claimed misconduct" (alteration in original)).  The Supreme Court has made clear that Rule 11 liability must be personal only to a signer. *Pavelic & LeFlore*, 493 U.S. at 124; *see United States v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 948 F.2d 1338, 1347 (2d Cir. 1991) ("As we view the record of the time period in issue, the only signed paper was Delia Guazzo's letter. Rule 11

sanctions against the other attorneys of record were, therefore, improper."). Further, Rule 11, the sole possible basis for the non-monetary sanctions, imposes no continuing obligation, *Jackson*, 875 F.2d at 1229, and the District Court undertook no individualized consideration of when each Appellant entered and exited involvement in substance of the case, far less a comparison of each timeline against supposed developments casting doubt on the factual or legal basis for the suit.

Individualized assessment and apportionment of liability, and *the explanation* of that assessment and apportionment, are critically important features of any sanctions order. *Nieves v. City of Cleveland*, 52 F. App'x 635, 637 (6th Cir. 2002) ("The district court's failure to 'indicate how any particular pleading, motion, or paper relates to any particular expense or attorney fee' merits remand." (citing *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 114 (6th Cir. 1989); *Vild v. Visconsi*, 956 F.2d 560, 571 (6th Cir. 1992))). Their absence in this one is fatal—and, given that the order suffers no want of words, telling.

## V.    The District Court erred as a matter of law by flouting Rule 11's substantive protections and using inapplicable supplemental sources of sanctions authority to fill the gap.

The District Court gave Appellants until January 19 within which to respond to the only stand-alone motion for sanctions then pending, as well as to respond to the motions to dismiss, where the motion of Detroit—the only party that would end up also moving for Rule 11 sanctions—included its request for sanctions under Section 1927 and inherent authority.  RE 172, Page ID # 6900-01.  Appellants dismissed the complaint on January 14.  *Id.*  Where is the vexatiousness, bad faith, or other sanctionable conduct in dismissing five days *early*, even though this Court and the Supreme Court were still considering—and would continue to consider—appeals challenging the District Court's preliminary injunction ruling?

If the Court's head spun when reading the dizzying date details in the procedural history, it is not alone.  This was fast-paced litigation, as is all election litigation.  Rule 11 allows a court to extend the safe-harbor period beyond twenty-one days.  Fed. R. Civ. P. 11(c)(2).  Before the safe-harbor deadline passed, Appellants moved for more time to respond to the only then-pending sanctions matters.  RE 172, Page ID #

6900.  It is true their motion for more time, directed as it was to the

pending sanctions motion filed by the gadfly, did not mention Rule 11.

But the safe-harbor deadline had not passed and no one had yet sought

Rule 11 sanctions.   Appellants, by voluntarily dismissing within the

time allotted to respond to the motions to dismiss and the motion for

Section 1927 and inherent-authority sanctions, substantially and in

good faith complied with Rule 11's safe-harbor provision.   Any other

result would be the kind of hypertechnical gotcha that has no place in

sanctions proceedings.

Having substantially complied with Rule 11's safe harbor by

terminating the case within the time the District Court granted for

responding to the original sanctions motion and motions to dismiss,

sanctions should have been unavailable as a matter of law under the

more demanding standards applied to Section 1927 and inherent-

authority motions.   The mere enactment of Rule 11 itself did not

extinguish these other sanctions authorities.  Fed. R. Civ. P. 11 (1983

advisory committee notes).   But there is a difference between conduct

not covered by Rule 11 (because, for example, it does not relate to the

signing of a pleading or paper) and conduct specifically excluded from

sanction by Rule 11's safe-harbor provision. Rule 11's grace period represents a clear determination that matters withdrawn within that period are not vexatious and the conduct cannot be in bad faith. A safe harbor cannot work otherwise. If an attorney must still fear sanctions under Section 1927 or a court's inherent authority despite ameliorating the harm within Rule 11(c)(2)'s time limit, what incentive is there to do what Rule 11 is plainly designed to incentivize: spare a court the necessity to decide?

"Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). This Court has similarly cabined Section 1927 discretion by noting that "[a] sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants." *In re Ruben*, 825 F.2d 977, 988 (6th Cir. 1987). What Rule 11 expressly encourages should not become by some other theory sanctionable.

## CONCLUSION

The District Court has improved upon Voltaire's observation that "[t]yrants have always some slight shade of virtue; they support the

laws before destroying them": It managed to shred the Constitution at the very same time it wrapped itself in the flag. In the canonical account of treachery towards a sovereign, it is one of the supporters of the pretender to the throne who proposes, "The first thing we do, let's kill all the lawyers." Shakespeare, Henry VI, Part II, Act IV, Scene 2. That is because "Shakespeare knew that lawyers were the primary guardians of individual liberty in democratic England." J.B. Hopkins, *The First Thing We Do, Let's Get Shakespeare Right!*, 72 Fla. B.J. 9, 9 (Apr. 1998). Americans know this too. Sanctions are not a saber but the resulting damage to civil society is the same. Shutting down speech is not our way.

Appellants respectfully request that the District Court's intemperate order be reversed or, in the alternative, vacated and remanded for consideration by another district judge in order to preserve "the fragile appearance of justice." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 191 (9th Cir. 1989) (internal quotation marks omitted).

Respectfully submitted this 7th day of February 2022.

/s/ Sidney Powell_____
Sidney Powell, Esq.

2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com

/s/ Howard Kleinhendler
Howard Kleinhendler, Esq.
369 Lexington Avenue, 12th Floor
New York, NY 10017
Ph: 917-793-1188
E-Mail: howard@kleinhendler.com

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the attached opening brief is proportionately spaced, has a typeface of at least 14 points, including headings and footnotes, and contains 17,681 words.

DATED this 7th day of February 2022.

/s/ Sidney Powell
Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is a member of the bar of this Court in good standing, and that the foregoing Appellant's Opening Brief was delivered via electronic service on this date to:

Heather S. Meingast                          David H. Fink
Erik A. Grill                                Nathan J. Fink
Assistant Attorneys General                  Fink Bressack
Office of the Attorney General               38500 Woodward Avenue
of Michigan                                  Suite 350
P.O. Box 30217                               Bloomfield Hills, MI 48304
Lansing, MI 48909
*Counsel for Defendants*                     *Counsel for Intervenor Detroit*

I declare under the penalties of perjury that the foregoing is true and correct, and that this certificate was executed in Dallas, Texas, this 7th day of February 2021.

/s/ Sidney Powell
Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com
*Counsel for Appellants*

87

# DESIGATION OF RELEVANT LOWER COURT DOCUMENTS

## (6th Cir. R. 28(b)(1)(A)(i))

1.   ECF 6 (First Amended Complaint) – Page ID # 872

2.   ECF 157 (Transcript of Sanctions Hearing Held on 7/12/2021) –

     Page ID # 5303

3.   ECF 172 (Opinion and Order re: Motions for Sanctions) –

     Page ID # 6890

4.   ECF 179 (Opinion and Order re: Amount of Sanctions) –

     Page ID # 7142

5.   ECF 180 (Judgment Against Appellants) – Page ID # 7169

6.   ECF 182 (Appellants' Notice of Appeal) – Page ID # 7174