No. 21-1786

# United States Court of Appeals
## for the Sixth Circuit

———— ı ————

**Timothy King, et al.**
*Plaintiffs*

and

**Gregory J. Rohl; Brandon Johnson; Howard Kleinhendler;
Sidney Powell; Julia Haller; Scott Hagerstrom**
*Interested Parties - Appellants*

v.

**Gretchen Whitmer; Jocelyn Benson; City of Detroit, MI**
*Defendants-Appellees*

———— ı ————

Appeal from the United States District Court
Eastern District of Michigan
No. 2:20-cv-13134
Honorable Linda V. Parker, District Judge, Presiding

**Reply Brief of Appellants
Sidney Powell, Howard Kleinhendler, Gregory Rohl, Julia Z.
Haller, Brandon Johnson, and Scott Hagerstrom**

Howard Kleinhendler, Esq.
369 Lexington Avenue, 12th Floor
New York, NY 10017
Ph: 917-793-1188
E-Mail: howard@kleinhendler.com

Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com

*Counsel for Appellants*

# TABLE OF CONTENTS

REPLY BRIEF.................................................................................1

ARGUMENT ...............................................................................6

   I.  The First Amendment protects Appellants' advocacy from retaliation by a District Judge who seeks to punish them for bringing a case the Judge abhors. ...................................6

  II.  The District Court's order is wrong as a matter of sanctions law.14

    A.  Plaintiffs' affidavits demonstrate their pre-filing investigation and were more than sufficient to justify bringing suit.............14

    B.  Detroit's contrary arguments are unavailing. .........................23

    C.  Plaintiffs' reliance on legal authorities was entirely reasonable .........................................................................................23

  III. The District Court lacked jurisdiction over Michigan's post-dismissal sanctions motions...........................................................39

  IV. None of Appellants' claims is moot. ...............................................41

CONCLUSION .................................................................43

CERTIFICATE OF COMPLIANCE.......................................................45

CERTIFICATE OF SERVICE................................................................46

# TABLE OF AUTHORITIES

## Cases

*Beverly v. Shermeta Law Grp., PLLC,* 2020 WL 2556674 (E.D. Mich. May 20, 2020) ........................................................................... 28

*Big Yank Corp. v. Liberty Mutual Fire Insurance*, 125 F.3d 308 (6th Cir. 1997) ................................................................................. 30-31

*Brubaker v. City of Richmond*, 943 F.2d 1363 (4th Cir. 1991) .............. 21

*Bush v. Gore*, 531 U.S. 98 (2000) .................................................. *passim*

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ................................. 29-30

*Costantino v. City of Detroit*, 950 N.W.2d 707 (Mich. 2020) .......... *passim*

*Feehan v. Wisconsin Elections Comm'n*, No. 20-cv-1771, 2022 WL 3647882 (E.D. Wisc. Aug. 24, 2022). .............................. 11-12, 34, 39-40

*Friends of the Earth, Inc. v. Laidlaw Env. Srvs. (TOC), Inc.*, 528 U.S. 167 (2000) ................................................................................ 41

*Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017) ....... 29, 31

*Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144 (4th Cir. 2002) .......... 38

*In re Foster*, 253 P.3d 1244 (Col. 2011) (en banc) .................................. 31

*Lokhova v. Halper*, 30 F.4th 349 (4th Cir. 2022) ................................... 38

*Moss v. Bush*, 828 N.E.2d 994 (Ohio 2005) .................................... *passim*

*O'Rourke v. Dominion Voting Sys., Inc.*, 552 F. Supp. 3d 1168 (D. Colo. 2021) ................................................................................... 26

*Page v. Oath Inc.*, 2022 WL 162965 (Del. Jan. 19, 2022) ................. 12, 34

*Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Nov. 29, 2020) ............... 36

*Teigen v. Wisconsin Elections Comm'n*, 976 N.W.2d 519 (Wisc. 2022) .. 36

*United State v. Throckmorton*, 98 U.S. 61 (1898) .................................... 35

*United States v. Aleo*, 681 F.3d 290 (6th Cir. 2012) ............................... 28

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................ 13

*West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) .............................. 42

## Statutes

28 U.S.C. § 1927 ...................................................................... 28, 39, 41

Mich. Comp. Laws § 168.769(4) ............................................................ 16

## Rules

Fed. R. App. P. 38 .................................................................................. 41

Fed. R. Civ. P. Rule 11 .........................................................25-27, 31-32

## Case Documents

Amicus Brief of Rep. Conyers, No. 04-2088, *Moss v. Bush*, 828 N.E.2d 994 (Ohio, filed Feb. 14, 2005) .......................................................... 10

Complaint, No. 18-cv-05391, *Ebenezer Baptist Church of Atlanta, Georgia, Inc. v. Raffensperger* (N.D. Ga. filed Nov. 27, 2018) ............. 13

Motion for Leave to Join Amicus Brief of Rep. Conyers by Senator Russell Feingold et al., No. 04-2088, *Moss v. Bush*, 828 N.E.2d 994 (Ohio, filed Feb. 14, 2005) ............................................................10-11

Order of Feb. 16, 2021, No. 18-cv-05391, *Ebenezer Baptist Church of Atlanta, Georgia, Inc. v. Raffensperger* (N.D. Ga. filed Nov. 27, 2018) ...................................................................................................... 13

Verified Complaint, *Moss v. Bush*, No. 04-2088, 828 N.E.2d 994, 997 (Ohio 2005) ......................................................................6, 36

## Books & Law Reviews

Bruce Ackerman & David Fontana, *Thomas Jefferson Counts Himself Into the Presidency*, 90 VA. L. REV. 551 (2004) .....................................9

Nicole Etcheson *Bleeding Kansas: Contested Liberty in the Civil War Era* (2004) ...............................................................................7

Roy Morris, Jr., *Fraud of the Century: Rutherford B. Hayes, Samuel Tilden, and the Stolen Election of 1876* (2004) .....................................9

## Other Authorities

Ltr. of The 65 Project to Office of Chief Disciplinary Counsel, State Bar of Texas (May 18, 2022) ......................................................10

BridgeMI, *Tudor Dixon wins 80 of 83 Michigan counties in GOP governor primary romp* (Aug. 3, 2022)...................................................8

Kate Brumback, *Election lawsuit backed by Stacey Abrams goes to trial in Georgia*, PBS (Apr. 9, 2022) ...........................................13

Philip Bump, *How Trump's effort to overturn 2020 is sanitized for the general public*, WASH. POST. (Aug. 1, 2022) ...........................................8

Rev. Martin Luther King, *The Other America* (Grosse Pointe High School, Mar. 14, 1968) ...............................................................9

*Riley Claims Win*, MONTGOMERY ADVERTISER (Nov. 7, 2002) ...............19

*Siegelman Concedes: Recount Efforts Abandoned*, BIRMINGHAM NEWS (Nov. 19, 2002)......................................................................20

William Cummings, *'You can have the election stolen from you,' Hillary Clinton warns 2020 Democrats*, USA TODAY (May 6, 2019),.................1

# REPLY BRIEF

"You can run the best campaign, you can<br>
even become the nominee, and you can<br>
have the election stolen from you …."

Hillary Clinton[1]

The District Court's sanctions order is an abuse of judicial power. Plaintiffs and their counsel had a First Amendment right to petition the court. They did so by filing a detailed complaint supported by hundreds of pages of sworn affidavits and expert reports—far beyond what is required to initiate any case.

