No. 21-1786

# United States Court of Appeals
## for the Sixth Circuit

———— ı ————

**Timothy King, et al.**
*Plaintiffs*


and


**Gregory J. Rohl; Brandon Johnson; Howard Kleinhendler; Sidney Powell; Julia Haller; Scott Hagerstrom**

*Interested Parties - Appellants*

v.

**Gretchen Whitmer; Jocelyn Benson; City of Detroit, MI**
*Defendants - Appellees*

———— ı ————

Appeal from the United States District Court
Eastern District of Michigan
No. 2:20-cv-13134
Honorable Linda V. Parker, District Judge, Presiding

**PETITION FOR REHEARING EN BANC**

Sidney Powell, Esq.
2911 Turtle Creek Blvd,
Ste 300 Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com
*Counsel for Appellants*

# Rule 35 Certificate of Counsel

The panel opinion affirms Rule 11 and Section 1927 sanctions at the complaint stage without requiring strict compliance with Rule 11 or following long-standing precedent, and this opinion creates extraordinary adverse implications for the practice of law.  The panel opinion conflicts with:

1. the decision of the United States Supreme Court in *Pavelic & LeFlore v. Marvel Entm't Grp., Div. of Cadence Indus. Corp.*, 493 U.S. 120, 125-126 (1989) (Rule 11 responsibilities are personal) (pre-1993 amendment).

2. with decisions of this Court in:

*Ridder v. City of Springfield*, 109 F.3d 288, 297 (6th Cir. 1997) (requiring "strict adherence" to Rule 11's "outlined procedure");

*Penn, LLC v. Prosper Bus. Dev. Corp.,* 773 F.3d 764, 767 (6th Cir. 2014) (the "[f]ailure to comply with the safe-harbor provision precludes imposing sanctions");

*Indah v. U.S. S.E.C.*, 661 F.3d 914, 929 (6th Cir. 2011) (finding plain error in the district court's imposition of sanctions on conduct not identified by party);

*Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1212 (6th Cir. 1997) (Section 1927 sanctions can be imposed "only where there was some improper purpose, such as harassment or delay.");

*In re Ruben*, 825 F.2d 977, 988 (6th Cir. 1987) (A Rule 11 "sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants.");

*Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396–97 (6th Cir. 2009) (court must identify specific conduct violating §1927 by each

i

sanctioned attorney; precludes joint and several liability; applies only to attorneys admitted to practice);

and consideration by the full Court is therefore necessary to secure and maintain uniformity of the Court's decisions.

3.    The proceeding involves one or more questions of exceptional importance:

The strict enforcement of Rule 11 requirements is integral to due process.  The First Amendment and *Noerr-Pennington* immunity protect all but a "sham" pleading.  *Knology, Inc. v. Insight Commc'ns Co.*, 393 F.3d 656, 658-59 (6th Cir.2004) (discussing *Eastern R.R. Presidents Conf. v. Noerr Motor Freight Inc.,* 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)).  This opinion creates an unprecedented and impermissible chilling effect on zealous advocacy and the willingness of any counsel to accept controversial cases.

The First Amendment Right to Petition and the harm from chilling zealous advocacy assume new importance considering the findings in *Missouri v. Biden*, --- F.Supp.3d ---, 2023 WL 4335270 (W.D. La. July 4, 2023) that the government has been "suppressing speech about election integrity." *Id.* at *2.  With coordinated media censorship by the political branches, it is imperative courts remain an open forum for attorneys to challenge  election law violations.

4.  The panel opinion also creates an unnecessary inter-circuit conflict with:

the Fifth Circuit in *Uptown Grill, LLC v. Camellia Grill Holdings*, 46 F.4th 374, 389 (5th Cir. 2022) and the Tenth Circuit in *Roth v. Green*, 466 F.3d 1179, 1191–92 (10th Cir. 2006) requiring identicality between the Rule 11 notice and filing; and,

the Seventh Circuit in *Claiborne v. Wisdom*, 414 F.3d 715, 722–24 (7th Cir. 2005) restricting §1927 liability to the misbehaving lawyer himself.

# Table of Contents

Rule 35 Certificate of Counsel…………………………………………..i, ii, iii

I.    Statement of Relevant Facts………………………………………..1

II.   The Panel Created a Circuit and Intra-circuit
      Split by Affirming Sanctions Without Detroit's Strict
      Compliance with Rule 11……………………………………………3

      A. Detroit's December 15 "Notice" Did Not Satisfy Rule 11….3

      B. The Defective "December 15 Notice" Did Not
         Trigger the Safe Harbor Countdown………………………..5

      C. Appellants Timely Dismissed the Complaint……..……….7

III.  The Opinion Violates the Plain Text of §1927
      and Supreme Court and Circuit Precedent………..………....8

IV.   The Opinion Contradicts Supreme Court and
      Sixth Circuit Precedent that Rule 11 Sanctions May
      Not Be Imposed against Non-Presenting
      Attorneys ………………………………………………………12

V.    Due Process Required Specific Notice
      and an Evidentiary Hearing………………………………….14

Certificate of Compliance……………………………………………19

Certificate of Service………………………………………………..20

# Table of Authorities

## <u>Cases</u>

*Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207 (6th Cir. 1997)……..……..i, 9

*Bush v. Gore,* 531 U.S. 98 (2000)………….……………………………..…10

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)………………4

*Claiborne v. Wisdom*, 414 F.3d 715 (7th Cir. 2005)…………….……iii, 9, 10

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)……….………………………………………...17

*Dailey v. Vought Aircraft Co.*, 141 F.3d 224 (5th Cir. 1998)………………14

*Davis v. Detroit Downtown Development Authority*,
    782 FED.APP. 455 (6th Cir. 2019)…………….…………………….11

*DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999)………………………..8, 9

*Donaldson v. Clark*, 819 F.2d 1551 (11th Cir. 1987)………………………14

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight Inc.*,
    365 U.S. 127 (1961)…………………………………………………ii

*Feehan v. Wisconsin Elections Comm'n*, No. 20-cv-1771,
    2022 WL 3647882 (E.D. Wisc. Aug. 24, 2022)……………..……11, 12

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*,
    307 F.3d 501 (6th Cir. 2002)………………………………………..3

*FM Indus., Inc. v. Citicorp Credit Servs., Inc.*,
    614 F.3d 335 (7th Cir. 2010)………………………………………9

*Garner v. Cuyahoga Cnty. Juvenile Court*,
    554 F.3d 624 (6th Cir. 2009)…………………………….…………8

*Indah v. U.S. S.E.C.*, 661 F.3d 914 (6th Cir. 2011)……………i, 5, 6, 14

*In re Ruben*, 825 F.2d 977 (6th Cir. 1987)……………………..…i, 8, 11, 14

*In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90 (3d Cir. 2008)……………11

*INVST Fin. Grp., Inc. v. Chem-Nuclear Sys., Inc.*,
    815 F.2d 391 (6th Cir. 1987)………………………………….…..14

*Kidis v. Reid*, 976 F.3d 708 (6th Cir. 2020)……………………..………..8

*Knology, Inc. v. Insight Commc'ns Co.*,
    393 F.3d 656 (6th Cir.2004)…………………………………....…… ii, 15

*Matter of Yagman*, 796 F.2d 1165 (9th Cir. 1986)…………………………11

*McGhee v. Sanilac Cnty.*, 934 F.2d 89 (6th Cir. 1991)………………..…..15

*Media Duplication Servs., Ltd. v. HDG Software, Inc.*,
    928 F.2d 1228 (1st Cir. 1991)……………………………….........14

*Missouri v. Biden*, --- F.Supp.3d ---, 2023 WL 4335270
    (W.D. La. July 4, 2023)……………………………………………ii, 15

*Morris v. Wachovia Sec., Inc.*,
    2007 WL 2126344 (E.D. Va. 2007)……………………………...……..13

*Moss v. Bush*, 828 N.E.2d 994 (Ohio 2005)…………………………...………1

*NPF Franchising, LLC v. SY Dawgs, LLC*,
    37 F.4th 369 (6th Cir. 2022)………………………………….......10

*Pavelic & LeFlore v. Marvel Entm't Grp., Div. of Cadence Indus. Corp.*,
    493 U.S. 120 (1989)…………………………………………………….i, 12

*Penn, LLC v. Prosper Bus. Dev. Corp.*,
    773 F.3d 764 (6th Cir. 2014)…………………………………i, 3, 4, 5, 6

*Ridder v. City of Springfield*,
 109 F.3d 288 (6th Cir. 1997)………………………….....i, 3, 4, 5, 6, 7

*Riddle v. Egensperger*, 266 F.3d 542 (6th Cir. 2000)………………..….14

*Rentz v. Dynasty Apparel Indus., Inc.*,
 556 F.3d 389 (6th Cir. 2009)……………………………….......i, 10

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980)………………..…….8

*Rodgers v. Lincoln Towing Service, Inc.*,
 771 F.2d 194 (7th Cir. 1985)…………………………………...14

*Roth v. Green*, 466 F.3d 1179 (10th Cir. 2006)……………………iii, 4, 5, 6

*Schlaifer Nance & Amp. v. Estate of Warhol*,
 194 F.3d 323 (2d Cir. 1999)………………………………….…6

*Truesdell v. S. Cal. Permanente Med. Grp.*,
 293 F.3d 1146 (9th Cir. 2002)…………………………………..6

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965)…………..…….ii

*Uptown Grill, LLC v. Camellia Grill Holdings*,
 46 F.4th 374 (5th Cir. 2022) ……………………………….iii, 5, 6

## **Statutes**

28 U.S.C. §1927………………………………………………......*passim*

## **Rules**

FED. R. CIV. P.  11……………………………………………..….*passim*

FED. R. CIV. P. 11(b)………………………………………………12

FED. R. CIV. P. 11(c)(1)……………………………………………12

FED. R. CIV. P. 11(c)(2)……………………….…………………….3, 7

## **Other**

FED. R. CIV. P. 11, 1993 Advisory Committee Notes.........................13

https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-815.html.................................................................2

The panel opinion diverges from the plain text and precedent of Rule 11 and §1927.  Its imposition of more than $150,000 in Rule 11 and §1927 sanctions without the requisite strict compliance, specific safe harbor notice, and even against "non-presenting" attorneys, violates long-standing authority from this Court and the Supreme Court, creates a split with sister circuits, and is just bad law.  It will have a profound chilling effect on the First Amendment right to petition–especially in the compressed timeframe of election-related litigation.[1]

## I. Statement of Relevant Facts.

Plaintiffs initiated only three substantive filings seeking relief in the district court: a complaint, Page ID #1-75; an amended complaint of 86 pages with 874 pages of affidavits and exhibits, Page ID #872-1831; and a motion for preliminary relief with a supporting brief (PI Motion), Page ID #1832-49.   Detroit, Page ID #840-57, the DNC Services Corporation/Democrat National Committee, the Michigan Democratic

---

[1]   "An election contest ... is not a typical lawsuit." *Moss v. Bush*, 828 N.E.2d 994, 997 (Ohio 2005) (refusing to sanction Democrats for litigation challenging the 2004 Presidential Election in Ohio for the same kind of alleged vote flipping and computer rigging of voting machines alleged here).