Counsel did not misrepresent the supporting documents. They invited the District Court to draw inferences from documented facts—as lawyers do in cases before the courts every day.[2] Nor did counsel misrepresent the precedents. They relied on relevant cases and argued

---

[1] William Cummings, *'You can have the election stolen from you,' Hillary Clinton warns 2020 Democrats*, USA TODAY (May 6, 2019), *available at* https://tinyurl.com/2p8vnmb9.

[2] The District Court never allowed Plaintiffs to present live evidence, even at the sanctions "hearing" when counsel specifically requested an opportunity to do so. Hearing Tr., RE 157, Page ID # 5383 (lns. 20-21).

for extension of those precedents to cover a novel fact situation—again, as lawyers do every day.

That the factual inferences and legal arguments were rejected, as inferences and arguments are rejected in countless other cases, is no ground for sanctions.  And the District Court's undisguised antipathy toward Plaintiffs' political views and their objective in bringing the lawsuit betrays all norms of judicial objectivity; it is an independent reason for reversal.

Appellees stubbornly refuse to engage with the sworn, first-hand witness accounts Appellants presented:  Poll workers instructed to back-date ballots and count invalid ballots?  Peccadillos, unworthy of comment.  A circuit split on one of Plaintiffs' legal arguments?  Plaintiffs' reliance on one side of that split is frivolous.  To Appellees and the court below, only the facts and law they agree with today matter.

Whatever we may know *now* about the 2020 Presidential Election, this Court must consider the situation during the chaotic period between November 23, 2020, and January 14, 2021, when Plaintiffs prosecuted their case—what was known then, what precedent existed

then, and how much time Plaintiffs' counsel had to vet the tidal wave of affidavits disclosing, in the words of Michigan Supreme Court Justice Zahra, "troubling and serious allegations of fraud and irregularities .... includ[ing] claims of ballots being counted from voters whose names are not contained in the appropriate poll books, instructions being given to disobey election laws and regulations, the questionable appearance of unsecured batches of absentee ballots after the deadline for receiving ballots, discriminatory conduct during the counting and observation process, and other violations of the law" raising "important constitutional issues ...." *Costantino v. City of Detroit*, 950 N.W.2d 707, 708-09 (Mich. 2020) (Zahra, J., concurring, joined by Markman, J.).

Contrary to Detroit's claim, these allegations were not "previously discredited in the *Costantino* case." The trial court in that case did "scrutinize[] the parties' bare affidavits, concluding that plaintiffs' allegations of fraud were not credible," but, contrary to Michigan law, "[t]he court's credibility determinations were made without the benefit of an evidentiary hearing." *Id.* at 710 & n.2 (Viviano, J., dissenting); *id.* at 709 ("[T]he trial court should meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the

credibility of the competing affiants ...." (Zahra, J. concurring, joined by Markman, J.)).  To this day, *not one* of the factual allegations presented by Plaintiffs has been tested by the adversary process; none have been found to be untrue by a trier of fact following an evidentiary hearing.

Nor was the legal landscape as inhospitable to Plaintiffs as the District Court and Appellees pretend.  That cases such as *Bush v. Gore* are "distinguishable," *e.g.*, Mich. Ans. Br. at Page ID # 28, 41, is irrelevant.  If lawyers were sanctioned whenever they can't find authority directly on point, few advocates—and zero good ones—would escape discipline.  Arguing by analogy from existing authority, seeking an extension to a new fact situation, even arguing for reconsideration of established authority, is the advocate's art and duty.  How would *Brown v. Board of Education*, *Loving v. Virginia*, and *Lawrence v. Texas*—and scores of cases like them—have reached the Supreme Court if lawyers were afraid of having their careers defenestrated for failing to come up with authorities that were not "distinguishable"?  Under the regime imposed by the District Court and exuberantly endorsed by Appellees, we would be living in a world where the votes of citizens are weighted unequally, the press is oppressed by ruinous defamation suits, and

contraception is illegal.  The law would suffocate for lack of advocates willing to risk their careers by challenging the established order.

What Appellants did here is no different from what lawyers have done since the dawn of the common law:  They gathered evidence—even provided under penalty of perjury; they made legal arguments plausibly supported by analogy to or extension of existing law; and they exercised their First Amendment right to petition by filing their complaint.  They failed because arguably erroneous judicial rulings and fast-moving events rendered meaningful appellate review impossible.  They accept the loss, though they do not agree with it.  But to then punish them for trying; to nit-pick their witness affidavits for inferences the District Judge thought implausible; to disparage the authorities on which they relied because they don't have a case directly on point; and to hit them with career-ending sanctions because the judge was offended by "the narrative that our election processes are rigged and our democratic

institutions cannot be trusted,"[3] Opinion, RE 172, Page ID # 6992-93, strikes a hard blow at our system of advocacy.

This Court must reverse, if not for the sake of Appellants, then for all those with seemingly hopeless causes who desperately need a lawyer to vindicate their rights.

## **ARGUMENT**

### **I.    The First Amendment protects Appellants' advocacy from retaliation by a District Judge who seeks to punish them for bringing a case the Judge abhors.**

"An election contest ... is not a typical lawsuit." *Moss v. Bush*, 828 N.E.2d 994, 997 (Ohio 2005) (refusing to sanction Democrats for litigation challenging the 2004 Presidential Election in Ohio for the same kind of alleged vote flipping and computer rigging of voting machines).   Election cases must, regardless of the particular statutory scheme involved, be litigated in "a very short time after an election," and therefore "a prospective contestor has limited time to investigate all

---

[3]  In 2004 Democrats held very similar beliefs, accusing Ohio Secretary of State Blackwell of "the misuse of his official powers and his abuse of the public trust" in "perpetrat[ing] or acquiesce[ing]" in "election fraud." Verified Complaint at 29, *Moss v. Bush*, No. 04-2088, 828 N.E.2d 994, 997 (Ohio 2005), *available at* https://tinyurl.com/2vb6e8mn.

the facts surrounding an election, particularly where, as here, the challenge is to a statewide election." *Id.* at 998.

Chief Justice Moyer's sage observations in *Moss* speak to two independent reasons for strictly limiting sanctions in election litigation. The first bears on the propriety of sanctions under conventional analysis, which requires taking account of the facts and circumstances (including the opportunity for investigation and deliberation) under which the attorney acted. That rationale will be addressed in Part II below.

It is Chief Justice Moyer's second reason that speaks to the First Amendment. Appellees offer this Court a naïve vision of elections in a democracy, one that suggests people in a deeply divided nation should immediately shake hands and say "good game" after a hard-fought election seems narrowly lost—as if they have ever done that.

Elections have enormous consequences. It should hardly be surprising that citizens take them seriously—and always have. *See* Nicole Etcheson, *Bleeding Kansas:  Contested Liberty in the Civil War Era* 1-2 & n. (2004) (describing the election-related violence that followed the failed promise of the Kansas-Nebraska Act).

The choice is not between Appellees' vision of citizens joining hands and signing kumbaya, and election litigation they do not like. The choice is between orderly resolution of election disputes by disinterested judges, and more direct, less orderly agitation for redress.

Appellees' apparent belief that all would have been well in the shire had the dastardly Appellants just never represented Plaintiffs is unrealistic. They would still have to contend with the fact that "many Americans are of the view that the 2020 election was not fully free and fair."[4] *Costantino*, 950 N.W.2d at 709 (Zahra, J., concurring, joined by Markman, J.).