Party (DNC/MDP), Page ID #1878-1907; and, Robert Davis intervened.

Page ID #1860-75.  There was no discovery and no hearing in the district

court.  An abbreviated timeline shows:

| | |
|---|---|
| 11-25-20 | Complaint filed.  Page ID #1-75. |
| 12-7-20 | District Court denied Preliminary Injunction (PI Order). Page ID #3296-3330. |
| 12-8-20 | Notice of appeal.  Page ID #3332. |
| 12-11-20 | Petition for certiorari.[2] |
| 12-15-20 | Detroit emailed "Rule 11 notice."  Page ID #4118. |
| 12-18-20 | Appellants requested Supreme Court expedite *King*. Page ID #4356. |
| 12-22-20 | Detroit, DNC/MDP, and Davis moved to dismiss.  Page ID #3350-3428, 3433-65, 3544-80. |
| 1-5-21 | Detroit filed a 55-page brief plus exhibits seeking sanctions, disbarment, and disciplinary referrals.  Page ID #3616-3836. |
| 1-11-21 | Supreme Court denied expedited review and consolidation. |
| 1-14-21 | Appellants dismissed case.  Page ID #4030, 4034. |
| 02-22-21 | The Supreme Court denied Appellants' Petition. |

---

[2] Docket sheet and filings available at
https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-815.html.

## II. The Panel Created a Circuit and Intra-circuit Split by Affirming Sanctions Without Detroit's Strict Compliance with Rule 11.

For more than twenty-five years, this Court has held Rule 11 sanctions may not be imposed without "strict adherence to the rule's outlined procedure." *Ridder v. City of Springfield*, 109 F.3d 288, 297 (6th Cir. 1997). "Rule 11's safe harbor provision is intended to provide notice and give parties the opportunity to correct their allegedly violative conduct." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 529 (6th Cir. 2002). For a Rule 11 notice to start the clock running on the "safe harbor," the served motion "must describe the specific conduct that allegedly violates Rule 11(b)." FED. R. CIV. P. 11(c)(2). "Failure to comply with the safe-harbor provision precludes imposing sanctions on the party's motion." *Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 767 (6th Cir. 2014).

### A. Detroit's December 15 "Notice" Did Not Satisfy Rule 11.

The panel's affirmance of Rule 11 sanctions rests on its material misunderstanding of Detroit's Rule 11 "notice," which Detroit represented as "detailed." Page ID # 6171. Without record citation, the opinion states: "Here, the City sent plaintiffs a detailed letter specifying

3

the allegedly sanctionable material." Op. at 20. However, there was no such "detailed" notice describing specific sanctionable conduct as required by Rule 11. Page ID #6406-14. This error requires reversal.

The December 15 email attached a seven-page blunderbuss "motion" that was nothing more than the vague "warning letter" courts consistently find insufficient. Rather than identifying specific defects, it simply recited the language of Rule 11 and claimed that the Complaint was "frivolous and legally deficient," filed "for an improper purpose," and sought to undermine democracy. It quoted extensively from the district court's PI Order.[3] Page ID #6409.

This failed Rule 11's specific notice requirement as a matter of law and contradicts this Court's precedent. *Penn, LLC,* 773 F.3d at 767–68; *Ridder*, 109 F.3d at 297; and that of other circuits. *Roth v. Green*, 466 F.3d 1179, 1191–92 (10th Cir. 2006) (reversing sanctions imposed

---

[3] The denial of a motion for a preliminary injunction does not equate to a suit being frivolous. *See, e.g., Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978) (instructing courts not "to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.").

following "notice" like Detroit's). To impose sanctions based on deficient notice is plain error. *See Indah v. SEC*, 661 F.3d 914, 926 (6th Cir. 2014).[4]

The Panel affirmed sanctions expressly on its erroneous belief the letter was "detailed," and "Plaintiffs could have avoided sanctions by abandoning frivolous claims and allegations and concentrating the attention of the court on what remained. They did not do so, and that is why we uphold much of the Rule 11 sanctions today." Op. at 20 (Ex. 1). That is error that mandates reversal.

## B. The Defective "December 15 notice" Did Not Trigger the Safe Harbor Countdown.

First, the "identification of the specific conduct that is allegedly sanctionable is critical to a finding of a Rule 11 violation." It is plain error to impose sanctions beyond that noticed. *Indah*, 661 F.3d at 926. Second, Rule 11 requires "identicality" between the notice served and the actual motion filed for sanctions to be imposed. *Penn, LLC* F.3d at 767–68 ("strict compliance"); *Ridder*, 109 F.3d at 297; *accord Roth*, 466 F.3d at 1191–92; *Uptown Grill, LLC v. Camellia Grill Holdings*, 46 F.4th 374,

---

[4] Even the district court, "recognize[d] there is disagreement about whether Detroit followed the Safe Harbor provisions with exactitude," but then glossed over it by proceeding *sua sponte* –equally without equitable notice. Page ID #5313.

389 (5th Cir. 2022), *cert. denied sub nom.* 143 S. Ct. 735 (2023) (identicality). Here, there was nothing approaching specific notice—much less identicality with the January 5 filing. Indeed, there are 45-plus pages of differences, plus exhibits. Cf. Page ID #6406-14 and Page ID #3616-3836.

The failure to enforce strict compliance with Rule 11 contradicts this Court's precedent and splits from its sister circuits. *See Uptown Grill*, 46 F.4th at 389 (identicality); *Roth*, 466 F.3d at 1192–93 (notice too general); *Schlaifer Nance & Amp. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999) ("[O]nly conduct explicitly referred to in the instrument providing notice is sanctionable."); *Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1151 (9th Cir. 2002) ("a filing-ready motion" required as notice). Detroit's failure to comply strictly with the notice and safe-harbor requirements precluded it from obtaining sanctions. *See Ridder*, 109 F.3d at 297; *Penn, LLC*, 773 F.3d at 768; *Indah*, 661 F.3d at 926.

Even worse, both courts found fault and imposed sanctions on multiple points Detroit *never* identified. This is plain error and a due process violation. *Indah*, 661 F.3d at 926. For example, Detroit did not

identify any defects in Appellants Michigan law claims or insufficiencies in their pretrial inquiry; machines Ramsland referenced; nor did it challenge the affidavits of Watkins, Sitto, Helminen, Waskilewski, Mandelbaum, Rose, Sitek, Posch, Champagne, Bomer, Brunell, Spalding, Sherer, Larsen, Gustafson, and Meyers. Page ID #5306-7. Petitioners were repeatedly greeted with accusations of which they had no notice.

### C. Appellants Timely Dismissed the Complaint.

It was not until Detroit's filing on January 5, 2021, that Detroit identified any specific defects—primarily disputing a few affidavits on their facts. Page ID #3616-3671.[5]   January 11, the Supreme Court denied expedited review. Three days thereafter, nine days after Detroit's filing, Plaintiffs voluntarily dismissed the complaint. Page ID #4030-47. This was well within the safe harbor. No sanctions may be imposed. *Ridder*, 109 F.3d at 297.

---

[5] This filing—captioned "Motion for Sanctions, for Disciplinary Actions, for Disbarment Referral, and for Referral to State Bar Disciplinary Bodies"—also violated Rule 11's requirement that the motion "must be made separately from any other motion," and it violated due process. FED. R. CIV. P. 11(c)(2). *See infra-Section V.*

## III. The Opinion Violates the Plain Text of §1927 and Supreme Court and Circuit Precedent.

Section 1927 does not permit sanctions for failing to dismiss a suit over a few days. "The unambiguous text of §1927 aims only at attorneys who *multiply* proceedings." *DeBauche v. Trani*, 191 F.3d 499, 511 (4th Cir. 1999) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762 (1980)) (emphasis in original); *See also In re Ruben*, 825 F.2d 977, 987 (6th Cir. 1987). "The purpose of §1927 is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 644 (6th Cir. 2009) (citation and quotation omitted).

Section 1927 sanctions should not be imposed where there is a plausible basis for claims.[6] *Kidis v. Reid*, 976 F.3d 708, 723 (6th Cir. 2020) (rejecting sanctions where some claims plausible). Likewise, sanctions should not be imposed when the Plaintiff has made only the basic filings to pursue his suit. As a matter of law, filing a single

---

[6] The panel found two claims and the relief requested were not frivolous and not sanctionable. Accordingly, counsel could have amended the complaint upon remand. Op. at 21.

complaint (and an amended complaint) cannot be held to "have multiplied the proceedings unreasonably and vexatiously and therefore §1927 cannot be employed to impose sanctions." *DeBauche,* 191 F.3d at 511–12 (also requiring specific findings to each individual).

In this Circuit, courts may impose "§1927 sanctions only where there was some improper purpose, such as harassment or delay." *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1212 (6th Cir. 1997) (citations omitted). Here the panel correctly found there was no improper purpose, and therefore erred in affirming section 1927 sanctions. *Barney*, 110 F.3d at 1213 (plaintiffs' purpose to obtain relief). Accordingly, the Panel's finding of no improper purpose foreclosed §1927 sanctions and requires reversal.

Liability under §1927 is direct, not vicarious. *See Claiborne v. Wisdom*, 414 F.3d 715, 722–24 (7th Cir. 2005). "Section 1927 does not require every lawyer who files an appearance to review and vet every paper filed by every other lawyer" or impose "a duty to supervise or correct another lawyer's work." *FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 614 F.3d 335, 341 (7th Cir. 2010). "[P]ersonal responsibility remains essential to an award of sanctions under § 1927." *Id.* For this reason,

9

this Circuit requires courts to identify specific sanctionable conduct by individual attorneys. *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 n.6 (6th Cir. 2009) (citing *Claiborne*, 414 F.3d at 722–24).[7] This failure also requires reversal.