Our Framers gave us the First Amendment not merely to protect individual liberty but to secure the legitimacy (and thereby the

---

[4] And still are. Philip Bump, *How Trump's effort to overturn 2020 is sanitized for the general public*, WASH. POST. (Aug. 1, 2022) ("'Well, it's certainly a concern to a lot of folks here in Michigan because of the way the election was handled by our secretary of state,' [Tudor] Dixon replied."). Far from rejecting Ms. Dixon's view on the 2020 election, Michiganders decisively chose her as their Republican nominee for governor. BridgeMI, *Tudor Dixon wins 80 of 83 Michigan counties in GOP governor primary romp* (Aug. 3, 2022), *available at* https://tinyurl.com/49rnrups. Refuting Plaintiffs' claims on the merits, rather than sweeping them out of court and sanctioning their lawyers, could have assuaged such doubts.

continuation) of government itself.  They knew that without the First Amendment's pressure valves—the rights of individuals to assemble, to speak, and to petition for redress—our great experiment would fail, because citizens who lack channels for peaceful expression of grievances will eventually, ineluctably choose non-peaceful means.  It was in Michigan, in fact, that Dr. King said 54 years ago:  "I must say tonight that a riot is the language of the unheard."  Rev. Dr. Martin Luther King, *The Other America* (Grosse Pointe High School, Mar. 14, 1968), *available at* https://tinyurl.com/3cb2vhvy.

How would Appellees have had Plaintiffs challenge the integrity of the 2020 presidential election other than in court with an attorney?  Should Plaintiffs have tried to cut some backroom deal, as with the Hayes-Tilden scandal?  *See generally* Roy Morris, Jr., *Fraud of the Century: Rutherford B. Hayes, Samuel Tilden, and the Stolen Election of 1876* 1-3 (2004).  Should Vice-President Pence have "counted" the President back into the presidency?  Bruce Ackerman & David Fontana, *Thomas Jefferson Counts Himself Into the Presidency*, 90 VA. L. REV. 551 (2004)?

Until Appellees can answer where the people in Plaintiffs' position, be they Democrats or Republicans, should go when no attorney will take their case for fear of sanctions,[5] they should not be heard to complain about Appellants' peaceful and orderly effort to facilitate their fellow citizens' petition for a redress of grievances. "Shut up and go home," which one senses to be Appellees' preference, is neither feasible nor right when millions believe the election was stolen.[6] *See* Opening

---

[5] Lest there be any doubt, Appellees' confederates have been busy weaponizing the District Court's order to make sure no one else will take on a Republican election challenge going forward. *See, e.g.*, Ltr. of The 65 Project to Office of Chief Disciplinary Counsel, State Bar of Texas (May 18, 2022), *available at* https://tinyurl.com/2p8h7p9y (requesting investigation and asserting disciplinary violations by a sitting senator supported by quotations from the District Court's order). This, of course, is separate and apart from whatever results from the District Court's referral of Appellants to their bar associations. And it is also separate from Appellees' efforts to prosecute Michigan's proposed alternate slate of electors *criminally*. Mich. Ans. Br. at Page ID # 71 n.24.

[6] Nor what Democrats thought proper when the shoe was on the other foot. After losing their claims of computerized election fraud, vote flipping, outcome changing third-party re-tabulation, and multiple other irregularities in Ohio after the 2004 election, Democrats vigorously opposed sanctioning the election lawyers. Amicus Brief of Rep. Conyers at 2, No. 04-2088, *Moss v. Bush*, 828 N.E.2d 994 (Ohio, filed Feb. 14, 2005), *available at* https://tinyurl.com/mwkde7uj ("For over two hundred years, one of the strengths of our democracy has been that citizens may question the results of an election."); Motion for Leave

*(footnote continued on next page)*

Br. of Appellants Sidney Powell et al., RE 27, Page ID # 27 nn.6-7 (Case 21-1786) ("Appellants' Opening Br.").

Appellants do not argue, as Detroit claims, that "attorneys have a First Amendment right to lie in court."  Detroit Ans. Br. at Page ID # 68 n.26.  No one has that right, and neither Appellants nor their clients lied.  The District Court sanctioned Appellants because it found the *inferences* Appellants suggested from the disclosed facts tenuous, and the authorities on which Appellants relied unpersuasive.  From this, the District Court also inferred bad faith.  Appellants are aware of no case, and Appellees have cited none, where lawyers have been sanctioned merely for suggesting inferences and making arguments a trial court rejected.  To the contrary, a federal district court in Wisconsin just rejected sanctions against Appellants on virtually identical facts, as have others.  *Feehan v. Wisconsin Elections Comm'n*, No. 20-cv-1771, 2022 WL 3647882, at *9-*12 (E.D. Wisc. Aug. 24, 2022); *Trump v.*

---

(*footnote continued from previous page*)

to Join Amicus Brief of Rep. Conyers by Senator Russell Feingold et al., *id.*, *available at* https://tinyurl.com/yyrxc8n5 (adding current January 6th Committee Members Rep. Zoe Lofgren and Rep. Adam Schiff among many others).

*Wisconsin Elections Comm'n*, No. 20-cv-1785-BHL (E.D. Wisc. Dec. 6, 2021); *Page v. Oath Inc.*, No. 69,2021, 2022 WL 162965 (Del. Jan. 19, 2022).

What the First Amendment does protect is the right to bring a claim with deeply political implications without suffering retaliation from a judge who vehemently disapproves of the objectives the lawsuit seeks to achieve. Election cases should be given *more* leeway than ordinary cases, in light of the temporal exigencies of electoral contests, the formidable obstacles to gathering evidence, and the public significance of the issues presented for adjudication. See Judicial Watch Amicus Brief, RE 31, at Page ID # 20-21 (Case No. 21-1786); *Feehan*, 2022 WL 3647882, at *9-10.

Certainly, parties and their lawyers should not be treated *worse* than other litigants because the District Judge disagrees with their view "that our election processes are rigged and our democratic institutions cannot be trusted." Opinion, RE 172, at Page ID # 6993. Plaintiffs do hold such views, as did Alabama Democrats in 2002, Ohio Democrats in 2004, the Clinton campaign in 2016, and millions of Americans today. *See supra* nn.1, 3-4, 6; *infra* nn.7-9; Appellants'

Opening Br. at Page ID # 27 nn.6-7.[7]  If they are wrong, that is for the marketplace of ideas to decide—not a partisan officer of the state. "Truth needs neither handcuffs nor a badge for its vindication." *United States v. Alvarez*, 567 U.S. 709, 729 (2012).