To justify §1927 sanctions, the panel relies heavily on Petitioners' erroneous initial belief that much of the case became moot December 14, 2020. However, counsel revised that opinion and sought expedited consideration of the appeal in the Supreme Court thereafter. Page ID #4356. These issues are novel. *See Bush v. Gore,* 531 U.S. 98, 127 (2000) (Stevens, J., dissenting) ("Congress chose to count [Hawaii's electors] appointed on January 4, 1961, well after the Title 3 deadlines."). The Supreme Court could have had a different view of the issues. Notably, Plaintiffs dismissed the case three days after the Supreme Court declined to expedite its review.

The panel also asserts that Detroit and Defendants were harmed by having to file motions to dismiss that they would not have had to file

---

[7] The panel erred in relying on *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369 (6th Cir. 2022) to hold otherwise. Op. at 24. It is a Rule 37 discovery sanctions case where the court itself had warned the lawyer of his egregious behavior. *NPF Franchising, LLC*, 37 F.4th at 378.

had counsel dismissed upon receipt of the "Rule 11 notice," but aside from the utter failures of that "notice," sanctions are not warranted for a result that could be achieved with a simple motion.[8]  *In re Ruben*, 825 F.2d at 988 ("A sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants.").

Petitioners dismissed within any conceivable safe harbor, were not dilatory in dismissing, and the complaint presented serious and valid claims which could have been pursued on remand.  Plaintiffs sought no substantive relief from the district court after the court denied Plaintiffs' motion for a preliminary injunction on December 7, 2020.  Neither filing the complaint—nor failing to dismiss it immediately—is vexatious under §1927 or any precedent.[9]  *Feehan v. Wisconsin Elections Comm'n*, No. 20

---

[8]   For example, the panel also faults counsel for suing the board of canvassers which it holds had immunity.  That is a routine motion, and the Board of Canvassers expressly declined to join the motion for sanctions. Page ID #4336 n.1.

[9]   Other circuits agree that filing suit is not grist for §1927 sanctions. *See, e.g., In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008) (proceedings cannot be multiplied until there is a case); *Matter of Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986) (§1927 does not apply to initial pleadings).  The only Sixth Circuit case imposing §1927 sanctions after voluntary dismissal shows why sanctions are appropriate for serial vexatious litigants.  *Davis v. Detroit Downtown Development Authority*, 782 FED.APPX. 455 (6th Cir. 2019) (sanctioning Intervenor-Defendant

cv-1771, 2022 WL 3647882, at *9–12 (E.D. Wisc. Aug. 24, 2022) (refusing §1927 sanctions in similar case).

In addition, for the same reason this Court reversed §1927 sanctions against Lin Wood, it must reverse sanctions against Kleinhendler, Haller, and Johnson.  The State did not seek §1927 sanctions against them.  Page ID #4348.

## IV.    The Opinion Contradicts Supreme Court and Sixth Circuit Precedent that Rule 11 Sanctions May Not Be Imposed against Non-Presenting Attorneys.

The opinion's affirmance of Rule 11 sanctions against four of the five attorneys who did not "present[]" the complaint by "signing, filing, submitting, or later advocating it," FED. R. CIV. P. 11(b), defies Supreme Court and Sixth Circuit precedent and is inherently inconsistent.  Rule 11 sanctions may not be imposed on attorneys who did not sign or otherwise present the complaint.  These responsibilities are personal. *Pavelic & LeFlore v. Marvel Entm't Grp. et. al.*, 493 U.S. 120, 125–26 (1989).  Rule 11 permits courts to impose such vicarious and joint and several liability only on law firms, FED. R. CIV. P. 11(c)(1), but there were

---

Davis); Page ID #4066-69 (describing Davis's pattern of "vexatious and frivolous filings" of over 100 lawsuits and the multiple sanctions imposed therefor).

none here. Appellants are all solo practitioners who collaborated to varying degrees in this case.[10]

And, separately, for the same reasons the Court vacated and reversed Rule 11 sanctions against Emily Newman, it must reverse the sanctions against Kleinhendler, Haller, and Johnson who were identically situated as "Of Counsel" under Newman's name and not admitted to practice before the court.[11]  These attorneys did not sign, file, or submit any pleading; nor did they "later advocat[e]" a pleading—there was no oral argument prior to dismissal.  *See* FED. R. CIV. P. 11, 1993 Advisory Committee Notes ("later advocating" addresses oral advocacy of previously filed pleadings).    The panel wrongly diverged from this

---

[10] The District Court attempted to evade the requirements of Rule 11 by finding that each Appellant was "responsible" for the violation "[b]y agreeing to place their names on pleadings and/or motions." RE 172, Page ID #6916-17.  However, there is no authority for this expansive reading of "responsible."  The only case cited addresses the liability of a law firm and its partners.  *Id.*  (citing *Morris v. Wachovia Sec., Inc.*, 2007 WL 2126344, at *9 (E.D. Va. 2007)).

[11] Johnson was not even listed on the original complaint as "of counsel," Page ID #75; nor was he included on the December 15, 2020, email to Plaintiffs' counsel that purported to provide Rule 11 notice; Neither Johnson nor Haller were listed on the motion for preliminary relief. Page ID #1847-48.

13

Court's opinion in *In re Ruben*, which is also dispositive on this issue.  825

F.2d 977, 984 (6th Cir. 1987).

## V.    Due Process Required Specific Notice and an Evidentiary Hearing.

"[T]he determination of what process is due is, in part, a function of

the type and severity of the sanction."  *Media Duplication Servs., Ltd. v.*

*HDG Software, Inc.*, 928 F.2d 1228, 1238 (1st Cir. 1991); *See Indah*, 661

F.3d at 928.   Counsel were entitled to an evidentiary hearing before

sanctions could be imposed here given the great severity of the sanctions

awarded: over a hundred-fifty thousand dollars, referrals to multiple bars

for   disbarment   proceedings,   and   multiple   other   serious   adverse

ramifications.[12]  Page ID #6997.  *See*, *Indah,* 661 F.3d at 929.  *See also*

*Riddle   v.   Egensperger*, 266  F.3d  542,  551  (6th  Cir.  2000)  (imposing

---

[12]  While routine sanctions cases may not require an evidentiary hearing, courts  have  found  that  due  process  requires  an  evidentiary  hearing where sanctions are based on findings of bad faith or improper purpose, credibility determinations, or disputed issues of material fact.  *See, e.g., Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 206 (7th Cir. 1985) (bad faith); *accord INVST Fin. Grp., Inc. v. Chem-Nuclear Sys., Inc.,* 815 F.2d  391,  405  (6th  Cir.  1987), *cert.  denied  sub  nom*,  484  U.S.  927  (1987); *Donaldson   v.   Clark*,  819  F.2d  1551,  1561  (11th  Cir.  1987)  (en  banc) (credibility); *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 229-30 (5th Cir. 1998) (disbarment).

sanctions for core political speech "create[s] … a chilling effect" on the enforcement of civil rights).

A hearing is especially important in the context of this First Amendment protected right to petition against the very partisan politicians who want their opponents crushed.[13] The chilling effect of the panel's decision on attorneys' willingness to bring controversial cases has dangerous ramifications. The government's massive campaign to suppress out-of-court statements involving election integrity makes this decision even more damaging to core constitutional rights. *See Missouri v. Biden*, --- F.Supp.3d ---, 2023 WL 4335270, at *1-2 (W.D. La. July 4, 2023).

As if this were a summary judgment or a bench trial (without discovery or an evidentiary hearing), the district court and the panel made impermissible fact-findings and credibility choices—effectively

---

[13] While "the central purpose of Rule 11 is to deter baseless filings in District Court … Rule 11 [must] be 'read in light of the concerns that it will … chill vigorous advocacy.'" *McGhee v. Sanilac Cnty.*, 934 F.2d 89, 92 (6th Cir. 1991) (citations and quotation omitted). This is especially true in the context of the First Amendment Right to Petition, which protects all but a sham pleading. *Knology, Inc. v. Insight Commc'ns Co.*, 393 F.3d 656, 658–59 (6th Cir. 2004). This complaint, with hundreds of pages of exhibits and multiple viable claims, was far from a sham.

adjudicating the case on the merits at the pleading stage.[14]  The district

judge cut off counsel's responses to her own questions and repeatedly

denied requests to allow witnesses to testify.  Page ID #5333, 5336, 5340,

5343, 5350, 5397, 5399, 5407, 5437, 5452, 5453, 5454, 5455, 5475, 5476.

Compounding the error, the panel wrongly assumed the affidavits,

which were not required but attached to the complaint in good faith, were

all that existed to support it.[15]  The panel misunderstood many of the

experts and overlooked other information that corroborated the

witnesses.[16]  Witnesses knew far more than what was included in the

---

[14] The district court devotes a single paragraph to a conclusory and unsupported finding that Appellants violated the "*Michigan* Rules of Professional Conduct". RE 172, Page ID #6997 (emphasis added).  Yet only two Appellants are members of the Michigan bar, and the hearing did not address this issue.  Page ID #6999.

[15] *See* Op. at 8 (assuming that "sole evidentiary support" for allegations regarding Dominion and Smartmatic was the Dominion Whistleblower report). *Id.* at 10 (assuming that the "sole basis" for other allegations was the Spyder affidavit); Cf. FED. R. APP. P. 28(j) letter to this Court dated February 27, 2023, referring to thousands of pages of exhibits, depositions, and a 590-page privilege log of information underlying the case.

[16] The panel also affirmed sanctions based on alleged defects in expert testimony that were not raised by the parties or the District Court, e.g., no party found fault, as the panel did, *see* Op. at 11, with Ramsland's analysis of the capacity of scanners in four Michigan counties to process the number of ballots in the early morning hours of November 4, 2020.

affidavits,  witnesses were available to testify, and evidence continued to mount—all supporting Plaintiffs' multiple requests for an evidentiary hearing.  The panel's approach does not even work under a directed-verdict standard—far less when assessing sanctions at the pleadings stage—when all allegations of the complaint are presumed true.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components ...."). To find counsel made baseless allegations—essentially finding Plaintiffs did not prove their case (in the pleadings); make assumptions or interpretations even of expert testimony that are simply wrong; and deny an evidentiary hearing violates due process.