The District Court's order bristles with disapproval, disdain, and incredulity at Plaintiffs' position.  A judge may hold such views, of course, but may not punish parties and their lawyers for holding their contrary views, by adopting a heretofore unknown, stricter standard as

---

[7] Another remarkably different treatment of a Democrat is Stacey Abram's "3-year 'stolen election' campaign" concerning the 2018 Georgia governor's race.  Kate Brumback, *Election lawsuit backed by Stacey Abrams goes to trial in Georgia*, PBS (Apr. 9, 2022), *available at* https://tinyurl.com/4855atwy (quoting Georgia Secretary of State (internal quotation marks omitted)).  The lawsuit spearheaded by her political action committee alleging, among other things, hackable voting technology, began with witness accounts of election-day irregularities and illegalities—just as this one did.  Complaint at 10, 22-24, 28-31, *Ebenezer Baptist Church of Atlanta, Georgia, Inc. v. Raffensperger*, No. 18-cv-05391 (N.D. Ga. filed Nov. 27, 2018).  The claims regarding insecure electronic voter lists had been pending since late 2018 and were not dismissed until February 2021, or more than a year after Appellants filed this case, and then only on mootness grounds.  Order of Feb. 16, 2021, at 59-62, *id.*  Rather than sanctioning the lawyers for bringing those claims, that district court allowed the rest of the case to go to trial, for which an opinion is pending.  Aware of the pending lawsuit in Georgia, Appellants had every reason to believe that their lawsuit raising similar issues would be given equivalent treatment.

to what are plausible inferences from evidence and what are permissible arguments for application or extension of existing law. Far from according the greater leeway that has *always* been applied in fast-moving election litigation with deep First Amendment and public policy implications, the District Judge adopted a nit-picky, censorious approach, venting her revulsion at what she viewed as an unjustified assault on our political process. This is viewpoint discrimination—the most odious intrusion on First Amendment rights known to our law. It cannot stand.

## II. The District Court's order is wrong as a matter of sanctions law.

### A. Plaintiffs' affidavits demonstrate their pre-filing investigation and were more than sufficient to justify bringing suit.

Affiant Jacqueline Zaplinty, a credentialed ballot box inspector and poll challenger, swore she saw votes being changed:

> There were multiple ballots that were "corrected" on ballots that should have been overvoted and not counted.
>
> 14. I tried to determine the identity or party affiliation of the people changing the votes on these ballots. I was told I could not speak with them. They wore no credentials or any identifying badges.

Zaplinty Affidavit, RE 6-4, Page ID # 1058.  Appellants raised this in their brief but Appellees have nothing to say about it, nor did the District Court.

Jessy Jacob, an employee of Appellee City of Detroit, swore under penalty of perjury that she saw serious violations of state election law:

7. At the satellite location, I processed voter registrations and issued absentee ballots for people to vote in person at the location.

8. I directly observed, on a daily basis, City of Detroit election workers and employees coaching and trying to coach voters to vote for Joe Biden and the Democrat party. I witnessed these workers and employees encouraging voters to do a straight Democrat ballot. I witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

9. During the last two weeks while working at this satellite location, I was specifically instructed by my supervisor not to ask for a driver's license or any photo I.D. when a person was trying to vote.

10. I observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot.

14. I then reported to work at the TCF Center on November 4, 2020, at 8:30 a.m. to process ballots. I was instructed not to validate any ballots and not to look for any deficiencies in the ballots.

15. Absentee ballots that were received in the mail would have the voter's signature on the envelope. While I was at the TCF Center, I was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file.

15

Jacob Affidavit, RE 6-4, Page ID # 1263-64.   Michigan ignores Jacob's allegations.   Detroit, echoing the District Court, dismisses one of them as irrelevant:   "An affiant's speculation that double voting might have occurred does not plausibly support an inference that double voting actually did occur."   Detroit Ans. Br. at Page ID # 35.   But Jacob provided proof:   People who showed up to vote in person after having received an absentee ballot did not comply with the Michigan law requirement that they turn in the absentee ballot or swear under oath that the ballot has been lost.   Mich. Comp. Laws § 168.769(4).   It might "not shock the Court that a Michigan resident can request an absentee ballot and thereafter decide to vote in person," Opinion, RE 172, Page ID # 6958, but it *should* shock the Court that such voters "were not required to return the mailed absentee ballot or sign an affidavit that [they had] lost the absentee ballot," as required by Michigan law.   Jacob Affidavit, RE 6-4, Page ID # 1263 (¶ 10).   That election officials repeatedly abetted voters in violating a law designed to avoid double voting would cause an unbiased observer to conclude that Jacob reported more than mere speculation.

And what about Jacob's numerous other observations of systematic illegality, impropriety, and partisanship by election officials? Are they chopped liver?  Appellees and the District Court seem to think so because they say nothing about them.   "The maxim of the law is 'Silence gives consent.'"  Robert Bolt, *A Man for All Seasons* 88 (Vintage Books 1961).

Jessica Connarn, a lawyer, swore under penalty of perjury that election officials instructed poll workers to back-date absentee ballots:

> 1.     I was working as the attorney acting as poll challenger with the Michigan Republican Party in a designated area of zone 12-15 when I was approached by a Republican Party poll challenger, who stated that a hired poll worker of the TCF Center, in Wayne County, Michigan, was nearly in tears because she was being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer.

> 2.     When I approached the poll worker, she stated to me that she was being told to change the date on ballots to reflect that the ballots were received on an earlier date.  I went to inform a supervisor of this, and I was asked to get the poll worker's name.  When I went back to the poll worker's table, I was yelled at by the other poll workers working at her table, who told me that I needed to go away and that I was not allowed to talk to the poll worker with whom I spoke earlier.  The poll worker slipped me a note that read "entered receive date as 11/2/20 on 11/4/20." I have attached a photograph I took of this note as Exhibit 1.

17

Connarn Affidavit, RE 6-6, Page ID # 2699.  Appellees and the District

Court must think back-dating is business-as-usual in Michigan because

they offer no comment.

Cynthia Brunell, a credentialed Republican poll challenger, swore

under penalty of perjury she saw invalid ballots counted:

> b.  Voter Dervorna Wilson didn't sign the envelope or ballot.  Her ballot was
>     processed through the electronic ballot counter.
>
> c.  Voter Kevin Douglas Merriweather II ballot numbers didn't match. His
>     ballot was processed through the electronic ballot counter.
>
> d.  Voter Miles Whitfield numbers on envelope and ballot did not match.
>     White tape was placed on his ballot.  His ballot was processed through
>     the electronic ballot counter.
>
> e.  Voter Stacy Denise Prichart didn't sign envelope or ballot . Her ballot was
>     processed through the electronic ballot counter.
>
> f.  Voter Steven Alante Ousley Scott born in 1929 was not a registered
>     voter.  His ballot was processed through the electronic ballot counter.

Brunell Affidavit, RE 6-3, Page ID # 1030.  The District Court mentions

a different part of Brunell's affidavit, Opinion, RE 172, Page ID # 6948

n.37, but ignores these very specific allegations of illegal conduct by

election workers, as do Appellees.  Is public confidence in the election

enhanced when Michigan, Detroit, and a federal District Judge greet

such irregularities with indifference?

Numerous facially credible people, including Michigan's immediate past Secretary of State,[8] provided Appellants with facially credible evidence of election tabulation irregularities and widespread violations of Michigan election law. Appellants' Opening Br. at Page ID # 36-39. Appellees do not argue, because it is not true, that any of these affiants had a balloon inscribed "Liar!" hovering above them. Appellees do not argue, because it is not true, that the sworn irregularities violate the laws of physics—in fact, they don't even strain the imagination, as they're some of the oldest political tricks on the books.[9] Appellants do

---

[8] The quote from two of Michigan's Supreme Court justices, implicitly endorsed by a third who dissented rather than concurred, bears repeating: "Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by the affiants offered by plaintiffs, among whom is Ruth Johnson, Michigan's immediate past Secretary of State, who testified that, given the 'very concerning' 'allegations and issues raised by Plaintiffs,' she 'believe[s] that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of th[e] election.'" *Costantino v. City of Detroit*, 950 N.W.2d 707, 708 (Mich. 2020) (Zahra, J., concurring, joined by Markman, J.).