This  erroneous  opinion  has  lifelong  and  career-altering ramifications for the attorneys it sanctions.  The words alone smear and stain  previously  sterling  reputations,  destroy  livelihoods,  and  feed attacks simultaneously launched by multiple bar associations and multi-*billion*-dollar litigants.

For  these  reasons,  the  panel  must  reverse  its  imposition  of sanctions in full.  If it does not, rehearing en banc should be granted, and

17

the opinion of the panel vacated and reversed on all points on which it affirmed the district court.  No sanctions can or should be imposed on this record as a matter of law.

Respectfully submitted,

*/s/ Sidney Powell*
Sidney Powell

## Certificate of Compliance

Pursuant to FED. R. APP. P. 32(a)(7)(C), I certify that the attached Petition for Rehearing En Banc is proportionately spaced in Microsoft Century Schoolbook typeface of 14 point for text and 14 point for footnotes. Excluding material exempted by Rule 32(f), the brief contains 3,603 words.

DATED this 11th day of July 2023.

/s/ Sidney Powell_____
Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com

## Certificate of Service

I hereby certify that on July 11, 2023, the foregoing Petition for Rehearing En Banc was served electronically in this matter via electronic mail and through the Court's ECF system to the following:

David H. Fink
Nathan J. Fink
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
nfink@finkbressack.com
*Counsel for Appellee City of Detroit*

Heather S. Meingast
Erik A. Grill
Assistant Attorneys General of Michigan
P.O. Box 30217
Lansing, MI 48909
meingasth@michigan.gov
*Counsel for Appellees*

Brandon C. Johnson
601 Pennsylvania Ave.,
N.W. South Building, Ste. 900
Washington, DC 40004
bcj@defendingtherepublic.org

Paul J. Stablein
Paul Stablein, PLLC
380 North Old Woodward,
Suite 320
Birmingham, Michigan 48009
PaulStablein@StableinLaw.com
*Attorney for Appellant L. Lin Wood*

Howard Kleinhendler, Esq.
369 Lexington Avenue, 12th Floor
New York, NY 10017
howard@kleinhendler.com

Julia Z. Haller
601 Pennsylvania Ave.,
N.W. South Building, Ste. 900
Washington, DC 40004
JuliZHaller@protonmail.com

Richard S. Hagerstrom
503 Mall Ct., #295
Lansing, MI 48912
scotthagerstrom@yahoo.com

Gregory J. Rohl
4051 Haggerty Rd.
West Bloomfield, MI 48323
greg@rohllaw.com

/s/ Sidney Powell_____
Sidney Powell, Esq.
2911 Turtle Creek Blvd, Ste 300
Dallas, TX 75219
Ph: 214-707-1775
Email: sidney@federalappeals.com

# Exhibit 1

# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  June 23, 2023

Mr. David H. Fink
Mr. Nathan Joshua Fink
Fink Bressack
38500 Woodward Avenue
Suite 350
Bloomfield Hills, MI 48304

Mr. Timothy E. Galligan
39 S. Main Street, Suite 24
Clarkston, MI 48346

Mr. Erik A. Grill
Ms. Heather S. Meingast
Office of the Attorney General of Michigan
P.O. Box 30217
Lansing, MI 48909

Ms. Stefanie Lynn Junttila
Federal Criminal Attorneys of Michigan
500 Griswold Street
Suite 2340
Detroit, MI 48301

Mr. Howard Kleinhendler
Howard Kleinhendler Esquire
369 Lexington Avenue
12th Floor
New York, NY 10017

Mr. T. Russell Nobile
Judicial Watch
P.O. Box 6592
Gulfport, MS 39506

Mr. Paul Joseph Orfanedes
Judicial Watch
425 Third Street, S.W.
Suite 800
Washington, DC 20024

Ms. Sidney Powell
Sidney Powell
2911 Turtle Creek Boulevard
Suite # 300
Dallas, TX 75219

Mr. Paul J. Stablein
Law Office of Paul Stablein
33 Bloomfield Hills Parkway
Suite 242
Birmingham, MI 48009

> Re:    Case Nos. 21-1785/21-1786/21-1787/22-1010, *Timothy King v. Gretchen Whitmer, et al*
> Originating Case No. : 2:20-cv-13134

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0134p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

TIMOTHY KING, et al.,

*Plaintiffs*,

L. LIN WOOD (21-1785); GREGORY J. ROHL, BRANDON
JOHNSON, HOWARD KLEINHENDLER, SIDNEY POWELL,
JULIA HALLER, and SCOTT HAGERSTROM (21-1786);
EMILY NEWMAN (21-1787); STEFANIE LYNN JUNTTILA
(22-1010),

*Interested Parties-Appellants*,

*v.*

GRETCHEN WHITMER; JOCELYN BENSON; CITY OF
DETROIT, MICHIGAN,

*Defendants-Appellees*.

Nos. 21-1785/1786/1787/22-1010

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-13134—Linda V. Parker, District Judge.

Argued:  December 8, 2022

Decided and Filed:  June 23, 2023

Before:  BOGGS, KETHLEDGE, and WHITE, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:**  Paul J. Stablein, PAUL STABLEIN, PLLC, Birmingham, Michigan, for Appellant in 21-1785.  Sidney Powell, Dallas, Texas, in propriā personā and for Appellants in 21-1786. Timothy E. Galligan, TIMOTHY E. GALLIGAN PLLC, Clarkston, Michigan, for Appellant in 21-1787.  Stefanie Lynn Junttila, FEDERAL CRIMINAL ATTORNEYS OF MICHIGAN, Detroit, Michigan, in propriā personā, in 22-1010.  David H. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellee City of Detroit. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees Gretchen

Whitmer and Jocelyn Benson in appeals 21-1786 and 22-1010.  **ON BRIEF:**  Paul J. Stablein, PAUL STABLEIN, PLLC, Birmingham, Michigan, for Appellant in 21-1785.  Sidney Powell, SIDNEY POWELL, PC, Dallas, Texas and Howard Kleinhendler, HOWARD KLEINHENDLER ESQUIRE, New York, New York, in propriīs personīs and for Appellants in 21-1786. Timothy E. Galligan, TIMOTHY E. GALLIGAN PLLC, Clarkston, Michigan, for Appellant in 21-1787.  Stefanie Lynn Junttila, FEDERAL CRIMINAL ATTORNEYS OF MICHIGAN, Detroit, Michigan, in propriā personā, in 22-1010.  David H. Fink, Nathan J. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellee City of Detroit. Heather S. Meingast, Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees Gretchen Whitmer and Jocelyn Benson in appeals 21-1786 and 22-1010.  Paul Orfanedes, JUDICIAL WATCH, INC., Washington, D.C., for Amicus Curiae in appeal 21-1786.

————————————

## OPINION

————————————

KETHLEDGE, Circuit Judge.  Three voters and three Republican nominees to the electoral college in Michigan brought this suit in a bid to overturn the results of the state's 2020 presidential election.  The complaint plausibly alleged that Republican election challengers had been harassed and mistreated during vote counting at the TCF Center in Detroit, in violation of Michigan law.  But the complaint also alleged that an international "collaboration"—with origins in Venezuela, extending to China and Iran, and including state actors in Michigan itself—had succeeded in generating hundreds of thousands of fraudulent votes in Michigan, thereby swinging the state's electoral votes to Joseph Biden.  Many of those allegations—particularly the ones concerning Dominion voting machines—were refuted by the plaintiffs' own exhibits to their complaint.  Other allegations arose from facially unreliable expert reports; still others were simply baseless.  The district court found the entirety of the plaintiffs' complaint sanctionable, and ordered all of plaintiffs' attorneys, jointly and severally, to pay the defendants' and the City of Detroit's reasonable attorney's fees.  We find only part of the complaint sanctionable, and thus reverse in part and affirm in part.

## I.

### A.

On November 3, 2020, Michigan voters cast their ballots in the presidential election. As soon as the polls closed, teams of state election officials began "canvassing" the results—a public process in which officials and observers verify that the number of votes cast in each precinct matches the number of voters listed on the poll lists. *See* M.C.L § 168.801. This canvass concluded on November 17. By the next day, every county in Michigan had reported its official election results to the Secretary of State and the Board of State Canvassers.

Michigan law allows any candidate with a "good-faith belief" that he lost the election due to "fraud or mistake" to request a recount within 48 hours of the canvass's conclusion. *See* M.C.L § 168.879(1)(b), (c). No candidate did so. As a result, on November 23, the bipartisan Board of State Canvassers unanimously certified results indicating that Joseph Biden had won the State of Michigan by 154,188 votes. That same day, Michigan's Governor transmitted those results to the United States Archivist. Michigan's electors for the Democratic Party were thereafter "considered elected." M.C.L § 168.42. That ended the involvement of the Board and the Governor in the election.

### B.

This case began two days later, on November 25, 2020. Plaintiffs sued Governor Gretchen Whitmer, Secretary of State Jocelyn Benson, and the Board of State Canvassers (together, the "state defendants"), asserting that they had "fraudulently manipulat[ed] the vote" through "a wide-ranging interstate—and international—collaboration" to ensure that Biden would win the election. Compl. ¶1-3. Plaintiffs alleged that unspecified "foreign adversaries" and "hostile foreign governments" had accessed Dominion voting machines; that Detroit election officials had participated in countless violations of state election law, including an "illegal vote dump" of "tens of thousands" of votes; and that expert analysis showed that the election results were fraudulent. Compl. ¶84, 162, 224. As a result, plaintiffs argued, they were entitled to "the elimination of the mail ballots from counting in the 2020 election"—meaning all of them—and an order directing "the electors of the State of Michigan . . . to vote for President Donald

Trump."  Compl. ¶229-233.  Sidney Powell, Scott Hagerstrom, and Gregory Rohl signed this complaint as the plaintiffs' attorneys, and five other lawyers—Emily Newman, Julia Haller, Brandon Johnson, Lin Wood, and Howard Kleinhendler—were listed as "Of Counsel."

On November 29, plaintiffs filed an emergency motion for injunctive relief, which repeated the arguments and requests of the complaint.  The Democratic National Committee, the City of Detroit, and Robert Davis (an individual voter with no particular stake in the matter) each filed motions to intervene as defendants, which the court granted.  On December 7, the court denied plaintiffs' motion for emergency relief.  *King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020).