[9] Some of the more mundane claims, like that Republican poll watchers and challengers were excluded, Brunell Affidavit, RE 6-3, Page ID # 1028 (¶¶ 10-12, 14, 18); Pennala Affidavit, RE 6-3, Page ID # 1007 (¶ 4); Giacobazzi Affidavit, RE 6-3, Page ID # 1016-19 (¶¶ 3, 8, 11-12), have been the mechanism by which Democrats claimed elections were stolen. *Riley Claims Win*, MONTGOMERY ADVERTISER (Nov. 7, 2002), at A1. (*footnote continued on next page*)

not argue, because it is not true, that back-dating ballots, not requiring voters to affirm they lost their absentee ballots, and myriad other shenanigans by election workers are legal under Michigan law. Yet, Plaintiffs and their lawyers are given no credit for presenting baskets of affidavits, virtually all based on first-hand observation, reporting illegal, improper, suspicious, and partisan conduct by poll workers.

Some witnesses were prevented from providing more specific observation by apparently coordinated interference and hostility from poll workers and, as to those affidavits, inferences needed to be drawn— all of which should have been drawn in favor of the Plaintiffs at the pleadings stage. But what is the point of having poll watchers and whistleblowers if their eyewitness account of irregularities and illegalities are discarded as not even arguably relevant?

The district court was not entitled to judge affidavits or snippets of affidavits in a vacuum. "For Rule 11 purposes, the allegation merely

_____

(*footnote continued from previous page*)

(detailing allegations that retabulation of votes in the Alabama gubernatorial election after Democratic observers went home for night resulted in victory for Republicans after previous count showed Democrats won); *Siegelman Concedes: Recount Efforts Abandoned*, BIRMINGHAM NEWS (Nov. 19, 2002), at 1A.

must be supported by *some* evidence.  Because we are unable to say that plaintiffs had *no* factual basis for their allegation, we cannot conclude that plaintiffs violated Rule 11's factual inquiry requirement." *Brubaker v. City of Richmond*, 943 F.2d 1363, 1377-78 (4th Cir. 1991) (emphases in original).  If you see a flock of feathered animals quacking as they waddle towards a lake, you can reasonably infer that they are ducks, even if not all are clearly discernible.  Sure, there might be a goose or a chicken in there somewhere, but it is certainly rational and proper to suggest that, after closer examination and further inquiry, those might be ducks after all.  What is not rational and proper is to focus on the one or two animals that are not clearly identifiable, ignore the rest, and conclude it's a flock of cats—and no one could possibly think otherwise.  This is what the District Court did, and what Appellees are now doing in their briefs.

Appellants are aware of no case, and Appellees have cited none, where a court has so methodically shut its eyes to the full reality presented—the congeries of affidavits and reports supporting the complaint—and zeroed in so zealously on trifles to the exclusion of all else.  Would the District Court have done this if this were an

employment-discrimination or price-fixing case, and would this Court approve? Highly doubtful. Appellants are entitled to be treated like lawyers for any other party—not hounded out of the profession by application of special rules adopted by a District Judge who found their lawsuit offensive.

Whether the illegalities, improprieties, and other bad behavior by election officials that Plaintiffs brought to the District Court's attention amount to violations of the Elections and Electors Clauses is unclear. For one thing, these affidavits have never been tested through the adversary process; they stand unrefuted. And, even if deemed true, it might depend on whether these are isolated instances of misconduct or the result of a centrally-coordinated or officially-sanctioned effort by government officials to swing the election to Biden. Plaintiffs gathered and presented a substantial number of as-yet unchallenged sworn affidavits which, even setting aside the few the District Court quibbled with, present a prima facie case of systemic electoral misconduct. In their collective 165 pages of appellate briefs, Appellees have not contested this. This essential, overriding point matters more than the

technical issues that follow, and Appellants respectfully request it remain forefront in the Court's mind.

## B. Detroit's contrary arguments are unavailing.

By putting the volumes of evidence Appellants presented to the side, the District Court worked a sea-change in the law of sanctions in an effort to justify its order. This creates a precedential nightmare that Detroit attempts to defend with several disjointed arguments.

*First*, the suggestion that Appellants are not being punished for relying on their clients and witnesses but for failing to conduct a reasonable pre-filing inquiry begs the question; to most lawyers and judges, the sworn word of clients and witnesses—and here, government employees, lawyers, and persons otherwise vetted above and beyond the man on the street—*is* the reasonable pre-filing inquiry. What is Detroit's position? That Appellants should have asked all the affiants "Are you sure?" "No, I mean like really, really sure?"[10]

––––––––––––––––––––

[10] Detroit offers a single example of what it believes Appellants should have done: "As the District Court noted, the fact that Appellants did not inquire into whether Ms. Carone's affidavit disclosed any personal knowledge of unlawful activity and chose instead to allege that she witnessed an 'illegal vote dump' was 'a quintessential example of

*(footnote continued on next page)*

Appellants were not present at the TCF Center themselves, as attorneys are typically not witnesses to events underlying the cases they take.[11]   But they were provided sworn witness accounts that corroborated each other.  What should they have done as lawyers for a party these witnesses supported?   Should they have walked away

---

*(footnote continued from previous page)*

guesswork laced with bad faith.'"   Detroit Ans. Br. at Page ID # 33 (quoting Opinion, RE 172, Page ID # 6964 n.58).   But as Detroit recognizes earlier, Carone explained the basis for her belief:  She saw two large trucks arrive, trucks that purported to bring food for the election workers but she saw no food delivered or distributed.   Two hours later she heard that 100,000 lost ballots had been found—ballots so overwhelmingly favoring Biden that it swung the outcome of the election.   This is the famous Michigan Z curve that was widely covered in the media.   From this Carone *inferred* that the trucks had actually delivered ballots, and the story about delivering food was a feint designed to avoid attention.

What would have been the point of further inquiry?   Carone made it clear she had seen no ballots.   Her suspicions were aroused by the circumstances and timing; she could say no more.   One can either provisionally accept the inference—and normally at the pleading stage plaintiffs are accorded latitude—or one could reject it outright.   Either way, badgering Carone would have served no purpose.   Blaming Appellants for failing to do so is itself a feint designed to distract from the fact that inferences such as these have been presented to American courts for the last 50 years with no suggestion that counsel had a duty to inquire further.

[11] Indeed, presence as a witness might well disqualify a lawyer from serving as counsel.

24

because not every one of their affidavits disclosed a first-person perception of a smoking gun? Before this case, the answers to such questions would have been self-evident, but the District Court's sanctions order now wrongly puts such matters in doubt.

Rule 11(b)(3) sanctions are in play only where the central allegations don't hold up and so, by hypothesis, the client or witness was mistaken or lied. In almost all such cases, sanctions are not imposed or even sought. Detroit offers no definition of which cases deserve sanctions that excludes the vast majority of failed cases but somehow includes Appellants. "It is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic would discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).