Plaintiffs thereafter hired a ninth attorney, Stephanie Junttila, to file an appeal with this court.  Meanwhile, Michigan's electors were set to vote on December 14.  Junttila and Powell filed a petition for certiorari with the Supreme Court, urging immediate intervention—because, they said, the case would become moot after the December 14 electoral-college vote.  But the Supreme Court did not intervene, and on December 14 Michigan's electors cast their votes for Joseph Biden.

C.

On December 15, the City served plaintiffs and their attorneys with a "safe-harbor" letter, warning that the City would seek sanctions under Civil Rule 11 if plaintiffs did not voluntarily dismiss their complaint.  Plaintiffs' counsel did not respond.  On December 22, the state defendants e-mailed plaintiffs' counsel to seek their concurrence in upcoming motions to dismiss; Junttila responded and declined.  That same day, the City, the DNC, and the state defendants filed separate motions to dismiss, and intervenor Davis filed a motion to sanction plaintiffs' counsel under 28 U.S.C. § 1927 and the court's inherent authority.

On January 5, 2021—three weeks after sending the safe-harbor letter without any response—the City moved for Rule 11 sanctions against plaintiffs and their attorneys, asking the court to impose a fine, to require plaintiffs' counsel to pay defendants' attorney's fees, and to refer them to their respective state bar associations for disciplinary proceedings.  The state defendants joined the City's motion in full.  On January 11 and 12, plaintiffs filed motions to

extend the time to respond to the pending motions to dismiss; the court extended that time until January 21.  On January 14, however, plaintiffs filed a response announcing that they would voluntarily dismiss the complaint.  The state defendants thereafter filed a separate motion for sanctions under 28 U.S.C. § 1927 against Powell, Junttila, Rohl, and Hagerstrom.

In July 2021, the district court held a lengthy hearing on the sanctions motions, during which it questioned plaintiffs' attorneys about the suit.  Lin Wood said that, before he heard about the sanctions hearing, he had no idea his name had been on any filings in the suit.  But he admitted he had offered to help Powell with the lawsuit, and Powell herself said she had "specifically ask[ed]" Wood for his permission before including his name on the filings.  Emily Newman and Stephanie Junttila, for their parts, each said their involvement in the case was minimal.  The remaining attorneys did not contest their roles in the case.  The court also discussed 15 of the plaintiffs' affidavits, to determine whether the attorneys had conducted a prefiling investigation as to the plausibility of their allegations.  In response, counsel repeatedly argued that they could rely on affidavits without conducting any inquiry.

The district court thereafter held that plaintiffs' counsel had violated Rule 11 by filing their suit for an improper purpose and by failing to conduct an adequate prefiling inquiry into the legal and factual merits of their claims.  The court further found that counsel had needlessly prolonged the proceedings, in violation of 28 U.S.C. § 1927, and that counsel had acted in bad faith, warranting sanctions under the court's inherent authority.  The court therefore ordered all nine of plaintiffs' attorneys, jointly and severally, to pay the reasonable legal fees of the City and the moving state defendants.  The court also ordered those attorneys to attend 12 hours of non-partisan legal education on election law and federal pleading standards, and directed the clerk to send disciplinary referrals to counsel's respective bar associations—which the clerk did the next day.  The court denied Davis's motion for sanctions and declined to impose sanctions on plaintiffs themselves.

In a separate order, the court considered objections to the amount of the City's request.  (No attorney had objected to the moving state defendants' request of $21,964.75.)  Of the $182,192 the City requested, the court awarded $153,285.62.

These four appeals followed.  Lin Wood, Emily Newman, and Stephanie Junttila each appeal individually, arguing that their involvement in this case was too minimal to warrant sanctions.  Gregory Rohl, Brandon Johnson, Howard Kleinhendler, Sidney Powell, Julia Haller, and Scott Hagerstrom appeal together, arguing primarily that none of their conduct was sanctionable.

## II.

We review the district court's imposition of sanctions for an abuse of discretion and its factual findings for clear error.  *Salkil v. Mount Sterling Twp. Police Dept.*, 458 F.3d 520, 527 (6th Cir. 2006); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991).

### A.

We begin with Rule 11, which in the district court's view authorized almost all the sanctions awarded here.  That rule provides, in relevant part, that attorneys who present a pleading or motion to the court thereby certify that:

> to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) [the pleading, written motion, or other paper] is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Civ. P. 11(b)(1)-(3).

### 1.

As an initial matter, the district court held that the attorneys filed their suit for an improper purpose, in violation of Rule 11(b)(1).  Specifically, the court asserted that "what very clearly reflects bad faith is that Plaintiffs' attorneys are trying to use the judicial process to frame

a public 'narrative.'" But another word for "framing a public narrative" is speech; and Rule 11 cannot proscribe conduct protected by the First Amendment. True, an attorney may not say whatever she likes inside a courtroom. *See Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005). But an attorney's political speech outside a courtroom—including political speech about a lawsuit—is irrelevant to a Rule 11 inquiry about the suit itself. To the contrary, parties and their attorneys are free to use litigation "as a vehicle for effective political expression and association[.]" *In re Primus*, 436 U.S. 412, 431 (1978). That is as true in election cases as in any other case.

Speech outside the courtroom is what the district court apparently found objectionable here. But that speech did not show that counsel were "motivated by improper purposes such as harassment or delay," which means it was irrelevant to the district court's inquiry. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 519 (6th Cir. 2002). And contesting election results is not itself an improper purpose for litigation. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98 (2000); *Moss v. Bush*, 828 N.E.2d 994 (Ohio 2005); *Coleman v. Ritchie*, 762 N.W.2d 218 (Minn. 2009). Nor does the record show that counsel were otherwise motivated by improper purposes. *First Bank*, 307 F.3d at 519. Thus, the district court did not identify any improper purpose supporting the imposition of sanctions under Rule 11(b)(1).

### 2.

The district court also sanctioned plaintiffs' counsel under Rule 11(b)(3), which mandates that attorneys engage in a reasonable prefiling inquiry to ensure that a pleading or motion is "well grounded in fact[.]" *Merritt v. Int'l Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010). Rule 11 also imposes an implied "duty of candor," which attorneys violate whenever they misrepresent the evidence supporting their claims. *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009). Thus, a court may sanction attorneys under Rule 11(b)(3) for factual assertions they know—or after reasonable investigation should have known—are false or wholly unsupported.

The first amended complaint contained 233 numbered paragraphs and over 800 pages of exhibits. Of the complaint's allegations, 60 are irrelevant for purposes of Rule 11 because they

quoted legal standards or described undisputed facts. The remaining paragraphs fall into three categories, to wit: allegations about Dominion's voting systems; allegations about statistical anomalies in the election results; and allegations about misconduct by election workers in Detroit.

a.

According to plaintiffs, the election fraud began "with the election software and hardware from Dominion Voting Systems." Compl. ¶4. Counsel devoted 61 paragraphs of the complaint to allegations about Dominion. Those paragraphs make out the following theory: that "foreign oligarchs and dictators" founded Dominion in order to help Hugo Chavez manipulate Venezuelan elections; that Dominion accordingly designed its software to include hidden "ballot-stuffing" features; and that foreign states—along with Michigan's Governor and Secretary of State, apparently—then exploited those features during the 2020 Presidential elections. Compl. ¶4-12, 125-174.

i.

The complaint said the following about Dominion's origins:

> Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. *See* Ex. 1 Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

Compl. ¶5. The plaintiffs' sole evidentiary support for these allegations was the so-called "Dominion Whistleblower Report"—allegedly authored by an unnamed "adult of sound mine [*sic*]" who purported to be a former member of Chavez's national guard. Yet the whistleblower report itself says nothing about Dominion's founding; instead, it describes a conspiracy "between a company known as Smartmatic" and "the Venezuelan government." Smartmatic is not Dominion, just as General Motors is not Ford. The report otherwise says that Dominion "relies upon software that is a descendant of the Smartmatic Election Management System." But the complaint's allegation that Dominion was founded as part of a Venezuelan conspiracy to commit

election fraud was entirely baseless.  The district court rightly concluded that this whole raft of allegations was sanctionable.

ii.

The complaint also alleged that Dominion's voting systems were easy to hack and impossible to audit.  By way of background, according to a journal article that plaintiffs attached to the complaint, modern election-management systems come in three kinds.  One is a hand-marked paper-ballot system, in which voters manually complete a blank ballot and then take it to a machine to be scanned and tabulated.  Another is a ballot-marking system, in which voters make their selections on a touch screen and receive a printed, marked ballot to take to the scanner.  And in an all-in-one system, a single machine marks, scans, and tabulates the ballots without further action by the voter.

The problem with the complaint's allegations regarding Michigan's voting system, simply enough, is that they concerned different kinds of systems than the one Michigan used.  As any Michigan voter could have told counsel, Michigan used a hand-marked ballot system—which one of the plaintiff's own exhibits, an article by Dr. Andrew Appel, said is "the only practical technology for contestable, strongly defensible voting systems."  That plaintiffs attached Appel's article in support of their criticisms of Michigan's voting system illustrates how little counsel understood about the system they were criticizing.  Similarly, the complaint alleged (by way of the Chavista whistleblower) that a "core requirement of the Smartmatic software design ultimately adopted by Dominion for Michigan's elections was the software's ability to hide its manipulation of votes from any audit."  Compl. ¶7.  But hand-marked ballots obviously can be recounted (and thus audited) by hand.  The complaint likewise alleged that "Michigan officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation."  Compl. ¶10.  We set to one side that the "Texas decision" came after the relevant decision by "Michigan officials."  For the Texas decision on its face concerned a ballot-marking system, not the hand-marked system that Michigan used.   And Michigan's contract with Dominion, likewise an exhibit, was limited to the hand-marked ballot system.

Plaintiffs' own exhibits thus refuted rather than supported the complaint's allegations about the Dominion system used in Michigan.  And an adequate prefiling inquiry under Rule 11 includes reading every document one plans to file.  *See, e.g.*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278, 1281 (3d Cir. 1994) (observing that "[w]e are at a total loss to understand how attorneys can urge that they have made a reasonable inquiry into the facts and law of a case when their complaint is predicated on allegedly false statements in documents which they have not bothered to read.").  Plaintiffs' inquiry as to these allegations was patently inadequate.

iii.