While Detroit nowhere defines what would have constituted a reasonable pre-filing inquiry here, it does argue that the standard should be *heightened* in the election context. This is backwards. As

25

*Moss v. Bush*, 828 N.E.2d 994, 997 (Ohio 2005), explains, the compressed timeline for such cases, combined with their massive scope when dealing with a statewide election, militate in favor of a *lowered* standard. The case Detroit cites for the contrary position, *O'Rourke v. Dominion Voting Sys., Inc.*, 552 F. Supp. 3d 1168, 1198 (D. Colo. 2021), was not an election challenge and turned on the fact that the lawyers acted "without any meaningful time constraints." *Id.* at 1192; *see also id.* at 1189-90, 1203-04. *O'Rourke*, distinguishable on the time-constraints alone, should not outweigh the considered judgment of a respected within-circuit chief justice, speaking for the Ohio Supreme Court, whose opinion has stood the test of time.

*Second*, Detroit asserts the 1993 amendments to Rule 11 somehow change everything. It is true that Rule 11 now imposes a continuing duty in the sense that attorneys may not *advocate* for a pleading, motion, or paper that has since become false, but Detroit identifies no such pleading, motion, or paper filed in the District Court after any of the events it claims rendered Plaintiffs' action frivolous (such as the *Washington Post* exposé on Merritt or the coming and going of

December 14).[12]  There was no new motion for injunctive relief, no next

amended complaint, no opposition to a motion to dismiss.  All relief had

been denied on December 8.  By the dates Detroit refers to, Plaintiffs

had nothing left to advocate for in the District Court.

As for Detroit's fixation on the addition of "responsible for"

language to Rule 11, which was added to clarify and expand the rule's

reach to parties and law firms, Detroit does not explain how any

particular attorney is "responsible for the violation."   Indeed, by

attempting to expand Rule 11's scope to reach *all* of the alleged

misconduct by *all* of the lawyers, Detroit has talked itself and Michigan

out of any basis for imposing sanctions under the District Court's

---

[12] While the *Post* story did come out on December 11, the District Court
repeatedly charged Appellants with *knowledge* of the story only on
January 5.  Opinion, RE 172, Page ID # 6987 ("First, the City attached
an article from the Washington Post to its January 5 motion for
sanctions, which at least put Plaintiffs' counsel on notice that Merritt
lacked the expertise they claimed."); *id.* at Page ID # 6989 ("As detailed
above, *by January 5*, Kleinhendler knew Merritt never completed the
training that formed the basis of his purported expertise." (emphasis
added)); *id.* ("Co-counsel for Plaintiffs also had reason to question
Merritt's expertise by no later than January 5.").  Whether December 11
or January 5 doesn't matter; the District Court had ruled on December
8.  Appellants did not subsequently file a single motion, paper, or
pleading advocating for *anything* other than a few requests for
extension of time.

inherent authority. *United States v. Aleo*, 681 F.3d 290, 307 (6th Cir. 2012) (Sutton, J., concurring) ("A court's use of inherent power to sanction the filing of … [an] (allegedly) frivolous motion could not be reconciled with the sanctioning regime already in place under the Federal Rules of Civil Procedure.").

*Third*, Detroit's only defense of the Section 1927 sanctions order is that Plaintiffs initially represented the case would become moot on December 14. Appellants have never disputed this and explained in their opening brief why they came to believe that initial legal conclusion was wrong. This was a mistake—not misconduct—and caused Defendants no harm. And Detroit offers no answer to Appellants' observation that Section 1927 is inapplicable to the *commencement* of litigation.[13]

---

[13] The Eastern District of Michigan has recently noted that the "plain language of the statute only penalizes attorneys who vexatiously and unreasonably 'multiply' proceedings," and that Section 1927 sanctions are not imposed "based on the filing of an initial complaint that turns out to be meritless." *Beverly v. Shermeta Law Grp., PLLC,* 2020 WL 2556674, at *1 (E.D. Mich. May 20, 2020).

*Fourth*, Detroit is correct that a 1991 case, *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), listed a variety of non-monetary sanctions then available to federal courts acting pursuant to their inherent authority. But it forgets that *Chambers* was modified sixteen years later by *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017): "This Court has made clear that [an inherent authority] sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature."  Lest its meaning be misunderstood (as Detroit apparently has), the Court goes on:  "In other words, the fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior."  *Id.*  And on:  "To level that kind of separate penalty, a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof.  When those criminal-type protections are missing, *a court's shifting of fees is limited to reimbursing the victim.*"  *Id.* (internal citations omitted) (emphasis added).  Non-monetary sanctions are not compensatory; they are punitive or at best rehabilitative.  Since 2017, therefore, federal courts cannot impose non-monetary sanctions

29

pursuant to their inherent authority without adopting criminal-type protections. The District Court here accorded Appellants *no* protections, not even the opportunity to present witnesses.

Additionally, if, as Detroit maintains, inherent authority sanctions may be imposed based on "should have known" liability, as the District Court did,[14] then they are not sanctions for bad faith. They are sanctions for negligent faith or simple mistakes, which exceeds what the Supreme Court has permitted federal courts to punish without congressional authorization. *See Chambers*, 501 U.S. at 46 (preserving courts inherent authority for "fraud" or when "the very temple of justice has been defiled" or when an attorney acts for an improper purpose, none of which is a species of should-have-known liability (internal quotation marks omitted)).[15]

_____

[14] Although the District Court found "bad faith" in this case, its finding incorporates a "should have known" prong, which would not satisfy any subjective bad faith standard. Appellants' Opening Br. at Page ID # 80-71 n.63. And, since there was no evidentiary hearing (or even a properly noticed show-cause hearing), the District Court certainly could not find Appellants acted knowingly. Hearing Tr., RE 157, Page ID # 5313 (lns. 17-24), # 5383 (lns. 20-21).

[15] Detroit's citation to cases involving fee-shifting under the American Rule, such as *Big Yank Corp. v. Liberty Mutual Fire Insurance*, 125

(*footnote continued on next page*)

*Fifth*, Detroit does not actually assert that disciplinary referrals are unreviewable. Detroit Ans. Br. at Page ID # 59-60 n.21. The Court should therefore decline to delve into the First and Eight Circuit law from the 1990s that Detroit cites. There is no question that the sanctions order in this case is part of a final, appealable order. Detroit's D.C. Circuit case is therefore plainly inapposite.

*Sixth*, even overlooking Detroit's own failure to comply with the technical requirements of Rule 11's safe harbor provision,[16] it offers no

---

*(footnote continued from previous page)*

F.3d 308, 313 (6th Cir. 1997), is inapposite because those cases do not involve "procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Goodyear*, 137 S. Ct. at 1186. It is possible some standard like the subjective "sham" standard used by Colorado to measure sanctions against the right to petition would be appropriate. *In re Foster*, 253 P.3d 1244, 1253 (Col. 2011) (en banc).

[16] When assessing Appellants' substantial compliance, it is relevant that Detroit did not comply with Rule 11's strict requirements either—something even the District Court acknowledged: "It bears mentioning that I recognize that there is disagreement about whether the City of Detroit followed the Safe Harbor provisions with exactitude." Hearing Tr., RE 157, Page ID # 5313 (lns. 15-17). The District Court's attempt to bypass Detroit's failures by insisting it could proceed *sua sponte* is risible; the District Court's utter failure to follow the procedures required for *sua sponte* sanctions made that even less defensible. *Id.* at lns. 17-24. Giving one side's transgressions a pass while throwing the

*(footnote continued on next page)*

response to Appellants' argument that, by dismissing the action within the time specifically granted by the District Court to respond to the motions to dismiss, Appellants provided Detroit with the remedy Rule 11 contemplates, within a time permitted by the District Court. The short delay, numbering days, between the lapse of the safe harbor period and Appellants doing that which Detroit asked, hardly supports the kind of nuclear response the District Court deployed. This is what Appellants meant by substantial compliance.