Plaintiffs' counsel sought to bolster their theories about Dominion with two putative expert reports.  Attorneys are rarely sanctioned for relying upon experts:  expert testimony by definition rests on "specialized knowledge[,]" Fed. R. Evid. 702, and consulting an expert is itself a way to investigate a claim's factual plausibility.  But there is no Rule 702 exception to Rule 11; an attorney's reliance upon a putative expert opinion must itself meet the standard of reasonableness imposed by Rule 11.  That means the expert's opinion must not be unreliable on its face—either because of the expert's lack of qualifications, or the substance of the opinion itself.  And the attorney cannot misrepresent what the expert himself actually says.

Here, as to the alleged international conspiracy, the complaint alleged that "Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections."  Compl. ¶17.  The sole basis for that allegation was the report of what the complaint called a "former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence."  Compl. ¶17.  But that "intelligence analyst" turned out to be a Dallas IT consultant who dropped out of an entry-level intelligence course after seven months' training.  And even a cursory review of his putative report shows that it concerned the integrity of Dominion's public website, not its voting machines.  That distinction should not have been hard for counsel to keep straight.  And the complaint further misrepresented the report when the complaint alleged that "Dominion allowed foreign adversaries to access data and *intentionally provided access* to their infrastructure" (emphasis added).  Compl. ¶161-162.  That allegation was utterly baseless.

The attorneys also presented an affidavit from Russell Ramsland to substantiate their suspicion that foreign powers had hacked into Dominion's machines. Ramsland said that his background included "advanced converged telecom, highly advanced semiconductor materials, hospitality, commercial real estate development & operation," as well as running "Europe's highest grossing Tex-Mex restaurant." His specialized knowledge as to foreign election-interference was thus questionable on its face. More to the point, Ramsland claimed that Dominion machines had been "manipulated" in "four precincts/townships" in four Michigan counties (Wayne, Oakland, Macomb, and Kent), which he said resulted in "289,866 illegal votes." Ramsland's theory was that the Dominion machines used in those counties—which he said were "Model DRM16011"—lacked the "processing capacity" to count as many ballots as were counted in the relevant precincts on election night. But Ramsland likewise assumed that those counties used a ballot-marking system nowhere used in Michigan, which showed that he did not know which machines were used in Michigan—meaning that his assumptions about "processing capacity" were baseless. Moreover, a simple internet search would have shown that Macomb and Oakland counties did not use Dominion systems at all.

A reasonable prefiling investigation would have shown counsel that their allegations about Dominion were baseless. Those allegations were therefore sanctionable under Rule 11(b)(3).

b.

i.

In another part of the complaint—covering about 19 paragraphs—counsel relied upon several putative expert reports to allege that Michigan's election results were statistically anomalous or impossible. The complaint alleged that "evidence compiled by Matt Braynard using the National Change Address Database" showed that 13,248 voters who had moved to another state had nonetheless illegally voted in Michigan. Compl. ¶119. But Braynard's opinion came in the form of four tweets, each 280 characters or less, which said nothing about his qualifications or the data he supposedly employed. That opinion was unreliable on its face; counsel violated Rule 11 by relying upon it.

Counsel also relied on a report by Dr. William Briggs, who—according to the complaint—opined that "Approximately 30,000 Michigan Mail-In Ballots Were Lost, and Approximately 30,000 More Were Fraudulently Recorded." *See* Compl. ¶108-112. But Briggs drew that conclusion by taking as true a second Braynard document, the so-called "Braynard Survey." That survey purported to describe Braynard's "multi-state phone survey data of 248 Michigan voters." Suffice it to say that Briggs's statistical extrapolations from that survey—30,000 lost absentee ballots, and 30,000 fraudulent ones—were facially unreliable as well.

The complaint likewise cited Dr. Stanley Young, who asserted that Biden's gains over Trump among new voters in nine large, metropolitan counties (*e.g.*, Oakland, Washtenaw, Wayne, Kent, Kalamazoo) were "unexpected." According to Young, Biden received 190,000 "excess" votes in those counties because Biden's margin of victory there was 190,000 votes greater than Clinton's margin had been in 2016. Every one of those counties has a large suburban population, which suggests a simpler explanation than an international conspiracy for that shift in votes. And by Young's logic, Trump received an "excess" of 29,000 votes in the rest of Michigan. Still, counsel could have reasonably relied on Young's opinion that this shift was unexpected. What the complaint actually said, however, was that "Dr. Young's analysis indicates that, when the entire State of Michigan is concerned, there were likely over 190,000 'excess' and *likely fraudulent* votes, which once again is significantly larger than Biden's 154,188 margin in Michigan." Compl. ¶118 (emphasis added). An "unexpected" shift in suburban votes in Young's report thus became, in the complaint, 190,000 fraudulent votes that swung the election. That allegation misrepresented Young's report and was sanctionable. *See Rentz*, 556 F.3d at 395.

ii.

Plaintiffs' reliance on four other experts was not sanctionable. First, the complaint accurately stated Dr. Louis Bouchard's conclusion that several spikes in Biden's vote count in Michigan on election night were "statistically impossible." Compl. ¶122. Dr. Bouchard's reasoning was that "the election results" showed "a tight race" in both Florida and Michigan; that Biden's vote total in Florida had no corresponding spike; and thus the spikes in Michigan were

"anomalous."  The proposition that Michigan's reporting of vote totals should track Florida's is without support; but Bouchard's technical analysis was not facially unreasonable to a layperson.

Second, Thomas Davis asserted that the share of Democrats who voted by absentee ballot exceeded the share of Republicans who did so by a similar percentage throughout the state— which, in Davis's view, suggested that a computer algorithm had manipulated the vote count. Occam's Razor suggests that Democrats just voted absentee more than Republicans did, but Davis's opinion—that the consistency of this difference across counties was suspicious—was not unreasonable on its face.

Third, Dr. Eric Quinnell and Dr. Young together opined that Michigan's election results were "mathematically anomalous," because, they said, the new voters in several Michigan townships mostly voted for Biden.  Their report appears to assume that everyone who voted for Trump in 2016 voted for him again in 2020, that everyone who voted for Clinton in 2016 voted for Biden in 2020, and that Biden then took an outsized share of "new" voters.  Although those assumptions might be implausible, we cannot say this opinion was facially unreasonable.

Finally, Robert Wilgus asserted that the number of absentee ballots that voters requested and returned on the same day warranted "further investigation."  The Michigan Constitution enables voters to do both of those things on the same day, so Wilgus's assertion that doing so warrants investigation is dubious.  *See* Mich. Const. Art II, § 4(h).  But his conclusion was tepid enough not to be facially unreasonable.

c.

A third part of the complaint comprised 79 paragraphs of allegations about misconduct at the "TCF Center," which is where "Absentee Voter Counting Boards" counted all of Detroit's absentee ballots.

i.

The complaint's most provocative allegation as to these boards was that they "fraudulently added tens of thousands of new ballots and new voters in the early morning and evening of November 4."  Compl. ¶82 (capitalization removed).  "Perhaps the most probative

evidence" in support of this allegation, according to the complaint, came from the affidavit of Dominion employee Melissa Carone.  Compl. ¶84.  She wrote:

> There was two vans that pulled into the garage of the counting room, one on day shift and one on night shift.  These vans were apparently bringing food into the building because they only had enough food for not even 1/3 of the workers. I never saw any food coming out of these vans, coincidentally it was announced on the news that Michigan had discovered over 100,000 more ballots—not even two hours after the last van left.

On the basis of this affidavit, the complaint alleged that Carone had "witnessed" an "illegal vote dump, as well as several other violations."  Compl. ¶84.  That allegation illustrates the complaint's pattern of embellishment to the point of misrepresentation.  The only thing that Carone said she witnessed was the arrival of "two vans"—period.  Powell and her co-appellants now concede that "Carone made it clear she had seen no ballots."  *Reply* at 24.  That means it was sanctionable to allege that she did.  *Rentz*, 556 F.3d at 395.

Counsel also used two affidavits copied from a state-court case—*Constantino v. Detroit*—to support the "illegal vote dump" theory.  The attorneys used the first affidavit, from election challenger Robert Cushman, to allege that "several thousand" ballots had been "fraudulently" counted at TCF.  Compl. ¶83.  Cushman was apparently a layperson as to election law; and in *Constantino*, Christopher Thomas—who served as Michigan's Director of Elections for over 30 years—submitted a detailed affidavit explaining that none of Cushman's observations suggested any violation of Michigan election law.  Plaintiffs' counsel were not required to treat Thomas's affidavit as sacrosanct.  But a reasonable prefiling inquiry—before renewing Cushman's allegations of fraud—would have included review of Thomas's explanation and a reasoned assessment as to whether those allegations remained plausible.  The record here reveals no such inquiry on counsel's part.

The second affidavit from *Constantino* came from election challenger Andrew Sitto, who wrote in relevant part:

> At approximately 4:30 a.m., tens of thousands of ballots were brought in and placed on eight long tables. Unlike the other ballots, these boxes were brought in from the rear of the room.  The same procedure was performed on the ballots that arrived at approximately 4:30 a.m., but I specifically noticed that every ballot I

observed was cast for Joe Biden. While counting these new ballots, I heard counters say at least five or six times that all five or six ballots were for Joe Biden. All ballots sampled that I heard and observed were for Joe Biden.

An attorney could legitimately use an affidavit like Sitto's to begin (rather than end) a line of inquiry regarding potential counting irregularities. But counsel here cited Sitto's affidavit as proof of "[t]he most egregious example of election workers' fraudulent and illegal behavior" at the TCF Center. That too was a gross exaggeration. Sitto did not say that the "tens of thousands of ballots" he saw were fraudulent. Compl. at ¶82. Nor did he say that election workers treated those ballots any differently from any others—to the contrary, he said the counters followed the "same procedure" as before. And though Sitto said that "every ballot" he observed was for Biden, his affidavit implied that he heard only 30 or so of the votes that were counted.

The complaint also cited an affidavit from Articia Bomer, who said she "believe[d]" that some of the counters at TCF "were changing votes that had been cast for Donald Trump and other Republican candidates." The complaint called this "eyewitness testimony of election workers manually changing votes for Trump to votes for Biden[.]" Compl. at ¶91. That too was an embellishment, considering that Bomer offered no basis for her belief.

Considered both individually and collectively, the affidavits cited in the complaint did not afford counsel a credible basis to allege that "tens of thousands" of fraudulent votes were counted at TCF. Those allegations therefore lacked the requisite basis in evidence. Fed. R. Civ. P. 11(b)(3).

ii.