*Seventh*, Appellants are not challenging Detroit's time entries on appeal, but rather its right to so large an award as an intervenor. What Appellants have noted is that awarding 700% of actual defendants' legal fees to officious intermeddlers creates a perverse incentive for fee-seekers to flock to election litigation. Given the wide variety of ways persons and entities can seek to establish standing as defendants in an election case, any attorney looking for an easy check would now be well

---

(*footnote continued from previous page*)

book at the other side is further proof of the District Court's lack of evenhandedness.

advised to intervene in future such cases, turn on the clock, stack up the paper, and see where the chips fall.

## C.    Plaintiffs' reliance on legal authorities was entirely reasonable.

The gravamen of Michigan's brief is that Plaintiffs had no reasonable argument that could have entitled them to relief and therefore Appellants presented legally frivolous arguments. *Id.* at Page ID # 28, 34, 39-40. Detroit makes the same argument. Detroit Ans. Br. at Page ID # 43-50. This means that, assuming Plaintiffs' factual allegations turned out to be true, the federal courts would have been, beyond question, powerless to provide a remedy. Do Appellants really mean that the federal courts could have provided no relief had Hillary Clinton proven in 2016 that Michigan government workers had conspired to change a dispositive number of ballots from her to Trump?

Detroit argues that "Plaintiffs' counsel have not produced any authority supporting the power of a federal court to grant" some of the relief they requested in the complaint, Detroit Ans. Br. at Page ID # 50, but that is not the test for frivolousness. Absent controlling authority clearly barring such relief, Plaintiffs were entitled to seek an extension

or modification of existing law. (More, they would have been entitled to argue for reconsideration of any binding precedent barring relief.)

Detroit argues that Plaintiffs' case is not on all fours with *Bush v. Gore* (*id.* at Page ID # 43-46), but *Bush* itself was a highly-controversial extension of existing law and there was no binding authority—or indeed any authority when Plaintiffs brought their case—precluding its application to the facts alleged here. The out-of-circuit district court cases Detroit cites at p. 36 (*id.* at Page ID # 46) of its brief were all decided after Plaintiffs filed their complaint and, had they been available, would not have been binding in any event.[17]

While space does not permit a point-by-point refutation of all of Appellees' arguments as to Plaintiffs' legal theories, Appellants respectfully refer the Court to the pages 5-13 of the amicus brief filed on

---

[17] If anything, these cases stand for the proposition that sanctions are unavailable here as a matter of law. In each of these nearly identical cases, sanctions were not sought, refused, or were set aside on appeal, putting to bed the question whether these claims can be called frivolous. *E.g., Page v. Oath Inc.*, No. 69,2021, 2022 WL 162965, at *3 (Del. Jan. 19, 2022). Just days ago, a court denied yet another request for sanctions related to Appellants' 2020 Presidential Election litigation. *Feehan v. Wisconsin Elections Comm'n*, No. 20-cv-1771, 2022 WL 3647882, at *9-*12 (E.D. Wisc. Aug. 24, 2022).

behalf of Judicial Watch, Inc., Judicial Watch Amicus Brief, RE 31, at Page ID # 11-19, which explains how "the district court underestimated the degree of disagreement amongst the courts over some of the legal issues raised in these proceedings, especially those related to the Elections and Electors Clauses." Appellees were served with the amicus brief but say nothing in response, effectively conceding the point. Debatable arguments—at least one of which involves a continuing circuit split, *id.* at Page ID # 13-14—are not grist for the sanctions mill.[18]

Detroit and Michigan also do not engage with the reality that presumptively reasonable jurists, including at least one United States Supreme Court Justice, three Michigan Supreme Court Justices, federal district judges, and law professors, have expressed concerns like those

_____

[18] The District Court spends pages excoriating Appellants for relying on *United State v. Throckmorton*, 98 U.S. 61 (1898), even though Appellants did not rely on the case during merits proceedings. Opinion, RE 172, Page ID # 6944-46. Appellants did not cite *Throckmorton* in their complaint, in their motion for a preliminary injunction, or in any other pleading seeking substantive relief. Sanctioning them for reliance on a case that did not come up until the sanctions hearing itself is bootstrapping, never mind that reliance on *Throckmorton* would have been appropriate advocacy in any event.

raised in Plaintiffs' complaint.  Appellants' Opening Br. at Page ID # 32-33; *see also Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Nov. 29, 2020) (RE 14) (granting TRO as to claims regarding Dominion voting machines).  And, since the opening brief was filed, the Wisconsin Supreme Court has disallowed the use of willy-nilly absentee ballot boxes—a claim it had refused to vindicate in response to an election challenge.  *Teigen v. Wisconsin Elections Comm'n*, 976 N.W.2d 519 (Wisc. 2022).

Remarkably, it was Democrats who first suggested third-party electronic tampering with ballots, secret computer code, and statistical anomalies justified a hearing to decide whether to reverse the assignment of Ohio's 2004 electoral college votes.  Verified Complaint at ¶¶ 69-75, 86-87, *Moss v. Bush*, No. 04-2088, 828 N.E.2d 994, 997 (Ohio 2005), *available at* https://tinyurl.com/2vb6e8mn.  It is simply not credible that it is *frivolous as a matter of law* to argue that a court could change the first-draft result of an election where there is evidence of widespread and perhaps state-sanctioned illegality and fraud.  The proposed amendments to the Electoral Count Act working their way through Congress, along with the litany of election-related reforms at

36

the state level cited in the opening brief, show not just that *some* people think there were gross abuses and election fraud in 2020, but legislative *majorities* do.

No prior case may have involved the exact facts alleged here, though *Moss v. Bush* and the litigation by Stacey Abrams' PAC, *supra* n.7, come very close. But it is not unreasonable to believe a court *might* grant a remedy when there is evidence of massive, state-sponsored voter fraud sufficient to change an election's outcome. If it is unreasonable to believe such a remedy might exist, it is difficult to see how far less egregious circumstances warranted judicial relief in *Bush v. Gore*. The grievance there, after all, was that some Florida county officials were tabulating ballots by different standards than others; no fraud or violations of Florida election law were alleged. Here, Plaintiffs presented evidence suggesting that state officials were engaged in a systematic campaign to undermine Michigan election law in order to favor Biden over Trump. *See, e.g.*, *supra*, pp. 15-18 (affidavits of Jacob, Connarn, and Brunell); Appellants' Opening Br. at Page ID # 36-43. That the federal courts can effectively declare one candidate President because state officials are using inconsistent tabulation methods that do

not violate state election law,[19] but that the federal courts cannot possibly provide relief where officials corruptly worked to favor one candidate by deliberately and systematically violating state election laws, make no sense.

"At bottom, it is clear that the district court could not have concluded, based on the record before it, that [the] complaint had '*no chance of success.*'" *Lokhova v. Halper*, 30 F.4th 349, 358 (4th Cir. 2022) (quoting and adding emphasis to *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002)). "As such, the district court incorrectly held that the complaint was frivolous and that Rule 11 was therefore violated." *Id.*

Michigan additionally faults Appellants for somehow failing, in November and December of 2020, to anticipate the contents of the Michigan Legislature's June 21, 2021, report. *Id.* at Page ID # 56 & n.21. Which is probably why Michigan doesn't include the date of the report in its brief—or even in its Table of Authorities.