The complaint also alleged various lesser violations of Michigan election law. The problem with those allegations, simply stated, is that counsel apparently did not read the statute they said was violated. For instance, the complaint includes 11 paragraphs of allegations about problems with verification of signatures and birthdates on absentee ballots at the TCF Center. But Michigan law does not require birthdate verification for absentee voters. *See* M.C.L. § 168.765a. Nor do the counting boards verify any signatures for the absentee ballots; instead, by the terms of the same statute, the city clerk's office would have already done that before the

ballots reached the TCF Center.  *See* M.C.L. § 168.765a(6) (absentee ballots delivered to absent-voter counting boards "must be" accompanied by "a statement by the clerk that the signatures of the absent voters on the envelopes have been checked and found to agree with the signatures of the voters on the registration cards").  The complaint did not allege otherwise; its allegations about improper verification at the TCF Center were therefore baseless.

Counsel similarly alleged that voters who had requested absentee ballots later illegally voted in person.  But the same statute specifies that Michigan law "does not prohibit an absent voter from voting in person within the voter's precinct at an election, notwithstanding that the voter may have applied for an absent voter ballot and the ballot may have been mailed or otherwise delivered to the voter."  M.C.L. § 168.765a(7).  And where the complaint did specifically allege double voting—as in paragraph 93—it misrepresented the supporting affidavit, which said only that some people who voted in person "had already *applied* for an absentee ballot."  (Emphasis added).

Of a piece was the complaint's allegation that election challengers had been improperly barred from observing the "ballot-duplication" process (meaning the process by which ballots that cannot be read by a machine are hand-copied onto ballots that can be scanned).  *See* Compl. ¶13, 76-77, 189.  For the same statute says that "at least 1 election *inspector* from each major political party" must witness the duplication.  M.C.L. § 168.765a(10) (emphasis added).  Under Michigan law, "challenger" and "inspector" mean two different things: election challengers are party volunteers with no official training in election procedure, whereas election inspectors are officials appointed by the Board of Election Commissioners.  M.C.L. § 168.765a(2).  The complaint unwittingly used those terms interchangeably; and nowhere does it suggest that anyone barred an election inspector from observing the ballot-duplication process.

The statute at issue here ran three pages; a reasonable prefiling inquiry as to all these allegations would have included reading it.

iii.

The complaint's remaining allegations about election-related events at TCF Center were not sanctionable.  One witness said she had seen an election worker manually correct ballots that

the witness thought should have been discarded as "over-votes"; the complaint fairly repeated that allegation. The same was true as to allegations by two challengers who thought they had seen someone move "spoiled" ballots to a "to be counted" pile. And counsel reasonably relied on the affidavit of one woman who said she had seen a voting record for her late son, purportedly reflecting that, after his death, he had voted in the 2020 election.

The complaint's most credible allegations were that election workers at the TCF Center mistreated, intimidated, and discriminated against Republican election challengers. Indeed some three dozen detailed affidavits supported the complaint's allegations to that effect. Those affidavits were notably consistent in their description of partisan hostility at the TCF Center. For instance, election challenger Abbie Helminen attested that, when the police removed a (presumably Republican) election challenger from the center, "the whole room erupted in claps & cheers, this included the poll workers." She also said that "Democrats outnumbered Republicans by at least 2:1." Similarly, Anna Pennala wrote that she "witnessed a pattern of chaos, intimidation, secrecy, and hostility by the poll workers," and that she saw workers "cheer, jeer, and clap when poll challengers were escorted out." And Emily Steffans wrote that she was "afraid . . . to challenge any ballots" because she "had watched two GOP people escorted out by the police," again to cheers from "democrat volunteers and poll workers at the table."

The intimidation and harassment alleged in these affidavits was potentially criminal. *See* M.C.L. § 168.734 ("Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding two years"). And the rank partisanship among election workers described in these affidavits undermines public confidence in elections just as much as bogus allegations about voting machines do. The district court should not have dismissed these affiants' allegations out of hand.

3.

The district court next held that the entire complaint was independently sanctionable under Rule 11(b)(2). That rule requires attorneys to certify that "the claims, defenses, and other

legal contentions" in their filings "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Thus, in short, frivolous "legal contentions" are sanctionable under Rule 11(b)(2).

### a.

Three of the complaint's legal claims—an equal-protection claim, a due-process claim, and a claim under the Michigan Constitution—relied exclusively on frivolous allegations of widespread voter fraud. That means those claims were already sanctionable in full under Rule 11(b)(3). Thus, we need not consider whether the legal contentions in support of the complaint's voter-fraud claims were sanctionable under Rule 11(b)(2) as well.

### b.

The defendants argue that the plaintiffs' remaining claims rested on frivolous legal contentions. A legal contention is frivolous if it is "obviously without merit" under existing law and unsupported by a good-faith argument to change or extend the law. Fed. R. Civ. P. 11(b)(2); *Waldman v. Stone*, 854 F.3d 853, 855 (6th Cir. 2017) (discussing frivolous claims under Appellate Rule 38).

### i.

As an initial matter, counsel never should have asserted any claims against the Board of Canvassers in this case. The Board is a state agency; and unless the state waives Eleventh Amendment immunity or Congress abrogates it, state agencies are immune from federal suit. *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017). Here, the state did not waive immunity and Congress did not abrogate it, and plaintiffs have never argued otherwise. Hence the Board was indisputably entitled to sovereign immunity. *Id.* Moreover, the Board had already certified the election results by the time of plaintiffs' suit, and thus lacked power to redress any of plaintiffs' alleged harms. Hence the plaintiffs also lacked standing to sue the Board. *See Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 715-16 (6th Cir. 2015). The legal contentions in support of these claims, therefore, were frivolous. *See Waldman*, 854 F.3d at 855.

ii.

That leaves two federal claims against Governor Whitmer and Secretary Benson and a handful of state claims.  The first federal claim was one under 42 U.S.C. § 1983 for alleged violations of the Elections and Electors Clauses of the Constitution.  The theory behind that claim, as set forth in the complaint, was that the Governor and the Secretary of State "unilaterally" chose to "deviate from the requirements of the Michigan Election Code."  Compl. ¶23, 179.  That this claim was one of "unilateral" action means it depended on actions specific to the Governor and Secretary themselves.  Yet the complaint alleged no such actions, apart from a conclusory allegation in the complaint's introduction (¶3) about "multifaceted schemes and artifices implemented by Defendants and their collaborators[.]"  And that allegation itself obviously could not support this claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  This claim was therefore both legally and factually frivolous.

A second § 1983 claim against the Governor and Secretary was one for selective enforcement of election law, in violation of the Fourteenth Amendment's Equal Protection Clause. That claim presents a close question.  As explained above, counsel had an evidentiary basis for pleading that Republican challengers were disproportionately excluded from and otherwise discriminated against in the TCF Center.  To make out a selective-enforcement claim, counsel would have needed to plead that state actors "intended to accomplish some forbidden aim" through a "truly discriminatory application of a neutral law."  *Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir. 1996).  Although counsel spent only a single paragraph of the complaint on this theory (¶189), that paragraph was a nonfrivolous attempt to state those elements.  Counsel also requested injunctive relief targeting the alleged harms.  Compl. ¶194.  That is not to say the claim would have survived a motion to dismiss.  For instance, the complaint did not explain what role, if any, the Governor and Secretary played in the law's discriminatory application.  On balance, however, this claim was "meritless rather than frivolous."  *See Waldman*, 854 F.3d at 855.  Hence it was not sanctionable under Rule 11(b)(2).

The complaint also asserted several state-law claims against the Governor and Secretary.  We have already explained that counsel's claims under the absentee-voting statute were sanctionable because the complaint failed to describe any violations of that statute.  *See* M.C.L.

§ 168.765(a).  Likewise frivolous was the complaint's attempt to state a claim under M.C.L. § 168.734, which merely sets forth certain criminal penalties for mistreatment of election challengers.  But the complaint's claim under a neighboring election-challenger provision, M.C.L. § 168.733, was not frivolous.  That claim had a factual basis, as described above. Although that provision also does not expressly create a private cause of action, its terms—*e.g.*, "[a] person shall not threaten or intimidate a challenger while performing" some 13 different activities—leave room to argue in good faith that one should be implied under Michigan law. *See Pompey v. Gen. Motors Corp.*, 385 Mich. 537 (1971).  This claim was not frivolous.

c.

The defendants argue that even the complaint's nonfrivolous claims were sanctionable because the complaint's requests for relief were frivolous.  But parties can tailor those requests as the case proceeds, and the complaint here included a request for any "relief as is just and proper."  Compl. ¶233.  That means counsel could have filed this lawsuit without any of the requests for relief that defendants say were frivolous.  Those requests alone therefore do not render the nonfrivolous legal claims sanctionable.  Nor did the district court identify any other ground to support a determination that the entirety of this complaint was frivolous.

Plaintiffs, for their part, defend the inadequacy of their complaint by pointing to the time constraints inherent in election contests.  But Rule 11 imposes a safe-harbor period to protect attorneys from sanctions for hasty mistakes.  A party may seek sanctions only after providing notice of the alleged violations, which the opposing party then has 21 days to cure.  Fed. R. Civ. P. 11(c); *see also* advisory committee's note to 1993 amendment ("[T]he timely withdrawal of a contention will protect a party against a motion for sanctions.").  Here, the City sent plaintiffs a detailed letter specifying the allegedly sanctionable material.  Plaintiffs could have avoided sanctions by abandoning frivolous claims and allegations and concentrating the attention of the court on what remained.  They did not do so, and that is why we uphold much of their Rule 11 sanctions today.

4.

In sum, therefore, the complaint stated two claims that were nonfrivolous: a selective-enforcement claim under 42 U.S.C. § 1983, and a state-law claim under M.C.L. § 168.733. Neither claim was sanctionable under Rule 11. We agree with the district court, however, that plaintiffs' other claims were all sanctionable under that rule.

The same analysis for the most part applies to plaintiffs' motion for a temporary restraining order. But that motion focused exclusively on election fraud and contained only a single sentence on plaintiffs' nonfrivolous allegations about election challengers. With the exception of that sentence and counsel's discussion of their experts, then, the motion relied entirely on allegations that were factually frivolous, and was to that extent sanctionable under Rule 11.

B.