---

[19] The Florida Supreme Court had as a matter of state law approved of "standards for accepting or rejecting contested ballots" that varied "not only from county to county but indeed within a single county from one recount team to another." *Bush v. Gore*, 531 U.S. 98, 106 (2000).

## III.   The District Court lacked jurisdiction over Michigan's post-dismissal sanctions motions.

Michigan did not file its motion for sanctions until two weeks after Appellants voluntarily dismissed and thereby conclusively ended this case.  The District Court did not hold a hearing or enter an order on sanctions until long after all mandates from the appellate courts issued. As the most recent order denying a request for sanctions in virtually identical litigation explains, the conclusion of a case and controversy between the parties divests a district court of jurisdiction to conduct further proceedings under Section 1927 or a court's inherent authority, which are the only kinds of sanctions Michigan sought.  *Feehan v. Wisconsin Elections Comm'n*, No. 20-cv-1771, 2022 WL 3647882, at *8-*9 (E.D. Wisc. Aug. 24, 2022).  Appellants identified this problem in their Opening Brief's Statement of Issues and argued it under the Argument heading.  Appellants' Opening Br., Page ID # 11, 25 & n.5.

Michigan's Answering Brief contains no response to this jurisdictional argument.  Instead, it includes two sentences about timeliness for purposes of inherent authority, Mich. Ans. Br. at Page ID # 32, and two sentences about timeliness as to Section 1927, *id.* at 62.

Timeliness and jurisdiction, or as the Supreme Court classifies them, time-related "[m]andatory claim-processing rules" and "jurisdictional time prescriptions," are two different beasts. *Hamer v. Neighborhood Housing Srvs. Of Chi.*, 138 S. Ct. 13, 17 (2017). "This Court and other forums have sometimes overlooked this distinction .... But prevailing precedent makes the distinction critical." *Id.*

Had Michigan not waived the jurisdictional issue by failing to respond to Appellants' argument, the Sixth Circuit cases it cited might have provided a basis for the District Court's jurisdiction. *E.g.*, *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 644-45 (6th Cir. 2006). As things stand, Appellants should receive the benefit of the position they advocated and Appellees have not contested—and that is the law in at least the Seventh Circuit. *See Feehan*, 2022 WL 3647882, at *8-*9 (citing and discussing *Overnite Transportation Co. v. Chi. Industrial Tire Co.*, 697 F.2d 789 (7th Cir. 1983)).

## IV.   None of Appellants' claims is moot.

Appellees assert that Appellants' claims regarding the continuing legal education portion of the sanctions order are moot.  Mich. Ans. Br. at Page ID # 59-60.   But Detroit, unsatisfied with merely deterring attorneys from representing persons like Plaintiffs in the future, apparently also wants to deter attorneys from attempting to vindicate themselves by appealing sanctions orders.  Detroit Ans. Br. at Page ID # 22 n.7 ("The City anticipates filing a separate motion asking this Court to sanction Appellants under Fed. R. App. P. 38 and/or 28 U.S.C. § 1927.").

As such, Appellants remain under threat of further sanctions, including another continuing legal education requirement.  While that possibility might not have been sufficient to confer standing to challenge it before imposition, the test for mootness is far more demanding.  The party asserting mootness faces "the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env. Srvs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *accord West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022).   Because

Appellants remain at risk in this case of being ordered to attend continuing legal education courses that satisfy an arbitrary standard of political correctness in violation of the First Amendment and more, the issue is not moot.

As for Michigan's argument that the disciplinary referral sanction is moot, Appellants addressed this argument in their motion for a stay pending appeal.  Motion to Stay, RE 32, Page ID # 15 (Case No. 21-1786).  If a federal district court's referral of attorneys for bar discipline carries weight, a federal court of appeals' recall of that referral would carry weight as well.  As final bar action has not been taken against any Appellant—except the Virginia Bar's decision to *dismiss* the District Court's referral of Emily Newman, Reply Brief, RE 32, Page ID # 19 (Case No. 21-1787)—relief unquestionably remains available.  Even if final action were taken, this Court's repudiation of the District Court's order would supply a basis for reconsideration or otherwise influence subsequent proceedings, whether in the original bar proceeding or others.  The case is far from moot.

## CONCLUSION

*Baker v. Carr, Miranda v. Arizona, Obergefell v. Hodges, Heller v. District of Columbia, Citizens United v. FEC, West Virginia Board of Education v. Barnette, Tinker v. Des Moines, New York Times v. Sullivan, Nixon v. United States, Gideon v. Wainwright, Plyler v. Doe, Bush v. Gore* and scores of cases like them would never have reached the Supreme Court under the District Court's and Appellees' punitive view of proper advocacy.  None of these cases were supported by then-existing precedent; in most, established law was directly contrary.  And, in countless cases that courts see every day, lawyers make allegations calling for inferences that are ultimately not borne out.  This is not misconduct; it's advocacy—peaceful, orderly advocacy on behalf of clients who believe they have been wronged.

Americans generally follow the People's Court bromidic motto:  "If you're in a dispute with another party and you can't seem to work things out, don't take the law into your own hands; you take 'em to court."  How long will this ethos endure if lawyers are too scared to bring difficult cases for fear that a hostile judge will end their careers because they don't have a case that is not "distinguishable," or the judge

finds their case or some of their suggested inferences offensive? If they can't go to court, where *will* those citizens go to seek redress for their grievances?

Appellants respectfully request that this Court vacate the District Court's sanctions order and the award of fees and costs to opposing counsel, order the recall of the disciplinary referrals precipitously issued by the District Court and, if the matter is remanded for any reason, that the case be re-assigned to another district judge.

Respectfully submitted this 12th day of September 2022.

/s/ Sidney Powell_____
Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com

/s/ Howard Kleinhendler_____
Howard Kleinhendler, Esq.
369 Lexington Avenue, 12th Floor
New York, NY 10017
Ph: 917-793-1188
E-Mail: howard@kleinhendler.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the attached reply brief is proportionately spaced, has a typeface of at least 14 points, including headings and footnotes, and contains 9,243 words.[20]

DATED this 12th day of September 2022.

/s/ Sidney Powell
Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com
*Counsel for Appellants*

---

[20] This includes 649 words appearing in images of affidavits inserted into the brief text, which have been counted manually.

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a member of the bar of this Court in good standing and that the foregoing Appellants' Reply Brief was delivered via electronic service on this date to:

Heather S. Meingast  
Erik A. Grill  
Assistant Attorneys General  
Office of the Attorney General  
of Michigan  
P.O. Box 30217  
Lansing, MI 48909  
*Counsel for Defendants*

David H. Fink  
Nathan J. Fink  
Fink Bressack  
38500 Woodward Avenue  
Suite 350  
Bloomfield Hills, MI 48304  

*Counsel for Intervenor Detroit*

I declare under the penalties of perjury that the foregoing is true and correct, and that this certificate was executed in Dallas, Texas, this 12th day of September 2022.

/s/ Sidney Powell_____  
Sidney Powell, Esq.  
2911 Turtle Creek Blvd, Ste 300  
Dallas, TX 75219  
Ph: 214-707-1775  
Email: sidney@federalappeals.com  
*Counsel for Appellants*