The defendants also argue, and the district court agreed, that counsel are liable for the entirety of the defendants' reasonable attorney's fees after December 14—because the plaintiffs failed to dismiss their case after it had concededly become moot. Under 28 U.S.C. § 1927, courts may award sanctions against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." Courts may award sanctions under this section "when an attorney knows or reasonably should know that a claim pursued is frivolous" and yet continues to litigate it. *Waeschle v. Dragovic*, 687 F.3d 292, 296 (6th Cir. 2012).

Here, plaintiffs themselves asserted in a petition to the Supreme Court that this case would become moot on December 14, 2020—the date Michigan's certified electors would cast their votes. Yet on December 15—when defendants sought plaintiffs' consent to a voluntary dismissal—counsel declined on the ground that the district court lacked jurisdiction to dismiss the case while it was on appeal. That excuse was makeweight: plaintiffs obviously could have voluntarily dismissed their appeal and complaint alike. Hence they unreasonably multiplied the proceedings by declining to dismiss their suit. *See Lemaster v. United States*, 891 F.2d 115, 118 (6th Cir. 1989).

The sanctioned attorneys now argue that the case gained "new life" when "an alternative slate of electors for Michigan was advanced in early January." That formulation is passive for a reason: what actually occurred in January is that the "alternative slate of electors" purported to elect themselves for the purpose of casting Michigan's electoral votes. And counsel do not explain why any competent attorney would take that self-election seriously for purposes of persisting in this lawsuit. Moreover, plaintiff's refusal to dismiss their suit had concrete consequences for defendants, who were forced to research and brief motions to dismiss that they should not have needed to file. The district court was right to impose sanctions under § 1927.

Finally, as noted above, the district court also invoked its inherent authority as an alternative basis for sanctions. But we need not review the court's exercise of that authority here. Unlike Rule 11, inherent-authority sanctions require a showing of bad faith in addition to frivolousness. *See Big Yank Corp. v. Lib. Mut. Fire Ins. Co.*, 125 F.3d 308, 314 (6th Cir. 1997). The court's inherent authority therefore does not support sanctions for the matters we have found non-sanctionable; and as to the sanctionable ones, Rule 11 and § 1927 sufficed.

## C.

### 1.

Some of the attorneys argue they were not responsible for the sanctionable filings in this case. Upon finding a violation of Rule 11, the court may sanction any attorney who "violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c). An attorney violates the rule directly by "presenting" an offending pleading to the court, such as "by signing, filing, submitting, or later advocating it." Fed. R. Civ. P. 11(b).

Separately, under 28 U.S.C. § 1927, the court may impose sanctions on attorneys whose conduct "falls short of the obligations owed by a member of the bar to the court." *Salkil*, 458 F.3d at 532. Here, the attorneys who appealed individually—Emily Newman, Stephanie Junttila, and Lin Wood, respectively—each argue they were not responsible for any frivolous filing under either standard.

a.

Although Emily Newman's name appeared on the complaint, she did not file or sign it. And at the sanctions hearing, Newman said she played only a minimal role in the litigation. Nobody at the hearing argued otherwise; in fact, Powell told the court that Newman "had no role whatsoever in the drafting and content of the[] complaints." And the district court made no factual findings to suggest that Newman was involved in drafting the complaint, the motion for preliminary injunction, or any other filing that defended plaintiffs' frivolous claims. Yet the court found that Newman was responsible for the complaint because it listed her as "Of Counsel." Fed. R. Civ. P. 11(c). The district court thus found Newman responsible more as a matter of form than as a matter of real responsibility. We therefore reverse the imposition of sanctions as to Newman.

b.

Stephanie Junttila did not appear in the case until December 8, 2020, by which time the other attorneys had already filed the complaint and the motion for a preliminary injunction. Yet the district court found that Junttila had "advocated" those filings—when she argued later that they were not sanctionable. But to seek relief on a claim is plainly different from arguing later that the claim was not frivolous. Junttila did only the latter; she never advocated the frivolous claims themselves. The district court's reasoning on this point was mistaken.

Junttila did personally decline defendants' request for a voluntary dismissal. But Junttila says she lacked the authority to agree to a voluntary dismissal, and nobody argues otherwise. To the contrary, Powell (to her credit) candidly stated at oral argument that she was responsible for the decision to continue the case on December 14. We therefore reverse the imposition of sanctions as to Junttila as well.

c.

Lin Wood says that someone placed his name on the complaint without his consent and that he knew nothing about this case until he "saw something in the newspaper about being sanctioned." But two months before, Wood filed a brief in the Delaware Supreme Court, in

which he said he "represented plaintiffs challenging the results of the 2020 Presidential election in Michigan and Wisconsin." Wood also tweeted about this case in December 2020, six months before the sanctions hearing, saying that "the enemy is running scared." Moreover, Powell said she "did specifically ask Mr. Wood for his permission" to put his name on the complaint; and Gregory Rohl submitted an affidavit stating that Wood "spearheaded" this suit. Suffice it to say that the district court did not clearly err when it found Wood not credible as to his involvement here. Nor, contrary to Wood's argument, was the district court required to undertake "an individual analysis" of his conduct before it could sanction him. *See NPF Franchising*, *LLC v. SY Dawgs, LLC*, 37 F.4th 369, 380-81 (6th Cir. 2022).

Wood also argues that the state defendants never sought any sanctions against him. The state defendants concede that point on appeal. Thus, as to Wood, we reverse only the court's award of attorney's fees to the state defendants.

2.

The remaining attorneys argue that the district court's sanctions were excessive. The district court awarded the City and the state defendants their full reasonable attorney's fees, required each attorney to take 12 hours of continuing legal education, and sent a referral for disciplinary proceedings to each attorney's respective bar association.

a.

Courts must limit any award of attorney's fees to only "those expenses directly caused" by the sanctionable conduct. *Cooter & Gell v. Hartmarx Corp*, 496 U.S. 384, 406-07 (1990). When a filing is entirely baseless, sanctionable conduct causes every expense reasonably incurred in responding to it. *Id.* But when, as here, a filing is partially non-sanctionable, courts may award only fees incurred in responding to the sanctionable parts. *Id.*; *see also* Fed. R. Civ. P. 11(c)(4); *Garner v. Cuyahoga Cnty. Juv. Ct.*, 554 F.3d 624, 635-47 (2009).

Here—given the district court's finding that the entire complaint was sanctionable—the court did not distinguish between fees generated in response to sanctionable and non-

sanctionable parts of the complaint. But courts are loath to prolong satellite litigation about fees, and here the record allows us to sort out those fees for ourselves.

i.

The district court awarded the state defendants $21,964.75 for 57.8 hours of work by two attorneys. The state attorneys' billing records show they spent about 6 hours responding in various ways to nonfrivolous parts of the complaint, including review of the expert reports on which counsel reasonably relied. Given the hourly rates for the attorneys involved, that work amounted to $2,325 in fees. We therefore reduce the fee award to the state defendants to $19,639.75.

The district court awarded the City $153,285.62, about $30,000 less than it had requested. The City's billing records show that its attorneys spent approximately 26 hours responding to the nonfrivolous components of plaintiffs' complaint and preliminary-injunction motion. This work amounted to $8,450 in fees, which we will deduct from the City's award.

Wood argues that the City's fee award included too many hours related to the sanctions litigation. "The time, effort, and money a party must spend to get another party sanctioned realistically is part of the harm caused by that other party's wrongful conduct." *Norelus v. Denny's Inc.*, 628 F.3d 1270, 1298 (11th Cir. 2010). Thus, under Rule 11 a court may award fees incurred while pursuing sanctions. *Id.*; *see also Chambers*, 501 U.S. at 32.

The record here, however, shows that the district court awarded fees for a number of tasks that bore little connection to sanctionable conduct in this case. Those tasks included, for example, reviewing a Michigan State Senate report about the elections, and responding to filings by intervenor Davis, whose involvement in the case was no fault of plaintiffs' counsel. The billing records show that together these tasks consumed about 37.5 hours, which amounted to an additional $12,025 in attorney's fees. The district court abused its discretion when it included those fees in the City's award. *See Cooter & Gell*, 496 U.S. at 406. With both of these deductions, then, we reduce the City's award to $132,810.62.

The sanctioned attorneys also argue that, as an intervenor, the City should not receive more in attorney's fees than the original defendants did. That argument is meritless: the City was all but compelled to intervene in this case, given (among other things) the plaintiffs' request that all the absentee ballots from the City's residents be "eliminat[ed]" from the vote count. Compl. ¶232.

ii.

The attorneys' remaining objections concern the court's non-monetary sanctions—namely the disciplinary referrals and the required legal education. As an initial matter, we reject the state defendants' argument that the attorneys' appeal of those sanctions is moot. Non-monetary sanctions cause continuing harm to counsel's reputation as attorneys, and thus present a live controversy even after an attorney complies with them. *See, e.g.*, *United States v. Talao*, 222 F.3d 1133, 1138 (9th Cir. 2000); *In re Goldstein*, 430 F.3d 106, 111 (2d Cir. 2005).

But we reject the attorneys' arguments on the merits. They assert that the district court violated the local rule governing disciplinary referrals; but that rule permits such referrals rather than proscribes them. *See* E.D.M.I. Local Rule 83.22(c). Nor do the nonmonetary sanctions violate the First Amendment. *See Mezibov*, 411 F.3d at 717.

*     *     *

We reverse the district court's imposition of sanctions against Emily Newman and Stephanie Junttila, respectively; we reverse the state defendants' fee award as to Lin Wood; we reduce the City's award to $132,810.62; and we reduce the state defendants' fee award to $19,639.75. Otherwise, the district court's imposition of sanctions in its August 25, 2021 order is affirmed.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 21-1785/1786/1787/22-1010

TIMOTHY KING, et al.,

    Plaintiffs,

L. LIN WOOD (21-1785); GREGORY J. ROHL, BRANDON
JOHNSON, HOWARD KLEINHENDLER, SIDNEY
POWELL, JULIA HALLER, and SCOTT HAGERSTROM
(21-1786); EMILY NEWMAN (21-1787); STEFANIE LYNN
JUNTTILA (22-1010),

    Interested Parties - Appellants,

    v.

GRETCHEN WHITMER; JOCELYN BENSON; CITY OF
DETROIT, MICHIGAN,

    Defendants - Appellees.

> **FILED**
> Jun 23, 2023
> DEBORAH S. HUNT, Clerk

Before:  BOGGS, KETHLEDGE, and WHITE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk